**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| FRIENDS OF ANIMALS | ) | |
| 777 Post Road, Suite 205 | ) | Civ. No. _____ |
| Darien, CT 06820 | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES BUREAU | ) | |
| OF LAND MANAGEMENT, an agency | ) | |
| of the United States | ) | |
| 1849 C Street NW, Rm. 5665 | ) | |
| Washington DC 20240 | ) | |
| | ) | |
|     Defendant. | ) | |
| | ) | |

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

1.    Plaintiff, Friends of Animals, brings this action on its own behalf and on behalf of its adversely affected members against the United States Bureau of Land Management (BLM) to challenge the following decisions pertaining to management of wild horses on federal public lands: (1) the November 28, 2017 Decision Record and Finding of No Significant Impact for the Pine Nut Mountains Herd Management Area Plan and Environmental Assessment, DOI-BLM-NV-C020-2016-0020-EA (hereinafter, "Pine Nut Ten-Year Plan"), and (2) the July 30, 2018 Decision Record and Finding of No Significant Impact for the Muddy Creek Wild Horse Herd Management Area Gather Plan and Environmental Assessment, DOI-BLM-UT-G020-2017-0032-EA (hereinafter, "Muddy Creek Ten-Year Plan").

2.    In adopting these plans BLM has disregarded, without explanation, its statutory and regulatory obligation to undertake roundup specific analysis of the horses and their habitat, and to ensure public participation in such decisions.

3.   Here, the Pine Nut Ten-Year Plan and the Muddy Creek Ten-Year Plan authorize ongoing, multiple roundups and removals of wild horses from the Pine Nut Mountains Herd Management Area (HMA) and the Muddy Creek HMA over at least the next ten years. Under the plans, no further analysis of the horses and their habitats is required, and no public notice and opportunity to comment will be provided before a future roundup takes place. Both plans identify and analyze the initial roundups (an initial roundup in 2018 of 600 or more horses from the Pine Nut Mountains HMA and an initial roundup in 2018 of approximately 148 wild horses from the Muddy Creek HMA). They do not, however, address the specifics of any future roundups that are authorized by the plans.

4.   The Wild Free-Roaming Horses and Burros Act (WHBA) and BLM's guidance documents require that decisions to round up wild horses be based on **current** information, and that management be at the minimal feasible level. 16 U.S.C. § 1333(a), (b)(2); *see also* BLM, Range Management Removal Manual, MS-4720 (2010) (hereinafter, "BLM Removal Manual"), § 4720.01. BLM must make a determination that wild horses are excess and removal is necessary prior to removing horses. 16 U.S.C. § 1333(b).

5.   BLM guidance also requires that BLM provide a site-specific National Environmental Policy Act (NEPA) analysis for each roundup decision and provide the public with opportunity to comment on such decisions. BLM, Wild Horses and Burros Management Handbook H-4700-1 (2010) (hereinafter, "BLM WHB Handbook") § 2.5. BLM guidance mandates that BLM issue roundup decisions thirty-one to seventy-six days before the proposed start date of the roundup, absent an emergency. BLM Removal Manual, § 4720.36; *see also* BLM WHB Handbook § 7.1.2.2.

6.   Citing this guidance, this Court recently stated that "before BLM can conduct a future gather, it must provide notice of its decision" within this timeframe and "provide an opportunity for administrative review of the decision." *Friends of Animals v. Haugrud*, 236 F. Supp. 3d 131, 135 (D.D.C. 2017).

7.   In adopting these plans, BLM has disregarded these obligations without explanation.

8.   Basing removal actions on the number of horses alone is not a sufficient justification to find that wild horses are "excess" and that it is necessary to remove the wild horses from public lands. *See Col. Wild Horse and Burro Coalition, Inc. v. Salazar*, 639 F. Supp. 2d 87, 96 (D.D.C. 2009) (finding it "difficult to think of a 'management activity' that is farther from a 'minimal feasible level' than removal").

9.   In adopting these plans, BLM has significantly increased the probability that future wild horse removals and fertility control treatments will be based on outdated data, including obsolete forage data and outdated appropriate management levels (AMLs), over the next ten years or more for both HMAs. Additionally, BLM has cut the public out of the process and instead proposes to authorize continued roundups for ten years or more with no opportunity for the public to review or comment on its decisions.

10.   Unfortunately, BLM desires to take this type of long-range, but short-sighted, approach to manage wild horses for nearly all HMAs.[1]

11.   In issuing the Pine Nut Ten-Year Plan and the Muddy Creek Ten-Year Plan, BLM violated its own policy and its statutory obligations under the WHBA. BLM also failed to fulfill its obligations under NEPA.

---

[1] BLM has proposed or approved similar long-term roundup plans for the following HMAs: Antelope and Triple B Complexes Gather Plan EA (DOI-BLM-NV-E030-2017-0010-EA); Silver King HMA  Wild Horse Gather EA (DOI-BLM-NV-L000-2017-0005-EA); Smoke Creek Complex Gather EA (DOI-BLM-NV-W030-2015-0001-EA); East Pershing Complex Gather Plan EA (DOI-NV-W010-2017-0009-EA); Seaman and White River HA Wild Horse Gather EA (DOI-BLM-NV-L000-2017-0006-EA); Caliente HA Complex Wild Horse Gather EA (DOI-BLM-NV-L030-2017-0031-EA); Stinkingwater HMA Population Management Plan EA (DOI-BLM-ORWA-B050-2017-0002-EA); Cold Springs HMA Population Management Plan EA (DOI-BLM-OR-V040-2015-022-EA); Paisley Desert HMA Wild Horse Gather Plan EA (DOI-BLM-OR-L050-2009-0065-EA); South Steens HMA Population Management Plan EA (DOI-BLM-OR-B070-2013-0027-EA); Warm Springs HMA Population Management Plan EA (DOI-BLM-ORWA-B050-2018-0016-EA); Hog Creek HMA Population Management Plan EA (DOI-BLM-ORWA-V000-2017-0026-EA); Eagle Complex Wild Horse Gather EA (DOI-BLM-NV-L030-2018-0004-EA); Onaqui Mountain HMA Population Control EA (DOI-BLM-UT-W010-2017-0009-EA); North Hills Wild Horse HMAP and Gather Plan EA (DOI-BLM-UT-C010-2018-0054-EA); Sulfur Wild Horse Gather Plan EA (DOI-BLM-UT-C010-2015-0011-EA); Bible Springs Complex Wild Horse Gather and Removal and Fertility Treatment Plan EA (DOI-BLM-UT-C010-2014-0035-EA).

12.  For these reasons, and as further alleged below, Friends of Animals seeks a declaration from the Court that BLM violated the WHBA and NEPA. Friends of Animals further requests that the Court vacate and remand the November 28, 2017 Pine Nut Ten-Year Plan Decision Record and Finding of No Significant Impact and the July 30, 2018 Muddy Creek Ten-Year Plan Decision Record and Finding of No Significant Impact, and prohibit the removal of wild horses from in and around both the Pine Nut Mountains HMA and the Muddy Creek HMA and/or the use of fertility control measures authorized by the plans.

