**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FRIENDS OF ANIMALS, *Plaintiff*, v. UNITED STATES BUREAU OF LAND MANAGEMENT, *Defendant*. | Civil Action No. 18-2029 (RDM) |

<u>**MEMORANDUM OPINION AND ORDER**</u>

The Wild Free-Roaming Horses and Burros Act ("WHA"), 16 U.S.C. § 1331 *et seq.*, was enacted in 1971 to protect dwindling equine populations on public lands. Since the law's passage, the numbers of wild horses and burros have rebounded, requiring the Bureau of Land Management ("BLM" or the "Bureau") to balance the animals' conservation against other public land uses. This balance requires the Bureau to manage herd size through a variety of means, including, if necessary, gathering and removing horses to be adopted or killed. Friends of Animals ("FOA"), an animal advocacy organization, challenges four herd management decisions the Bureau made in 2017 and 2018 approving removals and other control measures. FOA moves for summary judgment, Dkt. 37, arguing that the decisions violated the WHA and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq*. The Bureau opposes FOA's motion, Dkt. 40, and cross-moves for summary judgment, Dkt. 39.

For the reasons explained below, the Court will deny both motions for summary judgment without prejudice because genuine issues of material facts remain as to whether this case presents a live controversy ripe for resolution.

# I.  BACKGROUND

**A.    Statutory and Factual Background**

1.    *Wild Free-Roaming Horses and Burros Act*

In 1971, "few remaining wild free-roaming horses and burros" existed in the United

States.  H.R. Rep. No. 92-681, at 7 (1971).  Although these animals were neither the first nor the

last to face "depredation" in the American wilds, they awakened a special solicitude on the part

of Congress, *id.*, which deemed them "living symbols of the historic and pioneer spirit of the

West," 16 U.S.C. § 1331.  Against this backdrop, Congress enacted the WHA "to [e]nsure the

[creatures'] preservation and protection . . . in order to enhance and enrich the dreams and

enjoyment of future generations of Americans."  H.R. Rep. No. 92-681, at 7 (1971).

By 1978, Congress determined that Americans' dreams and enjoyment had been

enhanced a bit too much, to the tune of "20,000–30,000 excess animals."  H.R. Rep. No. 95-

1122, at 21 (1978).  Overgrazing had ravaged public lands, and the excess horses and burros, in

Congress's estimation, threatened other "wildlife, livestock, the improvement of range

conditions, and ultimately [the horses' and burros'] own survival."  *Id.* at 21; *see also id.* at 10.

Congress therefore amended the WHA.  *See* Public Grazing Land Improvement Act of 1978,

H.R. 10587, 95th Cong. (1978).

The amended WHA retains many of the original law's protective provisions.  The statute

still requires the Bureau "to protect and manage wild free-roaming horses and burros as

components of the public lands" "in a manner that is designed to achieve and maintain a thriving

natural ecological balance" through management "at the minimal feasible level" after

"consider[ing] the recommendations of qualified scientists in the field of biology and ecology,

some of whom shall be independent of both [f]ederal and [s]tate agencies."  16 U.S.C.

§ 1333(a).[1]  But Congress also made important changes, some relevant to this case.  In particular, the amended WHA requires the Bureau to "maintain a current inventory of wild free-roaming horses and burros on given areas of the public lands" for the purpose of: (1) setting "appropriate management levels [("AMLs")] of wild free-roaming horses and burros on these areas;" (2) determining "whether and where an overpopulation exists and whether action should be taken to remove excess animals;" and (3) deciding "whether [AMLs] should be achieved by the removal or destruction of excess animals, or other options (such as sterilization, or natural controls on population levels)."  *Id.* § 1333(b)(1).  In reaching these determinations, the Bureau must consult with the U.S. Fish and Wildlife Service, relevant state wildlife agencies, "such individuals independent of [f]ederal and [s]tate government as have been recommended by the National Academy of Sciences," and other individuals with "scientific expertise and special knowledge of wild horse and burro protection, wildlife management and animal husbandry as related to rangeland management."  *Id.*

The statute further defines when and how the Bureau should remove excess wild horses and burros in order to achieve AMLs:

> Where the Secretary determines on the basis of (i) the current inventory of lands within [its] jurisdiction; (ii) information contained in any land[-]use planning completed pursuant to [the Federal Land Policy and Management Act of 1976]; (iii) information contained in court ordered environmental impact statements . . . and (iv) such additional information as becomes available to [it] from time to time, including that information developed in the research study mandated by this section, or in the absence of the information contained in (i-iv) above on the basis of all information currently available to him, that an overpopulation exists on a given area of the public lands and that action is necessary to remove excess animals, he shall immediately remove excess animals from the range so as to achieve appropriate management levels.

---

[1]  The statute grants authority to the Secretary of the Department of the Interior and the Secretary of Agriculture, 16 U.S.C. § 1332(a), but for simplicity's sake, the Court refers throughout the opinion to the Bureau, to which the pertinent authority has been delegated.  *See Fund for Animals, Inc. v. BLM*, 460 F.3d 13, 15 (D.C. Cir. 2006); *see also* 43 C.F.R. § 4710.3-1.