**PARTIES**

13. Friends of Animals is a nonprofit, international animal advocacy organization incorporated in the state of New York since 1957. Friends of Animals has nearly 200,000 members worldwide. Friends of Animals and its members seek to free animals from cruelty and exploitation around the world, and to promote a respectful view of nonhuman, free-living and domestic animals. Friends of Animals informs its members about animal advocacy issues and its progress in addressing them through its magazine, ActionLine, its website, social media, and public events. Friends of Animals regularly advocate for the right of wild horses to live freely on public lands, and for more transparency and accountability in BLM's "management" of wild horses and burros.

14.  Friends of Animals and its members have a significant interest in the wild horses at the Pine Nut Mountains HMA and the Muddy Creek HMA. For example, Friends of Animals' member and contributor Craig Downer, a wildlife biologist specializing in the study of wild horses and their habitats, regularly visits the Pine Nut HMA and observes and studies the wild horses that reside there. Mr. Downer has written books about wild horses and has long evaluated the ramifications of the federal government's treatment of wild horse populations in the West. He has written articles about the benefits of wild horses to the ecosystem, including their positive role in fire suppression, as well as the impacts of the

fertility control pesticide porcine zona pellucida (PZP) on wild mares. Notably, Mr. Downer researched and composed a Pine Nut Mountain Ecological Report, with particular focus on wild horses, in July 2015. He also personally enjoys observing wild horses throughout the West. Mr. Downer and other members' professional and recreational interests in observing, studying, and photographing the wild horses would be injured if BLM proceeds with the proposed actions laid out in the Pine Nut Ten-Year Plan and the Muddy Creek Ten-Year Plan and/or any of the ten-year plans proposed by BLM. Friends of Animals members' injuries are fairly traceable to BLM's conduct and would be redressed by the relief sought by Friends of Animals in this case.

15.   Defendant, the United States Bureau of Land Management, is an agency located within the Department of the Interior. The agency administers over 245 million surface acres of public lands, most of which are in twelve Western states, including Nevada and Utah. The Pine Nut Mountains HMA and the Muddy Creek HMA are located on BLM-administered public land, and the agency is responsible for ensuring that federally-administered actions within the HMAs comply with the requirements of all federal laws.

## JURISDICTION AND VENUE

16.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question). This action presents a case and controversy arising under the WHBA and NEPA, federal statutes. This Court also has jurisdiction pursuant to 28 U.S.C. § 1346, as the United States is a defendant.

17.   This Court has authority to grant Plaintiff's requested relief pursuant to 28 U.S.C. §§ 2201-2202 (declaratory and injunctive relief) and 5 U.S.C. §§ 701-706 (Administrative Procedure Act).

18.   Venue properly lies in this Court pursuant to 28 U.S.C. § 1391(e) as Defendant, the Bureau of Land Management, is a federal agency headquartered in Washington, D.C.

## STATUTORY BACKGROUND

**A.      Wild Free-Roaming Horses and Burros Act.**

19.   In 1971, Congress passed the Wild Free-Roaming Horses and Burros Act (WHBA), 16 U.S.C. §§ 1331 *et seq*., finding that "wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West; that they contribute to the diversity of life forms within the Nation and enrich the lives of the American people; and that these horses and burros are fast disappearing from the American scene." 16 U.S.C. § 1331. Upon finding this, Congress stated its policy was that "wild free-roaming horses and burros shall be protected from capture, branding, harassment, or death, and to accomplish this they are to be considered in the area where presently found as an integral part of the natural system of public lands." *Id*.

20.   The WHBA requires BLM to "protect and manage wild free-roaming horses and burros as components of the public lands . . . in a manner that is designed to achieve and maintain a thriving, natural ecological balance on the public lands." 16 U.S.C. § 1333(a). Additionally, the WHBA requires management of wild horses and burros to be at "the minimal feasible level." *Id*.

21.   To do so, for each HMA, BLM must: (1) maintain a current inventory of wild horses in the management area; (2) determine the AML of wild horses that the HMA can sustain; and (3) determine the method of achieving the designated AML and managing horses within it. 16 U.S.C. § 1333(b)(1); 43 C.F.R. §§ 4710.2, 4710.3-1.

22.   BLM must manage wild horses "as self-sustaining populations of healthy animals in balance with other uses and the productive capacity of their habitat." 43 C.F.R. § 4700.0-6(a).

23.   BLM must undertake management activities affecting wild horses "with the goal of maintaining free-roaming behavior." 43 C.F.R. § 4700.0-6(c).

24.   In limited circumstances, the WHBA allows the removal of wild horses. However, prior to gathering or removing any wild horses from the range, the WHBA requires BLM to make a determination that: (1) "an overpopulation [of wild horses] exists on a given area of the public lands," and (2) "action is necessary to remove excess animals." 16 U.S.C. § 1333(b)(2).

25.   The WHBA defines the term "excess" as animals that "must be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area." 16 U.S.C. § 1332(f).

26.   The WHBA mandates that, when BLM is making a determination about whether an overpopulation exists, and action should be taken to remove excess animals, it should consult with various individuals. For example, BLM must consult with "qualified scientists in the field of biology and ecology, some of whom shall be independent of both Federal and State agencies," as has been recommended by the National Academy of Sciences, and others that it determines have scientific expertise and special knowledge of wild horse and burro protection, wildlife management, and animal husbandry as related to rangeland management. 16 U.S.C. § 1333(a).

**B.**     **The National Environmental Policy Act.**

27.   NEPA is our nation's basic charter for environmental protection.

28.   Congress enacted NEPA for two central purposes. First, Congress sought to ensure that all federal agencies examine the environmental impacts of their actions before acting. Second, Congress sought to provide the public with a statutory means to be informed about, and to comment on, the environmental impacts of proposed agency actions. *See* 40 C.F.R. § 1500.1. NEPA requires federal agencies to analyze the environmental impact of a particular federal action before proceeding with the action. *See* 42 U.S.C. § 4332(2)(C).

29.   Accordingly, before a federal agency can act in a way that significantly affects the quality of the human environment, NEPA requires the acting agency to prepare a detailed environmental impact statement (EIS) that discusses, among other things: "(i) the environmental impact of the proposed action; (ii) any adverse environmental effects; [and] (iii) alternatives to the proposed action." 42 U.S.C. § 4332(2)(C).

30.   The EIS is the cornerstone of NEPA. An EIS is required for all "major Federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(c). The requirement to prepare an EIS is broad and intended to compel agencies to take seriously the potential environmental consequences of a proposed action.

31.   Whether an agency action is "significant" enough to require preparation of an EIS involves "considerations of both context and intensity." 40 C.F.R. § 1508.27. The context of the action includes factors such as "society as a whole (human, national), the affected region, the affected interests, and the locality." 40 C.F.R. § 1508.27(a). Intensity "refers to the severity of impact" and requires BLM to consider several factors including: impacts of the action; unique characteristics of the geographic area; the degree to which the effects of on the quality of the environment are likely to be highly controversial; the degree to which the effects on the environment are highly uncertain or involve unknown risks; the degree to which the action may have a precedential effect; whether the action is related to other actions with individually insignificant but cumulatively significant impacts; and the degree to which the action may have an adverse effect on endangered or threatened species or their critical habitat. 40 C.F.R. § 1508.27(b).