*Id.* § 1333(b)(2).  The Bureau shall take the prescribed "action . . . until all excess animals have been removed so as to restore a thriving natural ecological balance to the range[] and protect the range from the deterioration associated with overpopulation." *Id.*

Finally, the statute prescribes in descending order of "priority" the relevant actions the Bureau is required to take to restore the range:  First, the Bureau "shall order old, sick, or lame animals to be destroyed in the most humane manner possible."  *Id.* § 1333(b)(2)(A).  Second, if overpopulation still exists, the Bureau shall humanely capture and remove animals and maintain them separately to be adopted by members of the public.  *Id.* § 1333(b)(2)(B).  Finally, if overpopulation persists, the Bureau shall "destroy" the excess horses and burros "in the most humane and cost[-]efficient manner possible."  *Id.* § 1333(b)(2)(C).  The Bureau has promulgated regulations to implement the WHA through the designation of "herd management areas" ("HMAs").  43 C.F.R. § 4710.3-1.  To determine high-level goals and standards for resource management of a region, the Bureau also establishes resource management plans ("RMPs")—that is, land[-]use plans that govern multiple HMAs.  *Fund for Animals*, 460 F.3d at 15; *see also* 43 C.F.R. § 4710.1; Dkt. 46-3 at 320–21.  The Bureau implements RMPs through narrower activity plans called, in the case of wild horse management, "herd management area plans" ("HMAPs").  43 C.F.R. § 4710.3-1; *see also* Dkt. 46-3 at 322.

2.   *National Environmental Policy Act*

NEPA requires federal agencies to take a "hard look" at the environmental consequences of actions before acting.  *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (1989).  The statute does not impose substantive limits on agencies' ultimate decisions, but rather establishes procedural duties that serve "twin aims":  "First, [NEPA] 'places upon an agency the obligation

4

to consider every significant aspect of the environmental impact of a proposed action;' . . . Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decision[-]making process." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983) (quoting *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978)). For a "major Federal action[] significantly affecting the quality of the human environment," NEPA requires the lead agency to prepare "a detailed statement" that describes the project's environmental impact and considers alternatives. 42 U.S.C. § 4332(2)(C).

To determine whether a proposed action will significantly affect the environment, the governing regulations require agencies to prepare an environmental assessment ("EA"), a "concise public document" that considers the action's environmental impacts as well as alternatives to the proposed action. 40 C.F.R. §§ 1508.9, 1501.4(b)(2).[2] If the EA reveals that the proposed action will significantly affect the environment, then the agency must prepare a more comprehensive environmental impact statement ("EIS"). 43 C.F.R. §§ 1508.9, 1508.11. Alternatively, if the EA shows that environmental impacts will not be significant, then the agency need prepare only a "Finding of No Significant Impact" ("FONSI") "briefly presenting the reasons why an action . . . will not have a significant effect on the human environment." *Id.* § 1508.13. Regulations also require the agency to "[e]ncourage and facilitate public involvement in decisions." *Id.* § 1500.2.

---

[2] The Council on Environmental Quality updated the regulations implementing NEPA on July 16, 2020. *See* Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43,304 (July 16, 2020). In this opinion, citations to regulations reflect the earlier regulatory language in place at the time the Bureau made the decisions challenged in this lawsuit.

As outlined in the Bureau's *Wild Horses and Burros Management Handbook*, HMAPs require either an EA or EIS pursuant to NEPA.  Dkt. 46 at 305–09.  The handbook provides that the AML for each HMA "shall be expressed as a population range within which" wild horses and burros "can be managed for the long term."  *Id.* at 285.  "The AML upper limit shall be established as the maximum number of" horses and burros that "results in a [thriving natural ecological balance] and avoids deterioration of the range," and the "lower limit shall normally be established at a number that allows the population to grow . . . to the upper limit over a 4-5 year period, without any interim gathers to remove excess" wild horses and burros, although "[s]ome HMAs may require more frequent removals to maintain population size within AML."  *Id.* Before the Bureau removes excess animals to achieve the AML, it must create a "[g]ather [p]lan[]" that includes a "site-specific environmental analysis" that meets NEPA requirements. *Id.* at 316.  The "authorized [BLM] officer" is required to "provide the public 30 days to review and comment on the NEPA document, typically an [e]nvironmental [a]ssessment that documents and analyzes the environmental effects of [] BLM's [p]roposed [a]ction."  *Id.* at 317.  Then, the Bureau must issue a final gather decision including a "decision record" summarizing and responding to substantive comments and setting "gather decisions effective upon a date established in the decision."  *Id.* at 316–18.  "Unless an emergency situation exists, gather/removal decisions shall be issued 31–76 days prior to the proposed gather start to provide an opportunity for administrative review of the . . . decision to be completed."  *Id.* at 316.

3.    *Factual Background*

Beginning in 2017, the Bureau issued a series of herd management decisions that gave rise to the instant suit.  The four decisions apply to the Pine Nut Mountains HMA, Dkt. 46-3, the Muddy Creek HMA, Dkt. 46-1, the Eagle Complex (an amalgam of HMAs), Dkt. 46, and the

6

Onaqui HMA, Dkt. 46-2, together covering more than one million acres in Utah and Nevada, as well as thousands of horses. *See* Dkt. 46-3 at 86 (estimating Pine Nut Mountains HMA population); Dkt. 46-1 at 97 (same for Muddy Creek HMA); Dkt. 46 at 34 (same for Eagle Complex); Dkt. 46-2 at 281 (same for Onaqui HMA); Dkt. 17 at 13, 24, 32, 39 (2d Am. Compl. ¶¶ 53, 139, 205–06, 269) (describing acreage of each HMA).[3] The timing of the relevant decisions are as follows:  On November 28, 2017, the Bureau released the Pine Nut Mountains HMAP, decision record, final EA, and FONSI.  Dkt. 37 at 19.  On July 30, 2018, the Bureau issued the decision record, final EA, and FONSI for the Muddy Creek HMA.  *Id.*  On August 27, 2018, the BLM published the decision record, final EA, and FONSI for the Eagle Complex.  *Id.* Finally, on December 14, 2018, the Bureau released the decision record, final EA, and FONSI for the Onaqui HMA.  *Id.* at 11–12.  The Court will refer to these decisions collectively as the "Gather Decisions" or "Decisions."  The Decisions implement relevant portions of the 2001 Carson City Field Office Consolidated Resource Management Plan (applicable to the Pine Nut Mountains HMA), *id.* at 18; the Price Field Office Record of Decision and RMP (applicable to the Muddy Creek HMA), *id.* at 20–21; the Ely District Record of Decision and RMP and the 1983 Pinyon Management Framework Plan (applicable to the Eagle Complex), *id.* at 23; and the aptly named 1990 Pony Express Record of Decision and RMP (applicable to the Onaqui HMA), *id.* at 25.