32.   Agencies may prepare an Environmental Assessment (EA) to determine whether a proposed action requires preparation of an EIS or warrants a finding of no significant impact.

33.   An EA must take a "hard look" at the potential consequences of agency actions and provide enough evidence and analysis for determining whether to prepare an

EIS. Agencies must involve the public, to the extent practicable, in preparing this assessment. 40 C.F.R. § 1501.4(b).

34.   If the agency decides the impacts are not significant, it must supply a convincing statement of reasons why, and make its finding of no significant impact available to the public. 40 C.F.R. § 1501.4(e).

35.   A significant effect may exist even if the federal agency believes that, on balance, the effect will be beneficial. 40 C.F.R. § 1508.27(b)(1).

36.   Whether in an EA or EIS, an agency must adequately evaluate all potential environmental impacts of the proposed action. *See* 42 U.S.C. § 4332(2)(C). To meet this obligation, the federal agency must identify and disclose to the public all foreseeable impacts of the proposed action, including direct, indirect, and cumulative impacts. *See id.* § 4332(2); *see also* 40 C.F.R. §§ 1508.7, 1508.8.

37.   After preparing an EA or EIS, an agency may not simply rest on the original document. The agency must gather and evaluate new information that may alter the results of its original environmental analysis and continue to take a hard look at the environmental effects of its future planned actions. *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 374 (1989).

**C.**   **Applicable BLM Directives on Wild Horses.**

38.   BLM's WHB Handbook explains that:

> Before issuing a decision to gather and remove animals, the authorized officer shall first determine whether excess WH&B are present and require immediate removal. In making this determination, the authorized officer shall analyze grazing utilization and distribution, trend in range ecological condition, actual use, climate (weather) data, current population inventory, wild horses and burros located outside the HMA in areas not designated for their long-term maintenance and other factors such as the results of land health assessments which demonstrate removal is needed to restore or maintain the range in a [thriving, natural ecological balance].

BLM WHB Handbook, § 4.3.

39.   According to BLM's WHB Management Handbook, a minimum population size of 50 effective breeding animals, or a total population size of about 150 to 200 horses, is currently recommended to maintain an acceptable level of genetic diversity within reproducing wild horse populations. BLM WHB Handbook, § 4.4.6.3.

40.   BLM's regulations provide that it can close public lands to grazing use by all or a particular kind of livestock "if necessary to provide habitat for wild horses or burros, to implement herd management actions, or to protect wild horses or burros from disease, harassment or injury." 43 C.F.R. § 4710.5.

41. BLM directives state that an appropriate NEPA analysis and issuance of a decision is required prior to removing wild horses. *See* BLM Removal Manual, § 4720.2.21(C)(6) ("An appropriate NEPA analysis and issuance of a decision is required prior to removing animals."); *see also id*. § 4720.3 ("[T]he authorized officer shall conduct an appropriate site-specific analysis of the potential environmental impacts that could result from implementation of a proposed gather in accordance with [NEPA].").

42.   BLM's guidance documents also specify that a key element of its analysis will be to make a determination of whether excess wild horses are present that require immediate removal. *Id*. § 4720.31.

43.   BLM's guidelines specify that round up and removal decisions must be issued thirty-one to seventy-six days prior to the start of the proposed round up. BLM WHB Handbook, §§ 7.1, 7.1.2.2.

44. One of BLM's primary objectives for wild horse management is "[t]o ensure management activities are carried out at the minimum feasible level necessary to attain the objectives identified in approved land use plans (LUPs) and Herd Management Area Plans (HMAPs) and that free-roaming behavior is maintained." BLM, Wild Free-Roaming Horses and Burros Management Manual MS-4700 (2010), § 4700.02.

10

45.   According to BLM's regulations and WHB Handbook, HMAPs establish short- and long-term management and monitoring objectives for a specific wild horse herd and its habitat and are prepared with public involvement through a site-specific NEPA process. BLM WHB Handbook, §§ 2.5, 6, Appendix 4. HMAPs identify the actions to be taken to accomplish herd and habitat management objectives, such as identifying and setting objectives for herd composition, animal characteristics, and habitat development needs, and must be in conformance with the applicable LUPs. BLM WHB Handbook, §§ 2.5.2, 6; *see also* 43 C.F.R. § 4710.3-1 (requiring BLM to prepare an HMAP for each herd management area).

46.   The objectives set forth in an HMAP guide future wild horse management activities in an HMA or complex over the life of the plan. BLM WHB Handbook, Appendix 4.

47.   The purpose of an HMAP is to facilitate on-the-ground implementation of the selected management strategy. The HMAP includes a Monitoring Plan and Tracking Log/Project Implementation Schedule. BLM WHB Handbook, Appendix 4.

48.   Future decisions implementing on-the-ground decisions, such as roundups and removals, must be based on current information, proper NEPA analysis, and public participation. *Id.* §§ 4.3, 4.4.6.4, 7.1, 7.1.2, 7.1.2.1; *see also* BLM Management Considerations Manual, MS-4710 (2010), § 4710.23.; BLM Removal Manual § 4720.3; BLM, National Environmental Policy Handbook, H-1790-1 (2008).

### FACTUAL ALLEGATIONS

A.   **Pine Nut Ten-Year Plan.**

1.   **Pine Nut Mountains Herd Management Area.**

49.   The Pine Nut Mountains HMA and the Pine Nut Mountains herd area (HA) are located within the Pine Nut Mountains.

50.   The Pine Nut Mountain range includes approximately 397,899 acres of mixed ownership land (public, private, and Indian trust land).

51.   The Pine Nut Mountains HMA is located in the northern portion of the Pine Nut Mountains, in Douglas, Lyon, and Carson City Counties, Nevada.

52.   The Pine Nut Mountains HMA is within the administrative boundary of BLM's Carson City District, Sierra Front Field Office.

53.   The established boundary of the HMA encompasses approximately 90,900 acres of public lands and 14,692 acres of private lands.

54. The topography of the range varies from approximately 5,000 feet in elevation to over 9,000 feet in elevation.

55. The wild horses on the Pine Nut Mountain range were the subject of the 1961 American drama film, *The Misfits*, written by Arthur Miller, directed by John Huston, and starring Clark Gable, Marilyn Monroe and Montgomery Clift.

56.   In 1971, when Congress passed the WHBA, wild horses were present in or near the area now designated as the Pine Nut Mountains HMA.

57.   The AMLs were established in 1995 in the Final Multiple Use Decision (FMUD) which established the AMLs by individual grazing allotments within the HMA. The combined total AML for the HMA is between 118 to 179 wild horses.

58. There are nine grazing allotments within the Pine Nut Mountains HMA: Buckeye (AML 27-41); Churchill Canyon (AML 9-13); Clifton (AML 24-37); Eldorado Canyon (AML 15-22); Hackett Canyon (AML 10-15); Mill Canyon (AML 17-25); Rawe Peak (AML 3-5); Sand Canyon (AML 5-8); and Sunrise (AML 9-13).