The Gather Decisions share several relevant features.  In all cases, the Bureau determined that the number of horses on the range significantly exceeded the AML for the relevant HMA; that this overpopulation was contributing to range deterioration; and that it was necessary to curb

---

[3]  Although the WHA regulates horses and burros, the challenged decisions appear to involve only wild horses.

the herds' sizes.  Dkt. 46-3 at 16, 18, 20; Dkt. 46-1 at 97–98; Dkt. 46 at 33, 59; Dkt. 46-2 at 11,

31, 262.  The Bureau published notices of the proposed action for each HMA or complex and

allowed time for public comment.  *See* Dkt. 46-3 at 8; Dkt. 46-1 at 229; Dkt. 46 at 174; Dkt. 46-2

at 262.  Substantively, the Decisions consist of three different actions.  First, the Bureau

announced its plan to conduct an initial gather (or series of roundups) to remove horses and to

bring the populations down to the low end of the AML in each HMA or complex.  Dkt. 46-3 at

24 (aiming to remove approximately 338 horses from within the Pine Nut HMA through an

initial gather to reach AML and to remove more than 200 outside the HMA); Dkt. 46-1 at 97,

106 (calling for the removal of 148 or 149 horses to reach AML in the Muddy Creek HMA);

Dkt. 46 at 33, 59–60 (aiming to remove 2,075 horses to reach AML in the Eagle Complex); Dkt.

46-2 at 281 (planning to remove approximately 465 horses from the Onaqui HMA).  Second, the

Bureau indicated that it will make use of fertility controls, such as administering contraceptives

and adjusting sex ratios, to maintain AML.  As part of this effort, the Bureau contemplates

conducting subsequent gathers after the initial gather to collect animals, administer fertility

controls, and release the animals back on the range.  Dkt. 46-3 at 28–29; 46-1 at 106–07; Dkt. 46

at 61; Dkt. 46-2 at 281–82.  Finally, the Bureau authorized future maintenance gathers to remove

horses from the range to maintain the AML.  Dkt. 46-3 at 25, 109;  Dkt. 46-1 at 106–07; Dkt. 46

at 61; Dkt. 46-2 at 281–82.  The Gather Decisions authorize the contemplated activities for ten

years.  Dkt. 46-3 at 15, 25; Dkt. 46-1 at 95; Dkt. 46 at 41; 46-2 at 10.  None of the plans commit

to further NEPA analyses or opportunities for comment prior to conducting subsequent gathers.

Dkt. 37 at 20, 22, 24, 26.  At oral argument, however, the Bureau represented that the public will

receive "notice of at least up to 30 days" before any future gathers but that "no additional

environmental analysis [would be] required," nor further opportunity to comment afforded.  Nov. 18, 2020 Hrg. Tr. (Rough at 51–54).

Both parties agree that the Bureau has completed the initial gathers in each of the four HMAs.  Dkt. 52 at 2 & nn.1–6 (providing the dates of each initial gather as well as links to BLM websites).  Of these initial gathers, the Muddy Creek gather apparently achieved its target of reaching low AML.  *Compare* Dkt. 46-1 at 97, 106 (setting a removal target of 149 horses to reach AML in the Muddy Creek HMA), *with* BLM, *2018 Muddy Creek Wild Horse Gather*, https://www.blm.gov/programs/wild-horse-and-burro/herd-management-areas/gathers-and-removals/utah/2018-muddy-creek-wild-horse-gather (last visited Jan. 19, 2021) (explaining that cumulatively 153 animals had been gathered from the Muddy Creek HMA and four returned to the range).  The other initial gathers, however, did not collect enough horses to achieve the targeted AML.  *Compare* BLM, *2019 Pine Nut Mountains Wild Horse Gather*, https://www.blm.gov/programs/herd-management/gathers-and-removals/nevada/2019-Pine-Nut-Mountains-Wild-Horse-Gather (last visited Jan. 19, 2021) (reporting 383 animals gathered from within and surrounding the Pine Nut HMA), *with* Dkt. 46-3 at 24 (aiming to remove approximately 338 horses from within the Pine Nut HMA and more than 200 from outside the HMA); BLM, *2020 Eagle Complex Wild Horse Gather*, https://www.blm.gov/programs/wild-horse-and-burro/herd-management/gathers-and-removals/nevada/2020-eagle-complex-wild-horse-gather (last visited Jan. 19, 2021) (reporting 1,716 animals gathered from the Eagle Complex), *with* Dkt. 46 at 33, 59–60 (aiming to remove 2,075 horses to reach AML in the Eagle Complex); BLM, *2019 Onaqui Wild Horse Gather*, https://www.blm.gov/programs/wild-horse-and-burro/gathers-and-removals/utah/2019-onaqui-wild-horse-gather (last visited Jan. 19, 2021) (reporting 241 animals gathered from the Onaqui HMA), *with* Dkt. 46-2 at 281 (aiming to

remove 465 horses from the Onaqui HMA).  All but the Muddy Creek initial gather, moreover, began more than 76 days after the applicable HMA decision.  *Compare* Dkt. 37 at 11 (providing the dates of each HMA decision), *with* Dkt. 52 at 2 (providing the date of each initial gather). Because the Decisions authorize further gathers over ten years, future gathers and removals could continue for the better part of the upcoming decade.