59. According to BLM, in 1995, the available forage was divided evenly between livestock and wild horses by grazing allotment. The FMUD established a maximum utilization rate of 55% for the combined use by livestock and wild horses.

60.   According to the Final Summary of Current Conditions, vegetation in the Pine Nut Mountains HMA is dominated by needlegrasses, Indian rice grass, squirreltail, sagebrush, rabbitbrush, bitterbrush, and pinyon-juniper woodlands.

61.   The most recent aerial inventory of wild horses within and outside of the Pine Nut Mountains HMA was conducted for each allotment in April 2016. At that time, a total of 536 horses were counted both within and outside of the Pine Nut Mountains HMA. Approximately 222 of the 536 horses were outside the HMA, which means only 314 horses were observed within the Pine Nut Mountains HMA. The counts included the following numbers of horses observed within each of the designated allotments: Churchill Canyon—8 horses; Clifton—162 horses; Eldorado Canyon—92 horses; Hackett Canyon—24 horses; Mill Canyon—22 horses; Sand Canyon—4 horses; and Sunrise—2 horses. No horses were observed in Buckeye and Rawe Peak.

62.   Based on the 2016 survey, BLM estimated that the number of horses within the surveyed area (both within and outside of the HMA) was 579 horses. BLM concluded that by 2017, the current population of wild horses both within and outside the HMA would be 694 horses. This number includes an assumed population increase of 20% despite the fact that the wild horse population has been observed to increase only 17% per year.

63.   Based on the numbers provided, in April 2016, 314 wild horses resided within the Pine Nut Mountains HMA. BLM did not provide a 2017 population estimate for horses only within the Pine Nut Mountains HMA.

64.   According to BLM, wild horses have reduced the forage production on four of the grazing allotments: Clifton, Eldorado Canyon, Hackett Canyon, and Mill Canyon. These four allotments make up 46% of the HMA.

65.   Based on the numbers provided, in April 2016, a total of 300 wild horses resided within the four grazing allotments where the initial roundup will take place, and only fourteen horses resided in the remaining 54% of the HMA.

66.   According to BLM, livestock have not grazed these four allotments for several decades.

67.   According to BLM, the forage production on these four allotments has been reduced by approximately 50% due to wild horse grazing.

68.   The last roundup of the Pine Nut Mountains wild horses occurred in December 2010. At that time, according to the 2010 Clan Alpine, Pilot Mountain, and Pine Nut Herd Management Areas Gather Plan, DOI-BLM-NV-C010-2010-0019-EA, the population within the Pine Nut Mountains HMA was estimated to be approximately 148 horses. During that gather, BLM rounded up forty-five mares, treated the mares with PZP-22, and released them back into the HMA. Sixty-five wild horses were permanently removed.

### 2. The 2001 Carson City Field Office Consolidated Resource Management Plan.

69.   The 2001 Carson City Field Office Consolidated Resource Management Plan (hereinafter, "Carson City RMP") provides that all designated wild horse and burro ranges are devoted primarily to the protection and preservation of wild horses or burros.

70.   According to the Carson City RMP, any future adjustments in wild horses must be based on consultation with interested parties and a current analysis of data from monitoring studies, including the use of vegetation study techniques to measure ecological status and trend, grazing utilization and distribution, actual use information, and climatic data.

71.   According to the Carson City RMP, AMLs must be determined for wild horses through the resource management planning process and wild horses must be considered comparable with other resource values in the formulation of resource management plans and managed as self-sustaining populations of healthy animals in balance with other uses and the productive capacity of their habitat.

72.   According to the Carson City RMP, horse management actions must be at the minimum feasible level and BLM is obligated to maintain sound thriving populations of wild horses within HMAs.

73.   According to the Carson City RMP, wild horse ranges must be designated when it is determined to be in the public interest to manage HMAs principally, but not necessarily exclusively, for wild horses.

74.   According to the Carson City RMP, in developing an HMAP for the Pine Nut Mountains HMA, the plan must be focused on wild horse management through maintaining or improving wild horse populations and habitats, development of water sources, and population and habitat monitoring studies.

75.   According to the Carson City RMP, an environmental review (i.e. environmental assessment) must be prepared before any projects, including wild horse roundups and removals, are developed in order to properly consider whether implementation, modification, or abandonment of the project may be considered depending on the identified impacts.

### 3.      The Proposed Pine Nut Mountains Herd Management Area Plan.

76.   The primary purpose of the Pine Nut Mountains HMAP is to outline and implement management action necessary to achieve and maintain a thriving natural ecological balance and multiple-use relationships by conducting roundups and removals of wild horses and/or implementing fertility control measures, outlining habitat goals, monitoring methods, and insuring genetic diversity of the horses within the Pine Nut Mountains HMA.

77.   Targets of the Pine Nut Mountains HMAP include limiting forage utilization to 35% use in the Mill Canyon, Clifton, Eldorado Canyon, and Hackett Canyon allotments.

78.   The Pine Nut Mountains HMAP indicates that, if habitat objectives are not met or substantially improving by 2020, management measures such as more frequent roundups and/or adjustments to AMLs for some of the allotments will be implemented.

79.   The Pine Nut Mountains HMAP further provides that emergency removals will be conducted if visual observations of wild horses show any indication of poor body condition due to drought, wildfire, range deterioration, or other unplanned/unforeseen events.

80.   The Pine Nut Mountains HMAP indicates that, when analysis shows low diversity, young horses from other HMAs or areas outside of the HMA, will be released into the HMA.

81.   The Pine Nut Mountains HMAP provides that the Pine Nut Mountains HMA will be monitored annually and will guide annual management actions over the next ten years, and wild horse inventories will be conducted on a yearly basis.

82.   According to the Pine Nut Mountains HMAP, long-term evaluations will be completed at roughly ten-year intervals, or as needed, and any significant changes needed as a result of these evaluations, such as adjustments in AML, may require appropriate NEPA analysis and documentation prior to implementation.

83.   According to the Pine Nut Mountains HMAP, the initial roundup was scheduled for January 2018, based on funding, available holding space, and national priorities, and would only occur in Clifton, Eldorado Canyon, Mill Canyon and Hackett Canyon grazing allotments. The target would be to reduce the wild horse populations to the low AML for each of these allotments. All of the horses outside of the HMA would be rounded up and removed as well.

84.   According to the Pine Nut Mountains HMAP, the initial roundup would remove approximately 338 wild horses in the four allotments. Additionally, 266 wild horse

would be removed from outside of the HMA. In total, approximately 600 wild horses would be rounded up.

85.   To the best of Friends of Animals' knowledge, this roundup has not yet occurred due to protests from the community.

86.   The Pine Nut Mountains HMAP does not specifically state how many horses within the Pine Nut Mountains HMA will be rounded up and removed over the ten-year life of the plan.

87.   The Pine Nut Mountains HMAP does not specifically state that future roundups will only include horses from Clifton, Eldorado Canyon, Hackett Canyon, and Mill Canyon.

88.   The Pine Nut Mountain HMAP also indicates that the Fish Springs area, an area within the original herd area that was removed from the HMA in 1983, will be evaluated for suitability and possible designation as an HMA. Around twenty-five wild horses will be allowed to remain in this area during the evaluation.