## B.    Procedural Background

Plaintiff FOA, "a nonprofit, international animal advocacy organization," Dkt. 17 at 4 (2d Am. Compl. ¶ 13), filed this lawsuit on August 29, 2018, Dkt. 1.  It alleges that the four Gather Decisions violate the WHA (Count I) by departing from applicable land-use plans and eliding necessary determinations prior to removal.  Dkt. 17 at 50 (2d Am. Compl. ¶¶ 352–54).  FOA further contends that the Decisions violate the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, (Count II) by departing from preexisting agency policy without explanation.  Dkt. 17 at 50–51 (2d Am. Compl. ¶¶ 355–60).  Finally, FOA maintains that the Decisions violate NEPA in two ways:  For each decision, the Bureau failed to prepare an EIS (Count III), and it failed to scrutinize environmental impacts with the "hard look" that NEPA requires (Count IV).  *Id.* at 51–52 (2d Am. Compl. ¶¶ 361–68).  Because of these violations, FOA asserts that the Decisions must be set aside pursuant to the APA, 5 U.S.C. § 706, as "arbitrary, capricious, an abuse of discretion, and not in accordance with law or required procedure," *id.* at 50–51 (2d Am. Compl. ¶¶ 354, 360); *see also id.* at 51–52 (2d Am. Compl. ¶¶ 364, 368).

FOA moves for summary judgment, Dkt. 37, and the Bureau opposes FOA's motion and cross-moves for summary judgment, Dkt. 39; Dkt. 40.  At the direction of the Court, the parties provided a joint status report addressing whether the Bureau has completed the initial gathers and

whether any of FOA's claims are now moot.  Dkt. 52.  The Court heard oral argument on November 18, 2020.

## II.  ANALYSIS

FOA challenges the Gather Decisions on multiple grounds.  But before considering any of those contentions, the Court must determine whether FOA's claims are justiciable as currently framed.  If the initial gathers have been completed and future gathers remain uncertain, then mootness may block FOA's challenge to the former, and a lack of ripeness may block its challenge to the latter.  "To prevail on a Federal Rule of Civil Procedure 56 motion for summary judgment[,] as opposed to a motion to dismiss," the moving party "must establish that there exists no genuine issue of material fact as to justiciability . . . ."  *Dep't of Com. v. U.S. House of Representatives*, 525 U.S. 316, 329 (1999); *accord. Pub. Citizen, Inc. v. Trump*, 361 F. Supp. 3d 60, 83 (D.D.C. 2019).  A fact is "material" if it is capable of affecting the outcome of a dispute, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and a dispute is "genuine" if the evidence is such that a reasonable factfinder—here, the Court—could find in favor of the nonmoving party, *see Scott. v. Harris*, 550 U.S. 372, 380 (2007); *Liberty Lobby*, 477 U.S. at 248. If the Court finds that a genuine issue of material fact exists as to justiciability, it must deny both cross-motions for summary judgment because the Court cannot reach the merits of a case in which justiciability remains substantially in doubt.

## A.     Mootness

"Under Article III of the Constitution," federal courts "may only adjudicate actual, ongoing controversies."  *Honig v. Doe*, 484 U.S. 305, 317 (1988).  The required "case or controversy," moreover, "must remain 'extant at all stages of review, not merely at the time the complaint is filed.'"  *United States v. Juvenile Male*, 564 U.S. 932, 936 (2011) (per curiam)

11

(quoting *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 67 (1997)).  Accordingly, at each stage

of the litigation, the Court must assess whether the plaintiff has suffered or is likely to suffer "an

actual injury traceable to the defendant" that is "likely to be "redressed by a favorable judicial

decision." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990).  "If events outrun the

controversy such that the [C]ourt can grant no meaningful relief, the case must be dismissed as

moot."  *McBryde v. Comm. to Rev. Cir. Council Conduct & Disability Orders of the Jud. Conf.

of the U.S.*, 264 F.3d 52, 55 (D.C. Cir. 2001).

Here, the parties agree that the Bureau completed its initial gathers long ago and, indeed,

it completed most of those gathers months before the first summary judgment brief was filed in

this case.  Dkt. 52 at 2 (listing dates of completion of initial gathers, ranging from September 18,

2018 to February 25, 2020).  But because neither party addressed mootness in their briefs, the

Court issued an order on November 3, 2020, directing that the parties "file a joint status report

addressing (1) when the initial gathers in each of the relevant HMAs commenced, (2) when each

such initial gather was completed or is likely to be completed, and (3) whether any of Plaintiff's

challenges to the initial (as opposed to any future) gathers is now moot."  Minute Order (Nov. 3,

2020).  In response, the Bureau took the position that FOA's challenge to the initial gathers is

moot, while FOA argued that the challenge remains justiciable.  Dkt. 52.

Although "the party asserting mootness—here, the [Bureau]—generally bears the burden

of establishing that a case is moot in the first instance," *Cierco v. Lew*, 190 F. Supp. 3d 16, 23

(D.D.C. 2016), the Court has an obligation to assess its jurisdiction—and thus to address the

question of mootness—*sua sponte*, *id.* (citing *Mine Reclamation Corp. v. FERC*, 30 F.3d 1519,

1522 (D.C. Cir. 1994)); *see also Fort Bend County v. Davis*, 139 S. Ct. 1843, 1849 (2019) (a

court "must consider" its subject-matter jurisdiction *sua sponte* "at any point in the litigation")

(citation omitted).  The Court cannot, in short, proceed to adjudicate a case on the merits in the face of serious, unresolved questions about whether FOA's claims are moot, regardless of which party bears the burden of proof.