89.   According to the Pine Nut Mountains HMAP, future management actions will include roundups to maintain horses within AML, roundups in emergency circumstances, and fertility control.

90.   According to the Pine Nut Mountains HMAP, in ten years (2028) BLM will evaluate the effectiveness of the HMAP in meeting or making progress towards meeting the targets identified in the HMAP, including possible adjustments to the AML and possible adjustments to the HMA boundaries.

91.   BLM completed a Summary of Current Conditions on June 7, 2016 (Summary). The Summary was prepared because BLM determined that, based on resource monitoring and wild horse population inventories, the AML may no longer be appropriate.

92.   The Summary found that plant species palatable to horses and livestock have declined and wild horse utilization of perennial grass species has exceeded maximum use levels within these four allotments.

93.   According to BLM, current monitoring data suggests that the current carrying capacity is approximately half of what it was when the AMLs were set in 1995.

**4.      Environmental Review for the Pine Nut Ten-Year Plan.**

94.   A draft Pine Nut Mountains Wild Horse Gather Plan EA was made available to the public for comment on December 22, 2016.

95.   The proposed action included the adoption of a Pine Nut Mountains HMAP, and an initial gather of approximately 500 horses from within the four grazing allotments (Clifton, Eldorado Canyon, Mill Canyon, and Hackett Canyon) and areas outside of the Pine Nut Mountains HMA. According to the draft EA, initial roundup activities would not occur in the remaining grazing allotments because they are currently within AML.

96.   According to the draft EA, the purpose of the proposed action is "restore a thriving natural ecological balance and multiple use relationship on public lands in the area."

97.   According to the draft EA, the need for the proposed action "arises from impacts caused from the current overpopulation of wild horses."

98.   The proposed action (Alternative A) and Alternatives B and C included the adoption of the Pine Nut Mountains HMAP that would be implemented to manage wild horses in the Pine Nut Mountains HMA over the next ten years.

99.   All three action alternatives included rounding up and removing wild horses from within the Pine Nut Mountains HMA to low AML for each grazing allotment for the next ten years.

100.      The action alternatives were very similar to one another apart from fertility control. The preferred alternative (Alternative A) included initially using PZP-22,

Zona Stat-H, or GonaCon. Alternative B was the same as Alternative A, but without any type of fertility control. Alternative C was the same as Alternative A, but includes gelding and spaying as an additional population control method, and managing twenty percent of the male population as a non-breeding population of geldings and twenty percent of the female population as a non-breeding population of mares.

101.    BLM received close to 5,000 comment submissions during the public comment period.

102.    Friends of Animals and others commented that BLM cannot authorize the continued removal and harassment of wild horses for ten years into the future.

103.    Friends of Animals and others commented that BLM failed to consider a reasonable range of alternatives.

104.    Friends of Animals suggested BLM circulate a new EIS or EA that considers five reasonable alternatives, including: (1) re-calculating AMLs to meet the needs of the Pine Nut Mountain wild horses; (2) reconsidering existing grazing permits and other uses; (3) natural population controls, such as protecting mountain lions as natural predators; (4) allowing horses in the expanded HA; and (5) making on the ground individual excess determinations consistent with BLM's responsibilities under the WHBA prior to any removals or harassment (including fertility control).

105.    Friends of Animals and others commented on the inadequate analysis of the impacts of the proposed action.

106.    Friends of Animals and others commented that BLM failed to fully consider the impacts of the proposed action and alternatives on the genetic viability of wild horses in the Pine Nut Mountains HMA.

107.    Friends of Animals and others commented that BLM failed to fully consider the impacts of fertility control measures.

108.     Friends of Animals and others commented that BLM failed to fully consider the positive impacts of wild horses on the environment, and the impact of the no action alternative.

109.     Friends of Animals and others commented that the AMLs within the Pine Nut Mountains HMA should be re-evaluated and increased in order to protect the present wild horse population without roundups, removals, and fertility control.

110.     On November 28, 2017, BLM issued the final Pine Nut Mountains HMAP, an EA, a Decision Record, and a Finding of No Significant Impact.

111.     The Pine Nut Ten-Year Plan authorized initially rounding up and removing 600 or more wild horses from both within and outside of the HMA using either helicopter or bait/water trapping to achieve low AML in each grazing allotment within the HMA, and applying fertility control treatments to slow the growth of the wild horse population. Additional management actions include continual roundups throughout the HMA and removals, as well as fertility control treatments, to be carried out over the next ten years.

112.     In the Pine Nut Ten-Year Plan, BLM does not consider any of the alternatives proposed by Friends of Animals.

113.     In the Pine Nut Ten-Year Plan, BLM does not consider any additional alternatives from the draft EA.

114.     The Pine Nut Ten-Year Plan does not include any genetic reports on the wild horses in the Pine Nut Mountains HMA.

115.     The Pine Nut Ten-Year Plan does not include any information about the cumulative impacts of past roundups and proposed future roundups on the genetic variability and viability of the wild horses in the Pine Nut Mountains HMA.

116.     The Pine Nut Ten-Year Plan does not take a hard look at the impact of the proposed action and future actions on the genetic viability of wild horses in the Pine Nut Mountains HMA.

117.     The Pine Nut Ten-Year Plan authorizes continued use of fertility control treatments, including PZP and GonaCon.

118.     The impacts from PZP and GonaCon are controversial and involve unique and unknown risks.

119.     The Pine Nut Ten-Year Plan concluds that PZP contraception appears to be temporary and reversible and does not appear to cause out of season births.

120.     However, there are several studies that cast serious doubt on BLM's conclusions about PZP.

121.     There are several studies demonstrating that fertility control treatments may cause irreversible sterility in mares. Moreover, the most recent and reliable data indicate that these fertility controls could also cause out of season births, band instability, and a general decline in immune function.

122.     Additionally, PZP and GonaCon could cause abscesses at the injection site, negative impacts on organ systems, and long-term health effects.

123.     The Pine Nut Ten-Year Plan fails to take a hard look at the impacts of administering fertility control as authorized in the Pine Nut Ten-Year Plan.

124.     The Pine Nut Ten-Year Plan does not consider scientific information about the positive impacts of wild horses, including that wild horses help spread and fertilize seeds over large areas, prevent fires, and can benefit ecosystems.

125.     The Pine Nut Ten-Year Plan does not take a hard look at the potential for wild horses to self-regulate their populations.

### 5.  BLM's Authorization to Remove Wild Horses.

126.  BLM did not commit to analyze grazing utilization and distribution, trends in ecological conditions, actual use, and climate data before making future decisions under the Pine Nut Ten-Year Plan.

127.  BLM did not commit to provide public notice before undertaking future roundups under the Pine Nut Ten-Year Plan.

128.  BLM did not commit to provide public participation in future roundup decisions under the Pine Nut Ten-Year Plan.

129.  Range conditions, wild horse numbers, and the appropriate management level can change each year.

130.  BLM does not have information that removal is necessary throughout the term of the Pine Nut Ten-Year Plan.

131.  BLM's Pine Nut Ten-Year Plan is based on AMLs established in the 1995 FMUD.

132.  BLM failed to consider what qualifies as a self-sustaining, healthy population of wild horses and how the Pine Nut Ten-Year Plan would impact the health and sustainability of wild horses.