Under the present circumstances, the Court is left with substantial doubt about whether FOA's challenges to the initial gathers remain live.  According to the parties' joint status report, the Muddy Creek HMA initial gather was completed over two years ago, on September 18, 2018; the Onqaui HMA and Pine Nut Mountains HMA initial gathers were completed about a year after that, in September and October 2019, respectively; and the Eagle Complex initial gather was completed on February 25, 2020, the day before the parties filed the joint appendix in this case.  Dkt. 52 at 2.  Thus, to the extent FOA challenges the lawfulness of those gathers under NEPA and the APA, the challenged conduct has already occurred.  And, to the extent "[i]t is 'impossible for the court to grant any effectual relief whatever' with respect to the challenged gathers," FOA's challenge is non-justiciable.  *Fund for Animals*, 460 F.3d at 22 (quoting *Beethoven.com LLC v. Libr. of Cong.*, 394 F.3d 939, 950 (D.C. Cir. 2005)).

In opposing dismissal of those challenges on grounds of mootness, FOA makes several arguments, none of which is persuasive on the current record.  First, FOA argues that its "interests and claims are not limited to any individual roundups that occur pursuant to th[e] Decisions" but, rather, extend to the Bureau's "plans to continue implementing the Decisions at least through 2027."  Dkt. 52 at 5.  That is true, but it is non-responsive to the contention that FOA's challenge to the completed gathers—as opposed to its challenge to future actions the Bureau may take, which are addressed below—is moot.  Second, FOA maintains that its challenge to the completed gathers is not moot because the Court could order that the Bureau return some or all of the gathered horses to the range.  *Id.* at 7.  At oral argument, however, FOA

acknowledged that it does not know whether the removed horses remain available to be returned or whether, for example, they have already been adopted by members of the public.  Nov. 18, 2020 Hrg. Tr. (Rough at 3).  This fact-based uncertainty bears on whether the case is still live, and thus constitutes a "genuine issue of material fact as to justiciability" that prevents the Court from granting summary judgment to either party on the merits at this time.  *Dep't of Commerce*, 525 U.S. at 329.  Although FOA alludes to exceptions to the mootness doctrine for (1) controversies that are capable of repetition yet evade review, and (2) cases where the defendant voluntarily ceases engaging in the challenged conduct, Dkt. 52 at 3, it does not develop either contention in a manner sufficient to support justiciability; other than reciting the elements of these exceptions, FOA fails to explain why either applies here.

The Bureau, for its part, disclaims any authority to return excess horses to the range, a proposition that, if true, would moot any controversy with respect to the initial gathers, regardless of the horses' whereabouts.  *Id.* at 9–10.  Although the Bureau contends that it is legally foreclosed from doing so, the Court is unpersuaded that a federal district court would lack equitable authority under appropriate circumstances to remediate a violation of law by requiring the return of horses that were recently gathered.[4]  For present purposes, it is enough to conclude that the relevant legal arguments are undeveloped and the relevant factual record is nonexistent.

The Court will, accordingly, deny without prejudice both pending motions for summary judgment with respect to the completed gathers.

---

[4]  Such a remedy does not become unavailable merely because FOA failed to identify this form of relief in its complaint.  A "final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings."  Fed. R. Civ. P. 54(c).

**B.      Ripeness**

While the completed initial gathers raise the specter of mootness, any future actions the

Bureau might take pursuant to the challenged Decisions raise questions of ripeness.  "The

ripeness doctrine is 'drawn both from Article III limitations on judicial power and from

prudential reasons for refusing to exercise jurisdiction.'"  *Nat'l Park Hosp. Ass'n v. Dep't of*

*Interior*, 538 U.S. 803, 808 (2003) (quoting *Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18

(1993)).  It "'prevent[s] the courts, through avoidance of premature adjudication, from

entangling themselves in abstract disagreements over administrative policies, and also . . .

protect[s] . . . agencies from judicial interference until an administrative decision has been

formalized and its effects felt in a concrete way by the challenging parties.'"  *Id.* at 807–08

(quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967)).  When, as here, the parties do

not raise ripeness, the Court may consider the issue *sua sponte*.  *Id.* at 808.

"The ripeness doctrine subsumes two inquiries: first, 'the Article III requirement of

standing, which requires a [plaintiff] to allege *inter alia* an injury-in-fact that is 'imminent' or

'certainly impending,'" *Garcia v. Acosta*, 393 F. Supp. 3d 93, 105 (D.D.C. 2019) (alteration in

original) (quoting *Am. Petrol. Inst. v. EPA*, 683 F.3d 382, 387 (D.C. Cir. 2012)), and second, two

prudential requirements, "'the fitness of the issue for judicial decision and the hardship to the

parties of withholding court consideration,'" *id.* (quoting *Abbott Labs.*, 387 U.S. at 149); *see also*

*Nat'l Park Hosp. Ass'n*, 538 U.S. at 808; *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d

43, 48 (D.C. Cir. 1999) (quoting *La. Env't Action Network v. Browner*, 87 F.3d 1379, 1381 (D.C.

Cir. 1996)).[5]

---

[5] In *Susan B. Anthony List v. Driehaus*, the Supreme Court questioned whether prudential
ripeness factors can render a claim nonjusticiable if constitutional ripeness is satisfied.  573 U.S.
149, 167 (2014).  But the Court stopped short of deciding that question, *see id.* at 167–68, and

The inquiries into constitutional and prudential ripeness may overlap.  For example, a case with no "certainly impending" injury for the purposes of a constitutional inquiry is also likely to fail the fitness inquiry for prudential ripeness.  *See Atl. States Legal Found. v. EPA*, 325 F.3d 281, 284 (D.C. Cir. 2003) (noting that the fitness inquiry in APA cases turns in part on whether the case at hand provides a sufficiently "concrete setting" to decide the case).  Perhaps for this reason, courts sometimes conduct the ripeness analysis without parsing which elements of the analysis are constitutional, prudential, or both.  *See, e.g.*, *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 732–33 (1998) (beginning the justiciability analysis by considering three factors to evaluate the fitness and hardship elements of ripeness, without deeming them prudential); *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 891 (1990) (explaining, without labeling the requirement constitutional or prudential, that an APA claim is usually not ripe "until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him"); *Alcoa Power Generating Inc. v. FERC*, 643 F.3d 963, 967 (D.C. Cir. 2011) (discussing the fitness and hardship determinations without classifying such considerations prudential or constitutional); *La. Pub. Serv. Comm'n v. FERC*, 522 F.3d 378, 397 (D.C. Cir. 2008) (noting that ripeness has both constitutional and prudential roots, and then addressing the fitness and hardship factors without labeling those factors strictly "prudential").  Here, the Court will focus on the factors required to establish prudential ripeness, but, for similar reasons, much of this analysis will overlap with corresponding constitutional considerations.