133.  BLM's Pine Nut Ten-Year Plan specifically states that, if Congress were to lift the current appropriations restrictions, then it is possible that horses removed from the Pine Nut Mountains HMA over the next ten years could be euthanized or sold without limitation.

### B.  Muddy Creek Ten-Year Plan.

### 1.  Muddy Creek Herd Management Area.

134.  The Muddy Creek HMA is located six miles southeast of Emery, Utah, and approximately twenty miles south of Ferron, Utah, in the San Rafael Swell.

135.     The Muddy Creek HMA is within the administrative boundary of BLM's Green River District, Price Field Office.

136.     The Muddy Creek HMA encompasses approximately 283,400 acres of federal and state lands.

137.     In 1971, when Congress passed the WHBA, wild horses were present in or near the area now designated as the Muddy Creek HMA.

138.     Portions of eleven grazing allotments (Lone Tree, Globe Link, South Sid & Charley, Mussentuchit, Last Chance, Red Canyon, Hondo, McKay Flat, Temple Mountain, Taylor Flat, and Dry Wash) are part of the Muddy Creek HMA, and all of these allotments have grazing privileges. Several of the sites have overlapping use between wild horses and livestock causing significant competition between wild horses and livestock at these sites.

139.     The Muddy Creek HMA supports vegetation types ranging from pinyon and juniper woodland to salt desert shrub, and grasslands. The salt desert shrub vegetation type dominates the HMA. Primary forage species are Indian ricegrass, galletta, sand dropseed, winter fat, and fourwing saltbush.

140.     The Muddy Creek has several springs and seeps as well as 40 reservoirs and the Muddy Creek itself.

141.     An aerial population inventory estimated that, in April 2017, approximately 161 to 185 adult horses resided within the Muddy Creek HMA. Based on this number, using an estimated 15% annual reproductive rate, BLM estimated that the population was approximately 195 horses on March 1, 2018, and that it would be expected to grow to approximately 224 by Fall 2018.

142.     According to BLM, additional horses may reside within the Muddy Creek HMA because: (1) wild horses may have been captured illegally by members of the

public in other wild horses areas and moved into this area, and (2) domestic or estray horses may have been released into the HMA.

143.     The AML for the Muddy Creek HMA was originally established in the 1989 San Rafael Resource Management Plan (hereinafter, "1989 San Rafael RMP").

144.     The AML for the Muddy Creek HMA was adjusted in 2008 and set at 75 to 125 wild horses after the boundaries of Muddy Creek HMA were expanded to include the southern portion of the Sinbad HMA, adding approximately 8,710 acres to the HMA. At that time, BLM determined that wild horses would no longer be allowed in the northern portion of the Sinbad HMA and the Robbers Roost HMA would be made into an HA with an AML of zero.

145.     Wild horses lost a significant amount of habitat when the HMAs merged and Robbers Roost lost HMA status.

146.     BLM made only a slight AML adjustment (from 60 to 100 horses to 75 to 125 horses) to the Muddy Creek HMA when it added the approximately 8,710 acres to the Muddy Creek HMA and removed Robbers Roost from HMA status.

147.     Since 1989, four roundups have occurred within the Muddy Creek HMA in order to keep the wild horse population within AML. The last roundup occurred in July 2009 when BLM rounded up and permanently removed 86 wild horses, leaving approximately 75.

148.     According to BLM, the overriding limiting factor for the carrying capacity of wild horses in the Muddy Creek HMA is not the available forage; instead, it is the supply of reliable water during the summer months.

149.     According to BLM, the AML in the Muddy Creek HMA alone is not large enough to maintain genetic diversity without introduction of horses from outside the HMA.

150.     In 2002, Dr. Gus Cothran reported that genetic analysis from 62 wild horses rounded up from the Muddy Creek HMA in 2001 showed a very low observed heterozygosity (Ho) or individual variability. In response, BLM began translocating wild horses from other HMAs into the Muddy Creek HMA in order to improve genetic diversity. The proposed action would continue this practice.

### 2.     The 2008 Price Field Office Resource Management Plan.

151.     The Price Field Office Resource Management Plan (hereinafter, "Price RMP") provides that wild horses will be managed "to achieve and maintain viable, vigorous, and stable populations."

152.     According to the Price RMP, any "[i]ncrease and decrease in available forage will be adjusted on a case-by-case basis to support Standards for Rangeland Health."

153.     According to the Price RMP, "[e]valuation of the RMP will generally be conducted every five years per BLM policy, unless unexpected actions, new information, or significant changes in other plans, legislation, or litigation triggers an evaluation."

154.     According to the Price RMP, "BLM will continue to actively seek the views of the public, using techniques such as news releases and web-site information to ask for participation and inform the public of new and ongoing project proposals, site-specific planning, and opportunities and timeframes for comment."

155.     The Price RMP combined the southern portion of the Sinbad HMA, which includes McKay Flat, with the Muddy Creek HMA, and removed all wild horses from the Robbers Roost HMA, leaving only two areas for wild horses—Muddy Creek HMA (283,400 acres; AML 75-125 horses) and Range Creek HMA (55,000 acres; AML 75-125 horses).

156.     Robbers Roost lost its status as an HMA, but maintained HA status for future management considerations should conditions change.

157.     According to the Price RMP, the AML in the Muddy Creek HMA will be periodically evaluated and subject to adjustment in HMA gather plans and environmental assessments based on monitoring data and best science methods.

158.     According to the Price RMP, BLM intended to prepare an HMAP for the Muddy Creek HMA by 2015. However, according to the September 2015 Price RMP Five-Year Evaluation Report, BLM modified its decision and now intends to prepare a HMAP for the Muddy Creek HMA by 2020.

159.     According to the Price RMP Five-Year Evaluation Report, BLM intends to adjust the northern boundary of the Muddy Creek HMA.

### 3.     Environmental Review for the Muddy Creek Ten-Year Plan.

160.     A draft Muddy Creek Wild Horse Herd Management Area Gather Plan EA was made available to the public on April 19, 2018.

161.     According to the draft EA, the purpose of the proposed action is "to remove excess wild horses from within and outside the HMA, to manage wild horses to achieve and maintain established AML ranges for the HMA and to reduce the wild horse population growth rate in order to prevent undue or unnecessary degradation of the public lands by protecting rangeland resources from deterioration associated with an overpopulation of excess wild horses within and outside the HMA, and to restore a thriving natural ecological balance and multiple use relationship" on the Muddy Creek HMA.

162.     According to the draft EA, the need for the proposed action "is to protect rangeland resources and to prevent unnecessary or undue degradation of the public lands associated with excess populations of wild horses within the HMA and use of rangeland resources by horses outside the HMA boundaries."

163.     According to the draft EA, "[u]tilization levels on the HMA have been moderate on most of the uplands and heavy near portions of the Muddy Creek, as well as a few springs and reservoirs."