---

the D.C. Circuit has continued to require prudential ripeness even when constitutional ripeness is established, *see*, *e.g*., *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 632–33 (D.C. Cir. 2017).

1.    *Fitness*

The fitness requirement promotes two important interests: first, "the agency's interest in crystallizing its policy before that policy is subjected to judicial review," and, second, "the court's interests in avoiding unnecessary adjudication and in deciding issues in a concrete setting." *Wyo. Outdoor Council*, 165 F.3d at 49 (quoting *Eagle-Picher Indus. v. EPA*, 759 F.2d 905, 915 (D.C. Cir. 1985)).  The Court must, accordingly, consider whether the issue presented "is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final." *Her Majesty the Queen in Right of Ontario v. EPA*, 912 F.2d 1525, 1532 (D.C. Cir. 1990).  Even if the issue is "'a purely legal one,'" it is not "fit" for judicial review if "further factual development would 'significantly advance [the Court's] ability to deal with the legal issues presented.'" *Nat'l Park Hosp. Ass'n*, 538 U.S. at 812 (quoting *Duke Power Co. v. Carolina Env't Study Grp., Inc*., 438 U.S. 59, 82 (1978)); *see also Atl. States Legal Found.*, 325 F.3d at 284 ("[E]ven purely legal issues may be unfit for review.").

Here, FOA raises a host of issues, some of which are purely legal and some of which turn on the facts.  It maintains (1) that to the extent the four Gather Decisions purport to authorize future roundup over the next ten years, they represent an unexplained and arbitrary departure from past agency policies, litigation positions, and land-use plans requiring the issuance of a NEPA assessment for each wild horse management decision, including each roundup and removal action, Dkt. 37 at 27–35; (2) that the WHA "prohibits the [Bureau] from continually rounding up wild horses for ten years into the future based on an older determination" and from basing "its decision on outdated information" or "on information that is not yet available, such as the wild horse population two, five, or ten years from now," *id.* at 36–37; and (3) that the Bureau

17

should have prepared an EIS for each of the Decisions and failed to take a "hard look" at the environmental consequences of each individual roundup, including the changes in environmental conditions that will occur over the next several years, uncertainty about the long-term effect of fertility measures, and the cumulative impacts of "continually removing wild horses for ten-years and applying fertility controls" over that same period, *id.* at 38–51.

Beyond the completed gathers, which are addressed above, the challenged Decisions contemplate future, discrete agency actions—administering contraceptives to horses or removing them through future gathers—over the course of ten years. But when and under what circumstances those actions will occur remains to be determined. *See, e.g.*, Dkt. 37 at 19, 26; *id.* at 41 (referring to the Decisions as "authoriz[ing] an undisclosed number of wild horse roundups over the next ten years"). The Decisions themselves set no timetables and, indeed, only include vague descriptions of the criteria for conducting future gathers. The Pine Nut Decision, for example, explains that "it is anticipated that subsequent gathers and removals to maintain AML [will] be necessary" and that, "[a]fter the initial gather[,] subsequent gathers and removals [will] occur to maintain AML and vaccinate and revaccinate the mares with contraceptives." Dkt. 46-3 at 109. Likewise, the Muddy Creek Decision explains that the Bureau will "return periodically to gather excess wild horses to maintain AML and administer or booster population control measures to the other gathered horses over a period of ten years from the date of the initial gather operation," Dkt. 46-1 at 106; the Eagle Complex Decision merely specifies that, if the Bureau fails to remove a sufficient number of horses to achieve low AML, it will "return . . . to remove excess horses above low AML and [will] conduct follow-up gathers over a [ten-]year period after the initial gather to remove [and administer contraceptives to] any additional wild horses necessary to achieve and maintain the low range of AML," Dkt. 46 at 42; and the Onaqui

18

Decision authorizes "follow-up gathers, as frequently as needed, [to] be conducted over a [ten]-year period to remove any additional wild horses necessary to maintain the wild horse population at AML," Dkt. 46-2 at 282.  In all of the Decisions, the Bureau stipulates that "[p]opulation inventories and routine resource/habitat monitoring [will] be completed between gather cycles to document current population levels, growth rates, and areas of continued resource concern . . . prior to any follow-up gather."  Dkt. 46 at 42; *see also* Dkt. 46-3 at 279 (similar); Dkt. 46-1 at 107 (same); Dkt. 46-2 at 441 (same).  In short, future gathers are not planned for set intervals but, rather, require ongoing "monitoring" and "track[ing] of the[] [wild horse] populations and the . . . health" of those populations.  Nov. 18, 2020 Hrg. Tr. (Rough at 35).