164.     The proposed action included initially rounding up and removing approximately 148 wild horses (approximately 66% of the existing wild horses) and returning to conduct follow-up roundups over a ten-year period to remove additional wild horses to maintain the low range of AML. BLM would also apply fertility control as soon as the population is within AML.

165.     Neither the no action alternative nor the two action alternatives include the development or adoption of an HMAP.

166.     Both action alternatives include rounding up and removing wild horses from within the Muddy Creek HMA to low AML for the next ten years.

167.     The action alternatives were very similar to one another apart from fertility control. The proposed alternative (Alternative 2) included using PZP-22, GonaCon, or the most current formulation as soon as the population is within AML. Alternative 3 would be the same as the proposed alternative, but without any type of fertility control or sex ratio adjustment.

168.     BLM received close to 4,000 comment submissions during the public comment period.

169.     Friends of Animals and others commented that BLM cannot authorize the continued removal and harassment of wild horses for ten years into the future.

170.     Friends of Animals and others commented that BLM failed to consider a reasonable range of alternatives.

171.     Friends of Animals suggested BLM circulate a new EIS or EA that considers four reasonable alternatives, including: (1) re-calculating the AML to meet the needs of the Muddy Creek wild horses; (2) natural population controls, such as protecting mountain lions as natural predators; (3) limiting conflicting uses that have adverse impacts to the environment, such as livestock grazing; and (4) making on-the-ground individual

excess determinations consistent with BLM's responsibilities under the WHBA prior to any removals or harassment (including fertility control).

172.    Friends of Animals and others commented on the inadequate analysis of the impacts of the proposed action.

173.    Friends of Animals and others commented that BLM failed to fully consider the impacts of the proposed action and alternatives on the genetic viability of wild horses in the Muddy Creek HMA.

174.    Friends of Animals and others commented that BLM failed to fully consider the impacts of fertility control measures.

175.    Friends of Animals and others commented that BLM failed to fully consider the positive impacts of wild horses on the environment, and the impact of the no action alternative.

176.    Friends of Animals and others commented that the AMLs within the Muddy Creek HMA should be re-evaluated and increased in order to protect the present wild horse population without roundups, removals, and fertility control.

177.    On July 30, 2018, BLM issued the final Muddy Creek Wild Horse Gather EA, a Decision Record, and a Finding of No Significant Impact.

178.    The Muddy Creek Ten-Year Plan authorizes the initial roundup and permanent removal of 60-70% of the wild horse population, or approximately 149 wild horses, using helicopter or bait/water trapping to achieve low AML, and applying fertility control treatments. Additional management actions include continual roundups and removals as well as fertility control treatments to be carried out over the next ten years.

179.    In the Muddy Creek Ten-Year Plan, BLM does not consider any of the alternatives proposed by Friends of Animals.

180.    In the Muddy Creek Ten-Year Plan, BLM does not consider any additional alternatives from the draft EA.

181.     The Muddy Creek Ten-Year Plan does not include any genetic reports on the wild horses in the Muddy Creek HMA.

182.     The Muddy Creek Ten-Year Plan does not include any information about the cumulative impacts of past roundups and proposed future roundups on the genetic variability and viability of the wild horses in the Muddy Creek HMA.

183.     The Muddy Creek Ten-Year Plan does not take a hard look at the impact of the proposed action and future actions on the genetic viability of the wild horses in the Muddy Creek HMA.

184.     The Muddy Creek Ten-Year Plan authorizes continued use of fertility control treatments, including PZP and GonaCon.

185.     The impacts from PZP and GonaCon are controversial and involve unique and unknown risks.

186.     The Muddy Creek Ten-Year Plan concludes that PZP contraception appears to be temporary and reversible and does not appear to cause out of season births.

187.     However, there are several studies that cast serious doubt on BLM's conclusions about PZP.

188.     There are several studies demonstrating that fertility control treatments may cause irreversible sterility in mares. Moreover, the most recent and reliable data indicate that these fertility controls could also cause out of season births, band instability, and general decline in immune function.

189.     Additionally, PZP and GonaCon could cause abscesses at the injection site, negative impacts on organ systems, and long-term health effects.

190.     The Muddy Creek Ten-Year Plan fails to take a hard look at the impacts of administering fertility control as authorized in the Muddy Creek Ten-Year Plan

191.     The Muddy Creek Ten-Year Plan does not consider scientific information about the positive impacts of wild horses, including that wild horses help spread and fertilize seeds over large areas, prevent fires, and can benefit ecosystems.

192.     The Muddy Creek Ten-Year Plan does not take a hard look at the potential for wild horses to self-regulate their populations.

**4.     BLM's Authorization to Remove Wild Horses from the Muddy Creek Herd Management Area.**

193.     BLM did not commit to analyze grazing utilization and distribution, trends in ecological conditions, actual use, and climate data before making future decisions under the Muddy Creek Ten-Year Plan.

194.     BLM did not commit to provide public notice before undertaking future roundups under the Muddy Creek Ten-Year Plan.

195.     BLM did not commit to provide public participation in future roundup decisions under the Muddy Creek Ten-Year Plan.

196.     Range conditions, wild horse numbers, and the appropriate management level can change each year.

197.     BLM does not have information that removal is necessary throughout the term of the Muddy Creek Ten-Year Plan.

198.     BLM's Muddy Creek Ten-Year Plan is based on AMLs established in 1989 and adjusted in 2008, when the boundaries of the HMA were expanded to include the southern portion of the Sinbad HMA and Robbers Roost lost HMA status. At that time, horses were no longer allowed in either the northern portion of the Sinbad HMA or Robbers Roost.

199.     BLM failed to consider what qualifies as a self-sustaining, healthy population of wild horses and how the Muddy Creek Ten-Year Plan would impact the health and sustainability of wild horses.

200.     The Muddy Creek Ten-Year Plan specifically states that, if Congress were to lift the current appropriations restrictions, then it is possible that wild horses removed from the Muddy Creek HMA over the next ten years could be euthanized or sold without limitation.

## CLAIMS

### FIRST CAUSE OF ACTION

### (VIOLATION OF THE WILD FREE-ROAMING HORSES AND BURROS ACT)

201.    Friends of Animals herein incorporates all allegations contained in the preceding paragraphs.

202.    On the above facts and legal obligations, Defendant violated the WHBA by failing to make an appropriate determination that wild horses were excess and removal is necessary prior to authorizing the permanent removal of horses over a ten-year period from the Pine Nut Mountains Herd Management Area.

203.  On the above facts and legal obligations, Defendant violated the WHBA by failing to make an appropriate determination that wild horses were excess and removal is necessary prior to authorizing the permanent removal of horses over a ten-year period from the Muddy Creek Herd Management Area.

204.   Defendant's Pine Nut Ten-Year Plan is therefore arbitrary and capricious, an abuse of discretion, and not in accordance with law, and should be vacated. 5 U.S.C. § 706.

205.  Defendant's Muddy Creek Ten-Year Plan is therefore arbitrary and capricious, an abuse of discretion, and not in accordance with law, and should be vacated. 5 U.S.C. § 706.