Beyond this technical uncertainty, the Decisions condition future actions on available funding, facility capacity, and Bureau priorities.  *See* Dkt. 46-3 (contemplating that "BLM [could be] unable to conduct limited or targeted follow-up gathers over the next [ten] years . . . due to lack of funding or available holding capacity"); Dkt. 46-1 at 107 ("Funding limitations and competing priorities might impact the timing of maintenance gather and population control components . . . ."); Dkt. 46 at 42 (same); Dkt. 46-2 at 282 ("All gathers . . . [would] be dependent on funding and available space for the horses in adoption and/or sale programs or holding facilities.").  As counsel for the Bureau explained at oral argument, "there are time periods where the agency cannot continue to gather," such as "during the foaling season," Nov. 18, 2020 Hrg. Tr. (Rough at 22); it is "only so often the agency has enough budget to take action," *id.*; *see also id.* at 26; weather conditions can "preclude gathering," *id.*; and the contractors, including helicopter operators used in the gathers, are not always available, *id.* at 26; *see also id.* at 38.

Moreover, although the Gather Decisions contemplate that future gathers may occur without a further environmental assessment and without public comment, that is a decision that Bureau officials will have to make in the future—perhaps weeks from now or perhaps years from now. Significantly, counsel for the Bureau represented at oral argument that, "[t]o the extent conditions on the ranges change over time and require different management activities, there will be new NEPA" assessments. *Id.* at 55. To be sure, counsel for both parties seem to anticipate that the Bureau is likely to conduct some future gathers without conducting additional environmental assessments. But that anticipation must be tempered by (1) the prospect that future policymakers (and future administrations) may conclude otherwise over the many years at issue and (2) the Court's obligation to avoid placing itself in the shoes of those policymakers before they have had the opportunity to evaluate all of the relevant facts—including facts that have yet to occur—and have decided how to proceed. *Cf. Pub. Citizen, Inc. v. Trump*, 297 F. Supp. 3d 6, 22–23 (D.D.C. 2018) ("Court[s] should avoid speculating about how governmental entities will exercise their discretion.") (citation and quotation marks omitted).

Against this backdrop, the Court cannot conclude—at least on the present record—that the issues in dispute are fit for judicial determination. FOA challenges the four Decisions on the ground that the agency has failed to offer a reasoned explanation for its alleged departure from past policies, litigation positions, and land-use plans, but that concern would dissipate if the Bureau were to offer the missing rationale at any time before conducting a future gather. The nature and extent of the alleged departure (and the prospect of prejudicial error), moreover, may depend at least in part on how much time passes before the gather occurs, whether any material conditions have changed, and whether any additional opportunity for public comment is provided.

The same is true of FOA's statutory argument.  FOA posits that the WHA precludes the Bureau from conducting gathers based on stale information and analyses.  Yet the strength of that argument may turn on the passage of time and intervening conditions.  A gather conducted next month that merely completes (or attempts to complete) the Bureau's prior effort to achieve AML in the first instance poses different questions than a gather conducted years from now, after the Bureau has achieved AML and the herd size has re-grown to levels that strain the then-exiting conditions on the range.

And questions of this sort apply with even greater force to FOA's NEPA arguments.  The length of time that passes between an agency's conduct of a NEPA analysis and the contemplated action may bear on the adequacy of that analysis, particularly if conditions have changed in material respects.  *See Marsh*, 490 U.S. at 373–74 (explaining that the decision to prepare a supplemental EIS "turns on the value of the new information to the still pending decision[-]making process").   Indeed, as counsel acknowledged at oral argument, such a change might well prompt the Bureau to conduct the type of NEPA analysis that FOA claims is missing here.  Nov. 18, 2020 Hrg. Tr. (Rough at 54–55).

 "In the context of agency decision making, letting the administrative process run its course before binding parties to a judicial decision prevents courts from 'entangling themselves in abstract disagreements over administrative policies, and . . . protect[s] the agencies from judicial interference' in an ongoing decision-making process."  *Am. Petrol. Inst.*, 683 F.3d at 386 (alteration in original) (quoting *Abbott Labs*., 387 U.S. at 148).  On the present record, the Court is unpersuaded that it can reach the merits of FOA's various challenges without knowing when the further gathers will occur, whether conditions will have changed by that time, and whether the Bureau might decide to conduct further environmental analyses before acting.  These

uncertainties amount to "genuine issue[s] of material fact as to justiciability," *Dep't of Commerce*, 525 U.S. at 329, and counsel against granting summary judgment on the merits to either party.  Waiting for further administrative developments, moreover, will provide FOA and others with time to convince the Bureau to alter its position or to correct its mistakes, and will "as least solidify or simplify the factual context and narrow the legal issues at play, allowing for more intelligent resolution of any remaining claims." *Am. Petrol. Inst.*, 683 F.3d at 387.

In *Friends of Animals v. Haugrud*, the Court confronted a similar set of facts.  236 F. Supp. 3d 131 (D.D.C. 2017).  The challenged decision in that case authorized the removal of 167 horses beginning on September 14, 2015, but also contemplated future gathers in subsequent fiscal years, subject to funding and space at holding facilities.  *Id.* at 134.  In response to FOA's challenge in that case, the Bureau argued that any challenge to future gathers was unripe "because the BLM [had] yet to authorize or plan an additional gather of wild horses."  Federal Defendants' Reply in Support of Cross-Motion for Summary Judgment at 7, *Haugrud*, (No. 15-cv-1500).  The Bureau explained its obligation as follows:

> [B]efore gathering any additional wild horses from the [HMA], the BLM will have to make a determination about whether additional environmental review or NEPA analysis is warranted. . . .  Even if [the BLM] confirms that an action is adequately analyzed in an existing NEPA document, the BLM would still normally prepare a new decision document before implementing another wild horse gather. . . .  The second option is to prepare additional NEPA analysis in the form of an EA if the BLM determines that rangeland or other conditions have changed significantly.  Either way, the BLM would have to determine the method of removal and how many horses it can attempt to remove.

*Id.* at 8.  The Bureau also explained that it would have to secure funding prior to any new gather and that any decision would be issued 31–76 days prior to the proposed gather to allow plaintiffs like FOA to pursue administrative appeals or legal challenges in district court.  *Id.* at 9.