**SECOND CAUSE OF ACTION**

**(APA: UNEXPLAINED DEPARTURE FROM AGENCY GUIDELINES)**

206.   Friends of Animals herein incorporates all allegations contained in the preceding paragraphs.

207.   BLM's policy mandates that BLM issue a site-specific NEPA document prior to each roundup.

208.   BLM's policy further mandates that a removal decision should be issued thirty-one to seventy-six days prior to removal.

209.   The Pine Nut Ten-Year Plan authorizes continued roundups and removals for ten years without prior notice to the public and an opportunity to comment on future roundups.

210.  The Muddy Creek Ten-Year Plan authorizes continued roundups and removals for ten years without prior notice to the public and an opportunity to comment on future roundups.

211.   The Pine Nut Ten-Year Plan was issued more than seventy-six days before the initial roundup and other proposed future roundups.

212.  The Muddy Creek Ten-Year Plan was issued more than seventy-six days before the initial roundup and other proposed future roundups.

213.   Defendant did not provide any explanation for departing from BLM's policy when it approved the Pine Nut Ten-Year Plan.

214.  Defendant did not provide any explanation for departing from BLM's policy when it approved the Muddy Creek Ten-Year Plan.

215.   Defendant's failure to follow its own policies, without explanation, when issuing the Pine Nut Ten-Year Plan is arbitrary, capricious, an abuse of discretion, and not in accordance with law or required procedure, and must be set aside under the Administrative Procedure Act, 5 U.S.C. § 706.

216.  Defendant's failure to follow its own policies, without explanation, when issuing the Muddy Creek Ten-Year Plan is arbitrary, capricious, an abuse of discretion, and not in accordance with law or required procedure, and must be set aside under the Administrative Procedure Act, 5 U.S.C. § 706.

### THIRD CAUSE OF ACTION

### (VIOLATION OF NEPA: FAILURE TO PREPARE AN ENVIRONMENTAL IMPACT STATEMENT)

217.  Friends of Animals herein incorporates all allegations contained in the preceding paragraphs.

218.  The implementation of the Pine Nut Ten-Year Plan, including rounding up 600 wild horses in the initial roundup and removing an unidentified number of horses over the next ten years, from in and around the Pine Nut Mountains Herd Management Area and administering fertility control treatment to an undisclosed number of mares, constitutes a major federal action that will significantly affect the quality of the human environment, and therefore an Environmental Impact Statement is required under NEPA.

219.  The implementation of the Muddy Creek Ten-Year Plan, including continual removals of an undisclosed number of horses over the next ten years, constitutes a major federal action that will significantly affect the quality of the human environment, and therefore an Environmental Impact Statement is required under NEPA.

220.  Before issuing the Pine Nut Ten-Year Plan, BLM did not prepare an Environmental Impact Statement.

221.  Before issuing the Muddy Creek Ten-Year Plan, BLM did not prepare an Environmental Impact Statement.

222.  In issuing the Pine Nut Ten-Year Plan without an Environmental Impact Statement, Defendant's actions are arbitrary and capricious, an abuse of discretion, and not

in accordance with the law or required procedure, in violation of the Administrative

Procedure Act, 5 U.S.C. § 706.

223.  In issuing the Muddy Creek Ten-Year Plan without an Environmental Impact

Statement, Defendant's actions are arbitrary and capricious, an abuse of discretion, and not

in accordance with the law or required procedure, in violation of the APA, 5 U.S.C. § 706.

### FOURTH CAUSE OF ACTION

### (VIOLATIONS OF NEPA: FAILURE TO TAKE A HARD LOOK AT THE IMPACTS OF THE PROPOSED ACTIONS)

224.   Friends of Animals herein incorporates all allegations contained in the

preceding paragraphs.

225.   Defendant failed to provide a full and fair discussion of the significant

environmental impacts of the Pine Nut Ten-Year Plan.

226.  Defendant failed to provide a full and fair discussion of the significant

environmental impacts of the Muddy Creek Ten-Year Plan.

227.  On the above facts and legal obligations, Defendant violated NEPA by failing

to independently and adequately analyze the direct, indirect, cumulative, and site-specific

effects of the decision to continually round up, permanently remove, and administer fertility

control to wild horses from the Pine Nut Mountains HMA.

228.  On the above facts and legal obligations, Defendant violated NEPA by failing

to independently and adequately analyze the direct, indirect, cumulative, and site-specific

effects of the decision to continually round up, permanently remove, and administer fertility

control to wild horses from the Muddy Creek HMA.

229.   In issuing the Pine Nut Ten-Year Plan without a complete and independent

analysis of the direct, indirect, cumulative, and site-specific impacts of the proposed action

and alternative actions, Defendant's actions are arbitrary and capricious, an abuse of

discretion, and not in accordance with law or required procedure, in violation of the Administrative Procedure Act, 5 U.S.C. § 706.

230.  In issuing the Muddy Creek Ten-Year Plan without a complete and independent analysis of the direct, indirect, cumulative, and site-specific impacts of the proposed action and alternative actions, Defendant's actions are arbitrary and capricious, an abuse of discretion, and not in accordance with law or required procedure, in violation of the Administrative Procedure Act, 5 U.S.C. § 706.

### REQUEST FOR RELIEF

Friends of Animals respectfully requests that this Court enter judgment providing the following relief:

A.  Declare that Defendant's Pine Nut Ten-Year Plan violated the Wild Free-Roaming Horses and Burros Act and the Administrative Procedure Act;

B.  Declare that Defendant's Muddy Creek Ten-Year Plan violated the Wild Free-Roaming Horses and Burros Act and the Administrative Procedure Act;

C.  Declare that Defendant's Pine Nut Ten-Year Plan Decision Record and Finding of No Significant Impact violate the National Environmental Policy Act and the Administrative Procedure Act;

D.  Declare the Defendant's Muddy Creek Ten-Year Plan Decision Record and Finding of No Significant Impact violate the National Environmental Policy Act and the Administrative Procedure Act;

E.  Enjoin any action previously authorized by Defendant's Pine Nut Ten-Year Plan at issue in this case unless and until the violations of federal law set forth herein have been corrected to the satisfaction of this Court;

F.  Enjoin any action previously authorized by Defendant's Muddy Creek Ten-Year Plan at issue in this case unless and until the violations of federal law set forth herein have been corrected to the satisfaction of this Court;

G.  Vacate and remand back to BLM the Pine Nut Ten-Year Plan;

H.  Vacate and remand back to BLM the Muddy Creek Ten-Year Plan;

I.  Award Plaintiff reasonable costs, litigation expenses, and attorney's fees associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq*., and/or all other applicable authorities; and/or

J.  Grant such further relief as the Court deems just and equitable.

Dated:  August 29, 2018                          Respectfully submitted,

                                                 /s/ Jennifer Best
                                                 Jennifer Best (DC Bar # CO0056)
                                                 Assistant Legal Director

                                                 /s/ Courtney McVean
                                                 Courtney McVean (DC Bar # CO0064)
                                                 Associate Attorney

                                                 Friends of Animals
                                                 Wildlife Law Program
                                                 7500 E. Arapahoe Road, Suite 385
                                                 Centennial, CO 80112
                                                 Tel: 720.949.7791
                                                 Fax: 888.236.3303

                                                 *Attorneys for Plaintiff*