22

Applying the test for prudential ripeness, the *Haugrud* court concluded that (1) no hardship would result to FOA from delayed review because the organization would have an opportunity to challenge any future, date-specific gather once the BLM announced a decision authorizing that action; (2) judicial review before such specific decisions would inappropriately interfere with the BLM's future decisions; and (3) the Court would benefit from further factual development of the issues, because the Bureau's analyses for future gathers might remedy the alleged shortcomings FOA cited in the challenged decision at hand.  *Haugrud*, 236 F. Supp. 3d at 135.  After rejecting FOA's counterarguments, the Court dismissed the case as unripe.  *Id.* at 136.

The Bureau contends that this case differs from *Haugrud* because the agency decision at issue in *Haugrud* merely contemplated possible future gathers, while the Decisions at issue here "are explicit about the need for long-term planning and execution."  Dkt. 47-1 at 12.  But that distinction is far from clear.  The decision at issue in *Haugrud* contemplated future gathers subject to funding and logistical limitations; the same is true here.  In *Haugrud*, counsel explained that before gathering additional horses, the Bureau would need to decide whether to conduct additional environmental review or NEPA analysis; the same is true here.  And, in *Haugrud* the challenged decision did not address when or how to remove additional horses or how many horses to remove; once again, the same is true here.  Ultimately, the difference between this case and *Haugrud* may be more in degree than in kind.  It may be that future gathers—for at least some of the HMAs—are more likely here, while the prospect that the Bureau will conduct further environmental assessments is less likely.  But the existing record does not show that these differences are as pronounced as Bureau assumes, and, more

importantly, it does not establish when, how, and under what circumstances the Bureau will conduct the additional, contemplated gathers.

At least on the current record, the Court is, accordingly, unpersuaded that FOA's challenges are fit for judicial review.

2.      *Hardship*

When, as here, a court has "doubts about the fitness of [an] issue for judicial resolution," it must "balance the institutional interests in postponing review against the hardship to the parties that will result from delay." *Consol. Rail Corp. v. United States*, 896 F.2d 574, 577 (D.C. Cir. 1990); *see also Nat'l Ass'n of Home Builders v. U.S. Army Corps of Engineers*, 440 F.3d 459, 465 (D.C. Cir. 2006) (quoting same). "[M]ere uncertainty as to the validity of a legal rule" does not "constitute[] a hardship for purposes of the ripeness analysis." *Nat'l Park Hosp. Ass'n*, 538 U.S. at 811. The focus of the hardship prong, moreover, "is not [on] whether [the plaintiff has] suffered any 'direct hardship,' but rather [on] whether postponing judicial review would impose an undue burden on them or would benefit the court." *Harris v. FAA*, 353 F.3d 1006, 1012 (D.C. Cir. 2004) (emphasis omitted).

If FOA faced the risk that the Bureau would conduct further gathers without providing advance public notice, it might well suffer undue prejudice if judicial review were postponed; under those circumstances, its ability to bring a challenge could be mooted before it even learns of the suspect agency action. But, here, the Bureau has represented that the "the public will get notice of at least up to 30 days" before future gather occurs. Nov. 18, 2020 Hrg. Tr. (Rough at 51). Although this assurance includes contradictory language—"at least" implies 30 or more days, while "up to" implies 30 or fewer days—the Court assumes that counsel meant that the

public will receive notice 30 days *or more* in advance of any future gather.[6]  With that understanding, the Court concludes that FOA can avoid any hardship by seeking judicial review before the action occurs.  The Bureau, in turn, runs the risk that if it provides notice of only 30 days (or even 60 or 90 days) it may face a motion for a preliminary injunction.  But, at least on the current record, the Court is unconvinced that the burden that FOA might face in seeking preliminary relief and the burden the Bureau might face in opposing such a motion are sufficient to outweigh the substantial "institutional interests in postponing review."  *Consol. Rail Corp.*, 896 F.2d at 577.

The Court is accordingly unpersuaded, at least on the existing record, that any burden to the parties that might result from postponing review outweighs the institutional interest in postponing review.

*   *   *

All that is currently before the Court are the parties' cross-motions for summary judgment, neither of which seeks dismissal on grounds of justiciability.  As a result, the Court's decision is a limited one:  The Court merely concludes that its doubt about the justiciability of FOA's claims precludes it from reaching the merits of the parties' dispute on the present record. The Court has not concluded that FOA's complaint should be dismissed at this time.  In light of this decision, the Bureau is free to seek dismissal of some or all of FOA's claims as non-justiciable, and the parties are free to renew their cross-motions for summary judgment in whole or in part.  If either party elects to take the latter course, however, it must demonstrate that the

---

[6]  If the Court's assumption is incorrect, counsel for the Bureau shall promptly clarify its position regarding the public notice it will offer in advance of any future gathers.

issues raised in such a motion are ripe for judicial consideration and have not been mooted by intervening events.[7]

## CONCLUSION

For the reasons above, the Court will **DENY** FOA's motion for summary judgment and will **DENY** the Bureau's cross-motion for summary judgment. The Court will set a status conference to address further proceedings in this matter.

**SO ORDERED.**

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: January 22, 2021

---

[7] Among other things, the parties will need to address whether the public will receive advance notice of future administrations of contraceptives. Although some language in the Decisions suggests that the Bureau will administer contraceptives to horses that have been gathered, Dkt. 46-3 at 109, 246; Dkt. 46-1 at 106, 137–38; Dkt. 46 at 41–42, 132, other language in some of the Decisions suggests that long-range darting may be used, Dkt. 46-3 at 174; Dkt. 46 at 132; Dkt. 46-2 at 375. As a result, it is unclear whether gathering is needed to administer contraceptives and whether the Bureau's undertaking to provide notice prior to gathers extends to the administration of birth control.