## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FRIENDS OF ANIMALS,

*Plaintiff*,

v.                                                                    Civil Action No. 18-2029 (RDM)

UNITED STATES BUREAU OF LAND
MANAGEMENT,

*Defendant*.

## <u>MEMORANDUM OPINION AND ORDER</u>

In 2018, the Bureau of Land Management ("BLM" or "Bureau") decided to gather wild horses inside and adjacent to the Onaqui Mountain Herd Management Area ("Onaqui Mountain HMA") to reduce the number of horses to the low end of the appropriate management level ("AML") of 121–210 horses. Under that plan, the Bureau would conduct an initial gather and would then return periodically over a period of ten years to maintain AML by removing excess wild horses and administering a fertility control vaccine. The Bureau started its initial gather on September 11, 2019, and continued the gather through August 2020, but, following the gathers, the wild horse population remained more than "two times . . . the specified AML." Dkt. 64-10 at 2 (Gates Decl. ¶ 4). Although the Bureau did not plan to conduct a further gather at the Onaqui Mountain HMA until 2022, it has accelerated its efforts due to the historic drought that has gripped the American West. In a typical year, the Onaqui Mountain HMA receives about 10 inches of annual precipitation; from April through June 2021, the area received less than an inch of rain, roughly five percent of typical rainfall. As a result, little-to-no vegetation has grown, and, according to the Bureau, the wild horses are facing a perilous year.

To alleviate pressure on the herd and public land in the area, the BLM plans to round up approximately 400 horses, to return approximately 100 (about half of which will receive the fertility control vaccine) to the range, and to remove about 300 permanently from the range, beginning on July 13, 2021.  Dkt. 62-6 (Best Decl. Ex. 1); Dkt. 64 at 32–33; Dkt. 66.  Plaintiff Friends of Animals ("FOA") seeks a preliminary injunction to block that gather, alleging violations of the Wild Free-Roaming Horses and Burros Act ("WHA" or "the Act"), 16 U.S.C. § 1331 *et seq.*; the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*; and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.  Dkt. 62.  Each side contends that its approach will protect the horses and that horses will suffer (and die) unnecessarily if the opposing side prevails.

For the reasons explained below, the Court concludes that FOA has not carried its burden to justify the extraordinary relief that it seeks and will, accordingly, **DENY** the pending motion for a preliminary injunction.

## I.  BACKGROUND

### A.    Wild Free-Roaming Horses and Burros Act

The WHA, enacted in 1971, "declares that wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West . . . that . . . contribute to the diversity of life forms within the [n]ation and enrich the lives of the American people . . . as an integral part of the natural system of the public lands."  16 U.S.C. § 1331; *see also* H.R. Rep. No. 92-681, at 7 (1971).  Notwithstanding the importance of these animals, however, they constitute only a fraction of the wildlife on public land, which in turn serves uses beyond the conservation of wildlife.  43 C.F.R. § 4700.0-6; *see, e.g.*, Dkt. 46-2 at 283–84 (discussing migratory birds, the greater sage-grouse, and endangered species in the Onaqui Mountain HMA); *id.* at 463 (listing

forage distribution for livestock).  The WHA, therefore, tasks the Secretary of the Interior (acting

through BLM) with "manag[ing] wild free-roaming horses and burros in a manner that is

designed to achieve and maintain a thriving natural ecological balance on" such lands.  16 U.S.C.

§ 1333(a); *see also id.* § 1332(a) ("'Secretary' means the Secretary of the Interior when used in

connection with public lands administered by [her] through the Bureau of Land Management.").

The legislative purpose to strike this balance—and, more importantly, to require the

Secretary to strike this balance—pervades the WHA.  Most notably for present purposes, the Act

requires the Secretary to "maintain a current inventory of wild free-roaming horses and burros on

given areas of the public lands" for the purpose of (1) setting "appropriate management levels of

wild free-roaming horses and burros on these areas;" (2) determining "whether and where an

overpopulation exists and whether action should be taken to remove excess animals;" and (3)

deciding "whether [AMLs] should be achieved by the removal or destruction of excess animals,

or other options (such as sterilization, or natural controls on population levels)."

*Id.* § 1333(b)(1).  To make these determinations, the Secretary must consult with the U.S. Fish

and Wildlife Service, relevant state wildlife agencies, "such individuals independent of [f]ederal

and [s]tate government as have been recommended by the National Academy of Sciences," and

other individuals with "scientific expertise and special knowledge of wild horse and burro

protection, wildlife management and animal husbandry as related to rangeland management."

*Id.*

Although the statute grants the Secretary (and BLM) considerable discretion, several

nondiscretionary parameters govern the removal of wild horses from the range:

> Where the Secretary determines on the basis of (i) the current inventory of lands
> within [her] jurisdiction; (ii) information contained in any land use planning
> completed pursuant to [the Federal Land Policy and Management Act of 1976];
> (iii) information contained in court ordered environmental impact statements . . .

and (iv) such additional information as becomes available to [her] from time to time, including that information developed in the research study mandated by this section, or in the absence of the information contained in (i-iv) above on the basis of all information currently available to [her], that an overpopulation exists on a given area of the public lands and that action is necessary to remove excess animals, [s]he shall immediately remove excess animals from the range so as to achieve appropriate management levels.  Such action shall be taken . . . until all excess animals have been removed so as to restore a thriving natural ecological balance to the range, and protect the range from the deterioration associated with overpopulation.

*Id.* § 1333(b)(2).

In the event the Secretary undertakes to remove wild horses from the range, she must do so through a prioritized list of methods prescribed by the WHA.  First, she "shall order old, sick, or lame animals to be destroyed in the most humane manner possible."  *Id.* § 1333(b)(2)(A).  Second, if overpopulation still exists, she must "cause such number of additional excess wild free-roaming horses . . . to be humanely captured and removed for private maintenance and care for which [s]he determines an adoption demand exists by qualified individuals, and for which [s]he determines [s]he can assure humane treatment and care."  *Id.* § 1333(b)(2)(B).  Finally, if overpopulation persists, "the Secretary shall cause additional excess wild free-roaming horses . . . for which an adoption demand by qualified individuals does not exist to be destroyed in the most humane and cost efficient manner possible."  *Id.* § 1333(b)(2)(C).

Pursuant to BLM regulations, the Bureau manages herds of wild horses and burros through "herd management areas" ("HMAs").  43 C.F.R. § 4710.3-1.  These HMAs are governed by broader "land use plans" ("LUPs") that set high-level goals for one or more HMAs.  *Id.* § 4710.1; *Fund for Animals, Inc. v. BLM*, 460 F.3d 13, 15 (D.C. Cir. 2006).  The Bureau implements LUPs through narrower activity plans called, in the case of wild horse management, "herd management area plans" ("HMAPs"), which "establish short- and long-term management and monitoring objectives for a specific . . . herd and its habitat."  Dkt. 46 at 279; *see also* 43

C.F.R. § 4710.3-1.  "HMAPs also identify the actions to be taken to accomplish herd and habitat management objectives."  Dkt. 46 at 279.  The Bureau's *Wild Horses and Burros Management Handbook* ("*WHA Handbook*") provides that the AML for each HMA "shall be expressed as a population range within which" wild horses and burros "can be managed for the long term."  *Id.* at 285.  "The AML upper limit shall be established as the maximum number of" horses that "results in a [thriving natural ecological balance] and avoids deterioration of the range," and the "lower limit shall normally be established at a number that allows the population to grow . . . to the upper limit over a 4–5 year period, without any interim gathers to remove excess" wild horses and burros, although "[s]ome HMAs may require more frequent removals to maintain population size within AML."  *Id.*  The handbook also distinguishes between an HMAP decision setting the AML and a decision to gather and remove horses in order to "preserve or maintain a thriving ecological balance and [to] maintain a multiple use relationship."  *Id.* at 313, 315.  While the former takes effect only after a 30-day appeal period expires, the latter takes effect, for present purposes, "on a date specified in the decision," which must be 31–76 days prior to the proposed gather start date.  *Id.* at 313, 315–16.

## B.    National Environmental Policy Act

A second statute, NEPA, also governs decisions to gather horses.  NEPA requires federal agencies to take a "hard look" at the environmental consequences before carrying out federal actions.  *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 373–74 (1989).  The statute accomplishes this by setting forth decision-making procedures that serve "twin aims":  "First, [NEPA] 'places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action;' . . .  Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decision[-]making

process." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983) (quoting

*Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978)).

For a "major [f]ederal action[] significantly affecting the quality of the human environment,"

NEPA requires the lead agency to prepare "a detailed statement" that describes the project's

environmental impact and considers alternatives.  42 U.S.C. § 4332(2)(C).

To determine whether a proposed action will significantly affect the environment, the

governing regulations require agencies to prepare an environmental assessment ("EA"), a

"concise public document" that considers the action's environmental impacts as well as

alternatives to the proposed action.  40 C.F.R. §§ 1508.9, 1501.4(b)(2).[1]  Regulations define an

EA as a "concise public document" used to determine whether the agency should prepare a more

comprehensive environmental impact statement ("EIS") for projects likely to have a significant

environmental impact, 40 C.F.R. §§ 1508.9(a), 1508.11, or a "finding of no significant impact"

("FONSI"), *id.* § 1508.13.  Regulations also require the agency to "[m]ake diligent efforts to

involve the public in preparing and implementing their NEPA procedures."  *Id.* § 1506.6.

The Bureau's *WHA Handbook* sets forth the relationship between NEPA and

management decisions that the BLM might make pursuant to the WHA.  To create an HMAP,

the BLM must issue either an EA or EIS.  Dkt. 46 at 305–09.  Generally, before the Bureau

removes excess animals to achieve the AML, it must create a "[g]ather [p]lan[]" that includes a

"site-specific environmental analysis" that meets NEPA requirements.  *Id.* at 316.  There is,

however, an exception to this rule.  "Before conducting a new NEPA analysis for a proposed

---

[1]  The Council on Environmental Quality updated the regulations implementing NEPA on July 16, 2020.  *See* Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43,304 (July 16, 2020).  In this opinion, citations to regulations reflect the earlier regulatory language in place at the time the Bureau made the 2018 decision challenged in this lawsuit.

[g]ather [p]lan," the Bureau should review "existing NEPA documentation . . . to determine if it is adequate." *Id.* at 317. "Changes in numbers of [wild horses] since the previous gather that result in changes in forage utilization, use patterns, and/or ecological conditions and trends, or changing environmental conditions such as drought . . . may require that a new NEPA analysis be conducted." *Id.* "If the existing NEPA documentation appears to be adequate, . . . the issuance of a [Determination of NEPA Adequacy ("DNA")] may be appropriate." *Id.*

According to the *WHA Handbook*, the "authorized officer will provide the public 30 days to review and comment on the NEPA document," including a DNA, "except when an emergency situation exists." *Id.* Then, the Bureau must issue a final gather decision including a "decision record" summarizing and responding to substantive comments and setting "gather decisions effective upon a date established in the decision." *Id.* at 316–18.

## C.    Factual Background

### 1.    *2018 Decision*

The Onaqui Mountain HMA spans roughly 240,153 acres in Toole County, Utah, sweeping upward from a 4,800-foot valley to peaks as high as 8,200 feet above sea level. Dkt. 46-2 at 287; Dkt. 62 at 18. It is a dry place with "limited surface water;" "[t]he majority of springs and water sources that are present have been developed to provide water in troughs and ponds for wild horses and livestock," and most streams "are intermittent or ephemeral or only flow a short distance downstream from a spring." Dkt. 46-2 at 292. But grasses, sagebrush, and other shrubs have managed to take root across much of the range. *Id.* at 290. Pursuant to Taylor Grazing Act, 43 U.S.C. § 315 *et seq.*, and the Federal Land Policy and Management Act, 43 U.S.C. § 1701 *et seq.*, the BLM has issued grazing permits for sheep and cattle, Dkt. 46-2 at 300,

although the amount of livestock grazing has declined in 2021 "due to drought, with grazing anticipated at only around 43 percent of permitted use." Dkt. 64-10 at 6–7 (Gates Decl. ¶ 17).

In 1990, the BLM released a high-level planning document called, appropriately enough, the Record of Decision for the Pony Express Resource Management Plan ("RMP"), which establishes management policies for the HMA and sets the AML for wild horses at 45. Dkt. 46-2 at 460 *et seq.* In 2003, the BLM amended the HMA boundary and raised the AML to 121–210 horses. *Id.* at 529. The Bureau has not reevaluated the AML since that time, and it has not issued an HMAP for the range. Dkt. 62 at 18–19.

On June 13, 2018, BLM released a draft EA estimating that 455 horses lived in the Onaqui Mountain HMA and were contributing to changes in habitat, including degrading vegetation. Dkt. 46-2 at 11, 31, 262. A 30-day comment period followed, and on December 14, 2018, the Bureau issued the final EA ("Onaqui EA"), a Record of Decision ("ROD"), and FONSI. *Id.* at 262; Dkt. 62 at 19. None of these documents specified which category of decision this was—an HMAP, a gather decision, or some other action. July 8, 2021 Hrg. Tr. (Rough at 42) (BLM acknowledging that it is not clear "which bucket . . . BLM would necessarily consider this falls within"). The ROD, however, specified the actions that the authorizing officer, BLM's Salt Lake Field Manager, contemplated: "(1) Excess wild horses will be gathered inside and adjacent to the HMA via trapping (water/bait) and helicopter methods" in order to reduce the number of wild horses in the HMA "to the low end of AML"—or, in other words, approximately 121 horses; (2) "Fertility control vaccines" will be administered to "qualifying mares . . . to help maintain . . . AML numbers;" (3) "The BLM would continue to conduct monitoring activities in the HMA;" and (4) "After the initial gather, the target removal number would be adjusted accordingly based off updated population inventories for the HMA and the resulting projection

of excess animals over AML." Dkt. 46-2 at 261. As the ROD further explained, the approved alternative "aim[ed] to achieve AML by removing approximately 465 wild horses [from a total of 586 horses, the projected 2019 population size] inside and adjacent to the HMA in an initial gather," after which "the BLM would return periodically over a period of ten years to maintain AML by removing excess wild horses and by administering [a] fertility control vaccine." *Id.* at 260. And, as the EA further clarified, "[i]f gather efficiencies during the initial gather d[id] not allow for the attainment of the proposed action (i.e., not enough horses [were] successfully captured to reach low AML), the BLM would return to the HMA to remove excess horses above AML (via trapping (bait/water) and/or helicopter methods)." *Id.* at 281. To the extent that BLM collected more than the target number of horses in this initial gather, the Bureau would return the horses to the range, treated with fertility control vaccines as appropriate. *Id.* But the decision did not stop there. The BLM asserted that it would conduct "follow-up gathers, as frequently as needed, . . . over a 10-year period to remove any additional wild horses necessary to maintain the wild horse population at AML." *Id.* at 282. Moreover, the Bureau would continue to dart horses with fertility controls. *Id.*

Over the course of the ten-year period covered by the ROD and EA, the BLM promised to adjust the target number for removals "based off updated population inventories for the HMA and the resulting projection of excess animals over AML" and claimed that "[a]ll gathers proposed . . . would . . . be informed by ongoing monitoring" and subject to "funding and available space for the horses in adoption and/or sale programs or holding facilities." *Id.* at 282. In addition, the Bureau would "periodically conduct[]" genetic analyses on the herd "to monitor its genetic diversity." *Id.* And the BLM would also continue to monitor "individual and herd health (including mares after fertility control vaccine treatments), genetic diversity . . .,

population size . . ., population growth rate assessments, and rangeland, wildlife habitat, and riparian conditions." *Id.* at 261; *see also id.* at 282.

2.     *Commencement of this Action*

On August 29, 2018, FOA brought the instant action against the BLM, challenging the 2018 Onaqui decision, along with three other long-term decisions purporting to authorize gathers and removals over a ten-year span.  Dkt. 1.  FOA brings this action on behalf of its members, some of whom frequently visit the Onaqui Mountain HMA to study, photograph, or otherwise enjoy the horses.  Dkt. 62-1 (Downer Decl.); Dkt. 62-2 (Betten Decl.); Dkt. 62-3 (Stein Decl.); Dkt. 62-4 (Trabue Decl.).  These members assert an interest not only in the herd as a whole, the viability of which they fear will suffer as a result of removal, but also in the welfare of individual horses, who might be injured and euthanized during the gather or subsequently held in pens— some never to be adopted and some "adopted" only to be sold for slaughter.  Dkt. 62-1 at 4 (Downer Decl. ¶ 11); Dkt. 62-3 at 2 (Cramer Decl. ¶ 6).  FOA alleges that in making long-term removal decisions, the BLM violated the WHA by "failing to make an appropriate determination that wild horses are excess and removal is necessary prior to authorizing the permanent removal of horses over a ten-year" period of time (Count I), Dkt. 17 at 50 (2d Am. Compl. ¶¶ 352–54); violated the APA by departing from agency guidelines without explanation (Count II), *id.* at 50– 51 (2d Am. Compl. ¶¶ 355–60); violated NEPA by failing to prepare an EIS (Count III), *id.* at 51 (2d Am. Compl. ¶¶ 361–64); and also violated NEPA by failing to take a "hard look" at the actions that BLM proposed (Count IV), *id.* at 51–52 (2d Am. Compl. ¶¶ 365–68).  For relief, FOA asked the Court to declare that the BLM's long-term roundup decisions violated the WHA and APA; declare the RODs and FONSIs for the long-term roundup decisions unlawful under NEPA and the APA; enjoin any action *previously authorized* by the BLM's long-term roundup

decisions "unless and until the violations of federal law [alleged in the second amended complaint] have been corrected;" and "[v]acate and remand back to [the] BLM the [l]ong-[t]erm [r]oundup [d]ecisions."  *Id.* at 52 (2d Am. Compl. Request for Relief) (emphasis added).

In the meantime, the Bureau moved forward with its initial gather in the Onaqui Mountain HMA.  On August 30, 2019, the BLM released a press release announcing a goal to "gather approximately 200 horses" from the Onaqui Mountain HMA over about nine days, beginning on September 11, 2019.  Dkt. 65-4 at 2 (Best Decl. Ex. 1).  Between September 11 and 19, 2019, the BLM conducted an initial gather, removing 241 horses from the range.  Dkt. 65-5 at 2–4 (Best Decl. Ex. 2).  The bulk of these horses had body condition scores of 4–5, ranking moderate or thin on the Henneke body condition scoring system (1 = poor and 9 = extremely fat).  *Id.*; Dkt. 64-10 at 3 (Gates Decl. ¶ 8).  Between October 2019 and August 2020, the Bureau removed an additional eighteen horses.  Dkt. 64-10 at 2 (Gates Decl. ¶ 4).  Following these gathers, the wild horse population "remained more than twice the established AML," Dkt. 64 at 13; Dkt. 64-10 at 2 (Gates Decl. ¶ 4), and the gathers were well below the BLM initial goal of gathering approximately 465 wild horses to attain the low end of AML, before moving to the maintenance phase of the Bureau's plan, Dkt. 46-2 at 260–61.

FOA moved for summary judgment on December 5, 2019, Dkt. 37, and on January 10, 2020, the BLM cross-moved for summary judgment, Dkt. 39.  After reviewing the parties' briefs, the Court ordered that they file a joint status report addressing "(1) when the initial gathers in each of the relevant HMAs commenced, (2) when each such initial gather was completed or [was] likely to be completed, and (3) whether any of [FOA's] challenges to the initial . . . gathers [were] moot."  Minute Order (Nov. 3, 2020).  After considering that submission and hearing oral argument, the Court issued a memorandum opinion and order on

January 22, 2021, denying both motions for summary judgment. *Friends of Animals v. BLM*, No. 18-cv-2029, 2021 WL 230139 (D.D.C. Jan. 22, 2021) ("*FOA I*").

The Court began by considering the motions for summary judgment with respect to the gathers conducted to date (including the September 2019 Onaqui Mountain HMA gathers). As the Court explained, FOA had failed to carry its burden of demonstrating that the Court could provide any meaningful relief with respect to those gathers. *Id.* at *6–7. But the Court also declined to grant summary judgment to the BLM. If the Bureau knew the removed horses' whereabouts, the Court reasoned, it might be able to grant relief by ordering that the BLM return the horses to the range. *Id.* Thus, without further development of the factual record as to the status of removed horses, the Court could not determine whether FOA's claims were moot with respect to the September 2019 Onaqui Mountain HMA and the other gathers that BLM had already conducted.

As to future actions the BLM might take pursuant to its long-term decisions, in contrast, the Court concluded that FOA's challenges were not ripe for review. As the Court explained, "the challenged [d]ecisions contemplate future, discrete agency actions—administering contraceptives to horses or removing them through future gathers—over the course of ten years." *Id.* at *8. But the decisions set no timetable for these actions, offer only vague criteria for future gathers, and condition any future gathers on funding, facility capacity, and Bureau priorities. *Id.* at *8–9. In addition, the RODs and EAs committed the Bureau to conducting population inventories and habitat monitoring prior to any follow-up gathers. *Id.* at *8.

The Court concluded that the matter was not fit for review in light of myriad remaining uncertainties. *Id.* at *11. As the Court explained:

> [A]lthough the Gather Decisions contemplate that future gathers may occur
> without a further environmental assessment and without public comment, that is

> a decision that Bureau officials will have to make in the future—perhaps weeks
> from now or perhaps years from now. Significantly, counsel for the Bureau
> represented at oral argument that, "[t]o the extent conditions on the ranges
> change over time and require different management activities, there will be new
> NEPA" assessments.

*Id*. at *9. In stressing that "the strength of [FOA's] argument[s] may turn on the passage of time

and intervening conditions," the Court further observed:

> A gather conducted next month that merely completes (or attempts to complete)
> the Bureau's prior effort to achieve AML in the first instance poses different
> questions than a gather conducted years from now, after the Bureau has achieved
> AML and the herd size has re-grown to levels that strain the then-existing
> conditions on the range.
>
> And questions of this sort apply with even greater force to FOA's NEPA
> arguments. The length of time that passes between an agency's conduct of a
> NEPA analysis and the contemplated action may bear on the adequacy of that
> analysis, particularly if conditions have changed in material respects. *See*
> *Marsh*, 490 U.S., 373–74.

*Id*. In short, the Court was "unpersuaded that it [should] reach the merits of FOA's various

challenges without knowing when the further gathers will occur, whether conditions will have

changed by that time, and whether the Bureau [has decided] to conduct further environmental

analyses before acting." *Id.* at *10.

Finally, having concluded that the dispute was not "fit" for resolution, the Court was

required to "'balance the institutional interests in postponing review against the hardship to the

parties that will result from delay.'" *Id.* at *11 (quoting *Consol. Rail Corp. v. Untied States*, 896

F.2d 574, 577 (D.C. Cir. 1990)). Against this backdrop, the Court noted that, if FOA faced the

risk of future BLM action without notice, "it might well suffer undue prejudice if judicial review

were postponed." *Id.* But, that risk was mitigated by the Bureau's representation that it would

provide at least 30-days' public notice "before future gather[s] occur[.]" *Id.* "With that

understanding, the Court conclude[d] that FOIA [could] avoid any hardship by seeking judicial

review before the action occurs," *id.*, and thus rejected the parties' competing motions for summary judgment on the grounds of prudential ripeness.

>3.     *Motion for Preliminary Injunction*

Had it rained more in Utah this past year, the present motion might not be before the Court.  Since late 2020, however, the Onaqui Mountain HMA has experienced "[e]xceptional [d]rought [c]onditions."  Dkt. 64-10 at 3 (Gates Decl. ¶ 6).  In a declaration prepared for this litigation, the District Manager for BLM's West Desert District, Michael Gates, details these conditions.  *Id.* at 2 (Gates Decl. ¶ 1).  Instead of the typical 6.9 inches of precipitation that normally falls between October and June in the area, the region has received less than half an inch of rain, *id.*, and virtually no vegetation has grown in 2021 "throughout the HMA[,] creating a dire situation . . . for months to come regarding the foraging needs of the horses."  *Id.* (Gates Decl. ¶¶ 6–7).  Although horses on the Onaqui Mountain HMA have traditionally maintained Henneke body condition scores of 5–6, Gates attests that in the summer of 2020, "horses were observed to have lost 200–300 pounds and some were in body conditions 3–4" and that "[d]uring the 2020–21 winter and early spring 2021[,] several horses were seen with a body condition of 2 (very thin)."  *Id.* (Gates Decl. ¶ 8).  Although "some horses observed in the winter as being thin have put on some weight" this year, "as the forage dries out during the summer [Gates predicts that] the horses will begin to decline again."  *Id.* at 3–4 (Gates Decl. ¶ 8).  Gates further attests:

>Based on the most recent observation (June 2021) by the BLM filed specialist, horses within the Onaqui HMA have an overall average body condition score of a 4, which coupled with the poor range condition and lack of forage, puts them at risk of a potentially rapid deterioration in body condition as the summer progresses.  This will result in suffering and, for some individual animals, death. If the July gather does not proceed as planned, it is likely that BLM employees, in accordance with BLM Policy (Permanent Instruction Memorandum 2021-007), will need to euthanize the animals as an act of mercy if the an animal is suffering from "Sickness, failing health, or an infirmity, disease, injury,

lameness, or serious physical condition or defect that has a poor prognosis for improvement or little chance of recovery."

Id. at 4 (Gates Decl. ¶ 9).

"Based on the herd's declining body condition, deterioration of the range[,] and ongoing drought conditions, in early January 2021, BLM Utah requested approval to conduct a gather on the Onaqui HMA during the summer of 2021." Dkt. 64 at 15; *see also* Dkt. 64-10 at 4 (Gates Decl. ¶ 11). This gather request (which BLM previously anticipated making for the summer of 2022) was sent to BLM Headquarters for funding, and, on February 19, 2021, BLM Headquarters emailed BLM Utah to confirm that funding had been allocated for the gather. Dkt. 64-10 at 4–5 (Gates Decl. ¶ 11). On February 26, 2021, the BLM updated the gather schedule on its website to reflect a plan to gather 400 horses from the Onaqui HMA, between July 12, 2010 [sic] and July 22, 2021. *Id.*; Dkt. 62-6 (Best Decl. Ex. 1). Of those 400 horses, the BLM plans to remove 296 horses permanently from the range. Dkt. 62 at 20; Dkt. 62-6 (Best Decl. Ex. 1). The BLM explains that 104 horses would likely be returned to the range after seven-to-ten days; of those, BLM anticipates about half will be mares that it will treat with fertility control before release. Dkt. 64 at 32–33; July 8, 2021 Hrg. Tr. (Rough at 80–81). The schedule described the Bureau's "[r]ationale" for the action as "AML/Outside HMA, water issues, forage issues." Dkt. 62-6 (Best Decl. Ex. 1). Both parties agree that the Bureau has publicly issued no further NEPA document—in the form of an EA, FONSI, or DNA—for the upcoming gather. *See* Dkt. 62 at 34; Dkt. 64 at 28–29.

On March 1, 2021, counsel for the BLM emailed counsel for FOA, providing a link to the updated gather schedule. Dkt. 64-4 at 2 (Smith Decl. Ex. 2). The email, however, was apparently screened out by counsel for FOA's email system and directed to a junk email folder, so counsel for FOA did not see it for months. Dkt. 65 at 23. Instead, FOA's counsel evidently

learned about the planned gather from the online schedule on or about June 1, 2021 and promptly emailed counsel for the Bureau to inquire whether the website's schedule was correct.  Dkt. 62-9 at 1 (Best Decl. Ex. 4).  On June 7, 2021, counsel for the BLM responded that the schedule was accurate, except for the fact that the gather was scheduled to commence on July 11, 2021.  *Id.* at 3 (Best Decl.  Ex. 4).  Counsel explained that "the drought conditions in the west are primarily . . . motivating the need to gather after watching body conditions drop last summer (200–300 pounds on individual horses)."  *Id.*  Although FOA's counsel belatedly learned of this planned gather, there is no dispute that FOA was are of the BLM's plan.  FOA's president, for instance, tweeted a message criticizing the gather on March 1, 2021.  Dkt. 64-3 at 2 (Smith Decl. Ex. 1).

FOA moved for a preliminary injunction on June 14, 2021, Dkt. 62; the BLM filed its opposition on June 24, 2021, Dkt. 64; and FOA filed its reply on July 1, 2021, Dkt. 65.  The Court heard oral argument on July 8, 2021.  That same day, the BLM filed a "notice in response to the Court's inquiry as to whether [the] BLM [could] reasonably postpone the planned July 11, 2021 gather" in which the agency committed that it will "not commence gather operations before July 13, 2021."  Dkt. 66 at 1.  The notice also clarified that the BLM has not filed, and does not intend to file, an administrative record relating to events occurring since FOA filed its second amended complaint in February 2019 because "the only decision fairly encompassed by [the operative] Complaint is the 2018 Onaqui Mountain Herd Management Area Population Control Decision Record and accompanying environmental assessment."  *Id.* at 1–2.

On July 9, 2021, FOA filed a responsive notice, asserting that the BLM's failure to "provide a formal administrative record means there is no new evidence to support a finding that [the] BLM's determination to remove wild horses in July 2021 was based on 'currently available information[,]' 16 U.S.C. § 1331," Dkt. 67 at 2.  Essentially agreeing with the BLM about the

16

scope of the pending case, FOA's notice also clarified that the group is not challenging a new administrative action but, as the BLM observed, is challenging the 2018 NEPA analysis on the ground that it is insufficient—as a matter of law and fact—to support a series of gathers over a period of ten years. *Id.* But, to the extent evolving facts are at issue, FOA also "vigorously dispute[d] the . . . statement made by BLM official Gus Warr at the conclusion of the hearing," and submitted further declarations in support of its motion.[2] *Id.* at 2–3.

## II.  LEGAL STANDARD

To prevail on a motion for a preliminary injunction, the moving party must show (1) "'that [it] is likely to succeed on the merits,'" (2) "'that [it] is likely to suffer irreparable harm in the absence of preliminary relief,'" (3) "'that the balance of equities tips in [its] favor,'" and (4) "'that an injunction is in the public interest.'" *Glossip v. Gross*, 576 U.S. 863, 876 (2015) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  For many years, the D.C. Circuit evaluated these factors on a "sliding scale." *See, e.g.*, *Davenport v. Int'l Bhd. of Teamsters, AFL-CIO*, 166 F.3d 356, 360–61 (D.C. Cir. 1999).  It has read the Supreme Court's decision in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. at 20–24, however, "at least to suggest if not to hold" that plaintiffs face "a more demanding burden" under which "a likelihood of success is an independent, freestanding requirement for a preliminary injunction," *Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011) (internal quotation marks omitted). This issue remains the subject of some uncertainty in this circuit.  *See Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018) ("[T]his court has not yet decided whether *Winter v. Natural Resources Defense Council* . . . is properly read to suggest a

---

[2]  At the direction of the Court, on July 12, 2021, the BLM filed copies of BLM Utah's 2021 gather request and the BLM Headquarters' response to that letter.  Dkt. 68.  FOA filed a response the same day.  Dkt. 69.

sliding scale approach to weighing the four factors be abandoned." (internal quotation marks omitted)); *Am. Meat Inst. v. USDA*, 746 F.3d 1065, 1074 (D.C. Cir. 2014), *reinstated in relevant part by* 760 F.3d 18 (D.C. Cir. 2014) (en banc) ("This circuit has repeatedly declined to take sides in a circuit split on the question of whether likelihood of success on the merits is a freestanding threshold requirement to issuance of a preliminary injunction."). But, notwithstanding this uncertainty, it is clear that the plaintiff's likelihood of success on the merits is a "key issue [and] often the dispositive one" at the preliminary injunction stage, *Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*, 639 F.3d 1078, 1083 (D.C. Cir. 2011), and that, even if the sliding-scale approach survived *Winter*, "a plaintiff with a weak showing on the" likelihood-of-success factor "would have to show that all three of the other factors so much favor the [movant] that [it] need only have raised a serious legal question on the merits." *Am. Meat Inst.*, 746 F.3d at 1074 (internal quotation marks omitted).

## II.   ANALYSIS

### A.   Likelihood of Success on the Merits

The Court begins with FOA's likelihood of success on the merits. "Because neither NEPA nor the [WHA] contain[s] an internal standard of judicial review, the [APA] governs this [C]ourt's review of the BLM's actions." *In Def. of Animals*, *Dreamcatcher Wild Horse & Burro Sanctuary v. U.S. Dep't of Interior*, 751 F.3d 1054, 1061 (9th Cir. 2014). The APA requires courts to set aside an agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). Agency actions "in excess of statutory jurisdiction, authority, or limitations," likewise, must be set aside. *Id.* § 706(2)(C). "The scope of review under the 'arbitrary and capricious' standard is narrow[,] and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State*

*Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  "That said, the Court must satisfy itself that the agency 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'"  *Amgen Inc. v. Azar*, 290 F. Supp. 3d 65, 70 (D.D.C. 2018) (alteration in original) (quoting *State Farm*, 463 U.S. at 43).

The first question the Court faces is whether anything has changed since it denied the parties' competing motions for summary judgment in January, and, in particular, whether the present dispute is ripe for decision.  In one sense, the answer to that question seems straightforward.  The Court previously concluded that the dispute was not fit for resolution because the length of time that might pass from finalization of the EA to the relevant agency action, and any intervening changes in conditions on the range, would likely affect the Court's assessment of the merits of the parties' dispute.  *FOA I*, 2021 WL 230139, at *9.  Indeed, the Court even cautioned the BLM that, if it failed to provide FOA with significant notice of its plan to launch a future gather, FOA might be forced to seek "preliminary relief," posing a burden on the Bureau to litigate the question at issue on a compressed timetable.  *Id.* at *11.  In short, the current circumstances appear—at least at first glance—to be just what the Court indicated might be required to permit judicial resolution of the dispute.

The one complication—and it is a serious one—is that FOA has not challenged the current gather decision as a discrete agency action but, rather, continues to focus on the BLM's December 2018 ROD and EA.  Unsurprisingly, the BLM responds that it has no obligation to supplement the administrative record with materials reflecting agency deliberations and actions taken since FOA filed its second amended complaint in 2019.  Dkt. 66 at 1–2.  As the BLM explains, "the only decision fairly encompassed by [FOA]'s [Second] Amended Complaint is the

2018 Onaqui Mountain Herd Management Area Population Control Decision Record and accompanying environmental assessment," and "[t]o the extent that Plaintiff now asserts that conditions have changed such that additional NEPA analysis is necessary, that claim is not before the Court." *Id.* FOA, for its part, doubles down on this same point, arguing that "all statements that post-date the 2018 Decision . . . are not part of any formal administrative record [and] cannot be considered by the Court in evaluating the merits of Friends of Animals' claims." Dkt. 67 at 1. FOA also agrees with the BLM, moreover, that the question before the Court is the adequacy of "the existing 2018 NEPA analysis" and that the Court may not consider any "new evidence" in evaluating that claim. *Id.* at 2.

In short, the parties appear to agree that the administrative record is precisely the same record that the Court previously considered when it concluded that FOA's challenge was not "fit" for judicial resolution because the record did not reflect when and under what circumstances the BLM might undertake further gathers or to "complete (or attempt[] to complete) [its] prior effort to achieve AML." *FOA I*, 2021 WL 230139, at * 9. Nor is the Court free to consider the parties' competing submissions regarding current conditions (or their predictions regarding future conditions) on the Onaqui Mountain HMA in assessing FOA's likelihood of success on the merits on its APA claims. To the contrary, "the Supreme Court in *Overton Park* held that even sworn affidavits filed during the litigation would not suffice to explain the action of the Secretary of Transportation," and, likewise, in "assessing [FOA's] probability of success on the merits," the Court must rely on the existing administrative record. *Am. Bioscience, Inc. v. Thompson*, 243 F.3d 579, 582 (D.C. Cir. 2001). To be sure, the Court can consider new evidence—including the risk that the drought poses to the wild horses—in considering the other three prongs of the test for issuance of a preliminary injunction. But with respect to the

likelihood of success on the merits, the Court may not—absent unusual circumstances of a type

that neither party argues are present here—depart from the administrative record as it existed

when the Court issued its prior decision earlier this year.  And, unless and until FOA seeks to

amend or to supplement its second amended complaint, the Court may consider only the claims

raised in that pleading, which do not include challenges to any decision or action taken since

December 2018.

      Because application of these limitations may vary from claim to claim, the Court will

consider how the limited scope of the administrative record and FOA's asserted claims affects its

likelihood of success on the merits with respect to each argument raised in its motion for a

preliminary injunction.

      1.    *2018 Decision's Compliance with the WHA*

      FOA first renews its contention that the WHA does not permit the Bureau to make long-

term gather decisions, like the ten-year plan set forth in the 2018 Onaqui Mountain HMA ROD

and EA.  FOA argues, in particular, that the WHA permits the Bureau to remove wild horses

only "based on current information" and that, as a result, the "BLM's decision [may] only

appl[y] to a specific population at a specific time."  Dkt. 62 at 24.  That conclusion is reinforced,

according to FOA, by the WHA's requirements that the BLM "immediately" remove excess wild

horses and that it consult with "qualified scientists" and others when deciding "whether and

where an overpopulation exists and whether action should be taken to remove excess animals,"

16 U.S.C. § 1333(b)(1).  *See* Dkt. 62 at 24–25.

      In assessing FOA's likelihood of success on the merits with respect to this argument, the

Court starts, as it must, with the text of the statute.  *See BP America Prod. Co. v. Burton*, 549

U.S. 84, 91 (2006); *see also Sebelius v. Cloer*, 569 U.S. 369, 376 (2013) (quoting same).  Here,

the WHA confers broad discretion on the Secretary (and thus the BLM) "to protect and manage wild free-roaming horses and burros as components of the public lands . . . in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public land."  16 U.S.C. § 1333(a).  That discretion, however, is cabined by several requirements.  First, "[a]ll management activities shall be at the minimal feasible level."  *Id.*  Second, "[t]he Secretary [must] maintain a *current* inventory of wild free-roaming horses and burros on given areas of the public lands."  *Id.* at § 1333(b)(1) (emphasis added).  As the WHA further explains:

> The purpose of such inventory shall be to: make determinations as to whether and where an overpopulation exists and whether action should be taken to remove excess animals; determine appropriate management levels of wild free-roaming horses and burros on these areas of the public lands; and determine whether appropriate management levels should be achieved by the removal or destruction of excess animals, or other options (such as sterilization, or natural controls on population levels).  In making such determinations the Secretary shall consult with the United States Fish and Wildlife Service, wildlife agencies of the State or States wherein wild free-roaming horses and burros are located, such individuals independent of Federal and State government as have been recommended by the National Academy of Sciences, and such other individuals whom he determines have scientific expertise and special knowledge of wild horse and burro protection, wildlife management and animal husbandry as related to rangeland management.

*Id.*  If on the basis of this information, as well as "information contained in any land use planning completed pursuant to" the Federal Land Policy and Management Act, 43 U.S.C. § 1712, "information contained in court ordered environmental impact statements," and "such additional information as becomes available to h[er] from time to time . . . or in the absence of [this] information[,] all information *currently* available to [her]," the Secretary determines "that an overpopulation exits . . . and that action is necessary to remove excess animals, [s]he shall *immediately* remove excess animals from the range so as to achieve appropriate management levels."  *Id.* at § 1333(b)(2) (emphasis added).

In taking "such action," however, the Secretary must act "in the following order and priority . . . *until* all excess animals have been removed so as to restore a thriving natural ecological balance to the range, and protect the range from the deterioration associated with overpopulation." *Id.* (emphasis added). First, "[t]he Secretary shall order old, sick, or lame animals to be destroyed in the most humane manner possible." *Id.* § 1333(b)(2)(A). Second, "[t]he Secretary shall cause such number of additional excess wild free-roaming horses and burros to be humanely captured and removed for private maintenance and care for which he determines an adoption demand exists by qualified individuals, and for which he determines he can assure humane treatment and care." *Id.* § 1333 (b)(2)(B). Third, "[t]he Secretary shall cause additional excess wild free-roaming horses and burros for which an adoption demand by qualified individuals does not exist to be destroyed in the most humane and cost efficient manner possible." *Id.* § 1333(b)(2)(C).

In opposing FOA's challenge, the Bureau does not invoke *Chevron* deference, and, accordingly, the Court will consider the merits of FOA's statutory argument without applying *Chevron*'s two-step framework. But even so, FOA has failed to carry its burden of demonstrating that it is likely to succeed on the merits with respect to this claim. To start, although the WHA establishes that removal decisions should be based on "current" information, nothing in the statute requires a separate determination prior to each individual round-up made pursuant to a gather plan. *See Friends of Animals v. Silvey*, 353 F. Supp. 3d 991, 1006–07 (D. Nev. 2018); *aff'd* 820 Fed. App'x 513 (9th Cir. 2020). To be sure, the Secretary must "maintain a *current* inventory of wild free-roaming horses" and must decide whether "an overpopulation exists" and whether "action is necessary to remove excess animals" based on "all information *currently* available to him." 16 U.S.C. § 1333(b)(1) & (2) (emphasis added). But that is, at least

in theory, what the Secretary did when he decided in December 2018 to gather excess wild horses in the HMA and to reduce the number of wild horses in an initial gather "to the low end of AML," Dkt. 64-6 at 5, or approximately 121 wild horses.  Thus, viewing the December 2018 ROD standing alone, FOA's argument carries little force.

FOA's argument, however, posits that the December 2018 ROD cannot be viewed in isolation because it authorized the BLM to continue its efforts to achieve the low end of AML, and then to maintain AML over a period of ten years, and one cannot plausibly maintain that a roundup undertaken ten years down the road is based on "current" information.  FOA's argument might—or might not—prove correct depending on how much time passes and on whether conditions change in relevant respects.  The Court, however, is unpersuaded for present purposes.

By focusing its challenge on the December 2018 ROD and EA—and eschewing efforts to supplement the record based on recent developments—FOA has elected to pursue what is, in essence, a facial challenge to the 2018 actions.  Because the administrative record is thus fixed as of December 2018, the Court can evaluate FOA's argument only in light of the record that existed at that time.  Viewed through that lens, the Court must conclude either, as it did before, that the challenge is not "fit" for judicial review, *see FOA I*, 2021 WL 23019, at *9, or that it is unsupported by record evidence that the Bureau's "current inventory" or "information" has grown stale.  If asked in the abstract whether anything in the WHA categorically precludes the Bureau from issuing a gather decision that contemplates a series of roundups over a period of years to achieve AML, the Court is unable to accept FOA's argument.  And, if asked whether anything about the specific facts and conditions present here compels a different result, the Court

24

is not permitted (as both the BLM and FOA stress) to consider the extra-record evidence that might—or might not—support that claim.

Moreover, even if the Court were to consider the amount of time that has passed since the December 2018 ROD, FOA has not shown that it is likely to prevail on its claim that such delay is categorically barred by the WHA.  Because only about 30 months have passed since the Bureau issued its December 2018 ROD and because the Bureau has yet to achieve its "initial" goal of reducing the herd size to the low end of AML, the upcoming gather is reasonably viewed as a continuation of the Bureau's initial gather, which was supported by current excess and necessity determinations.  *See FOA I*, 2021 WL 230139 at *9 ("A gather conducted next month that merely completes (or attempts to complete) the Bureau's prior effort to achieve AML in the first instance poses different questions than a gather conducted years from now, after the Bureau has achieved AML and the herd size has re-grown to levels that strain the then-existing conditions on the range.").

Similarly, FOA has failed to demonstrate that it is likely to prevail on the merits of its contention that long-term gather plans are precluded by the statutory command that the Secretary act "immediately" after making a finding that it "is necessary to remove excess animals."  16 U.S.C. § 1333(b)(2).  Read in context, that direction requires the Secretary to begin the process of removing animals promptly.  But the very next sentence of the statute recognized that the process may proceed in stages "*until*" the goal of restoring "a thriving natural ecological balance to the range" is achieved.  *Id.*  Indeed, reading the statute to require the Secretary to act "without *any* intervening delay . . . would contravene the ultimate purposes of the WHA by forcing [the] BLM to act recklessly and without regard for the continuing viability or humane treatment of creatures it is specifically tasked with preserving."  *W. Rangeland Conservation Ass'n v. Zinke*,

265 F. Supp. 3d 1267, 1284 (D. Utah 2017).  Nor is there any reason to conclude that Congress required that the Secretary act "immediately" to ensure that the information that he relied upon was as current as possible.  Rather, as the D.C. Circuit has explained, the 1978 amendments to the WHA—which introduced that language upon which FOA relies—was adopted "to cut back on the protection the [WHA] affords wild horses, and to reemphasize other uses of the natural resources wild horses consume."  *Am. Horse Prot. Ass'n, Inc. v. Watt*, 694 F.2d 1310, 1316 (D.C. Cir. 1982).

To be sure, the statute requires the immediate removal of "excess animals . . . so as to achieve" AML.  But requiring immediate action so as to achieve something is not the same thing as immediately achieving that goal.  One might immediately stop eating dessert "so as to achieve" a five-pound loss of weight.  But that does not mean that the moratorium on desserts begins and ends on day one.  The same is true here.  The statute requires the BLM to remove wild horses promptly after deciding that "an overpopulation exists," but that does not mean that the BLM's efforts must come to an end immediately—or shortly after "immediately."  Rather, the WHA merely requires that the BLM make progress toward the AML through the removal of horses "immediately," and the BLM's September 2019 gather, which commenced less than a year after the 2018 decision, likely falls within the "discretionary space" the statute affords to the Bureau to act "immediately."  *W. Rangeland Conservation Ass'n*, 265 F. Supp. 3d at 1284.

The Court does not doubt that there is some limit on how long a single gather determination may meaningfully apply.  The problem FOA faces in this case, however, is that it has merely challenged the December 2018 ROD and EA, and it has not amended or supplemented its complaint to challenge the current plan.  As a result, the administrative record is limited to the BLM's December 2018 actions, and the Court cannot conclude that FOA is

likely to prevail in showing that it was unreasonable or contrary to law for the BLM in December 2018 to authorize a series of gathers over a period of approximately 30 months.

       2.     *2018 Decision's Compliance with NEPA*

Next, FOA contends that the BLM has run afoul of NEPA "by failing to provide any NEPA analysis of the proposed 2021 roundup." Dkt. 62 at 33.[3]  The 2018 decision, according to FOA, "completely failed to consider events after the 2018 [d]ecision and the current condition of the range and wild horses" in 2021.  *Id.* at 34.  Nor did the BLM release a DNA explaining why its previous NEPA analysis was adequate.  *Id.*  This is "crucial," according to FOA, because the 2018 decision "failed to consider the cumulative impact of rounding up 400 wild horses" in 2021, *id.* at 35, and failed to consider genetic effects adequately, because the most recent genetic analysis of the Onaqui herd, dated to 2005, found the herd to have critically low genetic variability, *id.* at 36.  The Bureau responds that an EA (such as the 2018 EA) can support multiple gathers, Dkt. 64 at 27; that the December 2018 EA clearly contemplated and planned for future gathers such as the 2021 roundup, *id.* at 28–29; that the BLM has continued monitoring the range since 2018, *id.* at 28; and, finally, that the 2018 EA adequately considered genetic diversity, *id.* at 29–31.

The D.C. Circuit addressed a similar situation in *Mayo v. Reynolds*, 875 F.3d 11 (D.C. Cir. 2017).  In that case, the Park Service and Fish and Wildlife Service adopted a fifteen-year plan in 2007 to manage an elk herd in Grand Teton and prepared an EIS to assess the plan's environmental impacts.  *Id.* at 17.  The plan called for reducing the herd by thousands of animals over fifteen years through an "adaptive management approach . . . based on established criteria

---

[3]  At oral argument, FOA explained that it uses "roundup" interchangeably with "gather."  July 8, 2021 Hrg. Tr. (Rough at 32–33).  For present purposes, the Court will follow that lead.

and changing social, political, or biological conditions." *Id.* (internal quotation marks omitted). The plan assumed that hunting would be authorized and that "over the long term an estimated average of 232–287 elk per year would be harvested by . . . deputized hunters." *Id.* at 18 (internal quotation marks omitted).  In 2014, wildlife photographer Timothy Mayo sued the Park Service to challenge its annual hunting authorization, alleging that "each annual hunting authorization constitute[d] a 'major [f]ederal action' that trigger[ed] NEPA's mandate that the agency prepare an EA or EIS." *Id.* at 18, 20.  He argued that: (1) "the 2007 [p]lan did not disclose the particulars of each future annual hunt; (2) the agencies ha[d] stopped implementing the [p]lan; and (3) significant new information bearing on the environmental effects of hunting had never been analyzed." *Id.* at 20.  The Park Service, in turn, argued that the annual hunting authorization was merely an implementation step of the fifteen-year plan and that "the 2007 EIS relieved the Park Service of the obligation to prepare fresh NEPA documentation each year it implements the elk-reduction program in conformity with" that plan.  *Id.*

The D.C. Circuit first observed that once an agency takes a "hard look" at every significant aspect of environmental impacts associated with a proposed major federal action, "it is not required to repeat its analysis simply because the agency makes subsequent discretionary choices in implementing the program."  *Id.* at 20–21; *see also Balt. Gas & Elec. Co.*, 462 U.S. at 97.  Because "an agency is not required to make a new assessment under NEPA every time it takes a step that implements a previously studied action," an agency need not supplement an original NEPA document, "[s]o long as the impacts of the steps that the agency takes were contemplated and analyzed by the earlier NEPA analysis."  *Mayo*, 875 F.3d at 21 (first citing *Marsh*, 490 U.S. at 373, then citing *Nat'l Comm. for the New River, Inc. v. FERC*, 373 F.3d 1323, 1330 (D.C. Cir. 2004)).  The court considered whether the EIS prepared for the 2007 plan

demonstrated that the Park Service had taken a "hard look" at the long-term effects of its program, and it concluded that the EIS had done so. *Id.* at 21–22.

The *Mayo* court then considered whether, notwithstanding the sufficiency of the initial EIS, the Park Service was obligated to supplement its EIS with any further NEPA analysis. As the D.C. Circuit explained, "NEPA does not prevent an agency from satisfying future NEPA obligations by performing a NEPA analysis at the outset of a long-term project." *Id.* at 22.

> To be sure, agencies are not always free to comply with NEPA by issuing a single EIS at the outset of a long-term project. An environmental analysis that occurs too early in the planning process may lack "meaningful information" necessary for informed consideration. . . . Thus, if a program "involves . . . separate sub-projects and will take many years," NEPA's implementing regulations allow the agency to "evaluate[] each sub-part as it becomes ready" and tailor its subsequent analyses to particularized considerations not already addressed in a prior "programmatic EIS."

*Id.* at 22–23 (citations omitted). Courts must apply a "rule of reason" when evaluating agency decisions not to supplement a NEPA document and should defer to the agency's "informed discretion." *Id.* at 16 (internal quotation marks omitted); *see also id.* at 23. Applying this principle, the *Mayo* court concluded that the record revealed no effects on the elk population outside those considered by the 2007 EIS and that, accordingly, no supplement was required to support the challenged annual hunting authorization. *Id.* at 23–24.

The approach set forth in *Mayo* has two distinct steps. First, the Court must consider whether the agency took a "hard look" at long-term environmental consequences in its initial EIS or EA. *Id.* at 20–21. Second, the Court must consider whether any actual consequences of the subsequent, implementing action were not adequately "contemplated and analyzed by the earlier NEAP analysis." *Id.* at 21. In resolving the pending motion, the Court can undertake the first of these tasks, which turns on the administrative record as it existed in December 2018, but cannot

29

resolve the second question because FOA has not filed a separate challenge to any current or impending action and the administrative record is limited to what occurred in 2018.

FOA is correct that the December 2018 EA "has no analysis of" the exact gather contemplated—that is, a July 2021 roundup of 400 horses, removing 296 animals and applying contraceptives to 52 others. Dkt. 62 at 34. But *Mayo* holds that an agency need not analyze the effects of each specific implementation step to satisfy the dictates of NEPA. 875 F.3d at 21 ("[A]n agency is not required to make a new assessment under NEPA every time it takes a step that implements a previously studied action."). Here, the 2018 EA contemplated that "in order to achieve low AML of 121 wild horses[,] . . . approximately 465 wild horses would be gathered and placed in the adoption and/or sale program." Dkt. 46-2 at 281. The BLM further observed that "efficiencies during the initial gather [might] not allow for the attainment of the proposed action (*i.e.*, not enough horses [would be] successfully captured to reach low AML)" and that, in such a case, "the BLM would return to the HMA to remove excess horses above AML." *Id.* The impending gather falls squarely within that action anticipated by the December 2018 EA.

Although about one-third the length of the EIS at issue in *Mayo*, the December 2018 EA assessed many of the same topics analyzed in the *Mayo* EIS. The EA considered how the "reduction program would likely affect the . . . overall size of the [Onaqui] herd," *Mayo*, 875 F.3d at 21; *see, e.g.*, 46-2 at 281–82; "the density of the herd and distribution of the" horses, *Mayo*, 875 F.3d at 21; *see, e.g.*, Dkt. 46-2 at 303–04; and the "[foaling], age, and sex ratios of the" herd, *Mayo*, 875 F.3d at 21; *see, e.g.*, Dkt. 46-2 at 303–05. As in *Mayo*, the December 2018 EA "considered the [horse]-reduction program's relation to the region's human environment," *Mayo*, 875 F.3d at 21; Dkt. 46-2 at 310, and the "likely consequences on other wildlife," *Mayo*, 875 F.3d at 21; Dkt. 46-2 at 313–17. Although the EA did not break each of these considerations

30

out by year, it did explain that, "[w]ith the exception of changes to herd demographics," which the BLM aimed to keep "negligible" through "scientifically informed" removal decisions, "direct population wide impacts have proven, over the last 20 years, to be temporary in nature with most if not all impacts disappearing within hours to several days of when wild horses are released back into the HMA." Dkt. 46-2 at 303–04. "No observable effects associated with these impacts would be expected within one month of release, except for a heightened awareness of human presence." *Id.* at 304. This lone longer-lasting effect does not distinguish the present case from *Mayo*, where the EIS "explained how hunting might affect the elks' social practices, potentially increasing the elks' nervousness." 875 F.3d at 21 (internal quotation marks omitted). In sum, for the same reasons the D.C. Circuit found the NEPA analysis sufficient in *Mayo* under a rule of reason, the Court is unpersuaded that FOA is likely to succeed on the merits of its challenge to the adequacy of the December 2018 EA's "hard look" at the long-term consequences of the contemplated gathers.

The one notable difference between this case and *Mayo* is that in *Mayo*, the agency produced an EIS instead of an EA. In its motion for summary judgment, FOA argued that the EA failed to consider "numerous significance factors that indicate an EIS is required." Dkt. 37 at 41.[4] A single EA cannot support the long-term 2018 decision, the argument runs, because

---

[4] FOA purports to incorporate all of its summary judgment arguments by reference into its motion for a preliminary injunction, Dkt. 62 at 2, and the BLM purports to incorporate all of its previous defenses in its opposition, Dkt. 64 at 21. This Court's Local Rules, however, bar a motion or opposition from exceeding 45 pages "without prior approval of the Court." D.C. L.Cv.R. 7(e). As the D.C. Circuit has observed in a slightly different context, "ordinarily" a party may not incorporate arguments by reference because it provides a way to "evade word limits." *Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019). Here, neither party sought permission to exceed the page limit, yet each side's briefs would surpass 80 pages by incorporation. Argument by incorporation is especially inappropriate in the present context, moreover, because FOA bears the burden of demonstrating that it is likely to succeed on the merits, and it has signaled which arguments it believes are most persuasive by including them in

environmental conditions might change, including alterations such as "droughts, wildfires, and other climate related changes; changes in grazing management; oil and gas development; mining; new roads; new fencing; and changes in available forage." Dkt. 37 at 41.  BLM's FONSI allegedly "failed to address how these uncertainties might impact the need to revise the applicable AMLs of the effected herds, or, combined with the authorized roundups, could potentially impact the stability and viability of the individual wild horse populations." *Id.*  The same goes for the long-term use of fertility control measures, including the administration of contraceptives, which FOA contends could work unknown harms "on the health and sustainability of wild horse populations," including "permanent infertility." *Id.* at 41–42.

When reviewing NEPA challenges, the Court's task "is not to 'flyspeck'" the Bureau's "environmental analysis for 'any deficiency no matter how minor.'" *Sierra Club v. FERC*, 827 F.3d 36, 46 (D.C. Cir. 2016) (quoting *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 75 (D.C. Cir. 2011)).  Instead, the Court's job is "simply to ensure that the agency adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary and capricious." *Id.* (quoting *Balt. Gas & Elec. Co.*, 462 U.S. at 97– 98).  This does not mean that "[j]udicial review of an agency's [FONSI] is . . . merely perfunctory;" rather, "the [C]ourt must [e]nsure that the agency took a hard look at the environmental consequences of its decision." *Sierra Club v. Peterson*, 717 F.2d 1409, 1413 (D.C. Cir. 1983) (internal quotation

---

its memorandum in support of its motion for preliminary injunction, and because the time pressure posed by a motion for a preliminary injunction does not afford the Court the luxury of perusing FOA's prior filings to see if an argument that FOA has declined to feature in its pending motion might offer greater promise.  Because FOA's efforts to distinguish *Mayo* turn on the difference between an EA and EIS, however, the Court will briefly touch on the parties' arguments regarding the sufficiency of the EA.

marks omitted).  When evaluating whether an agency discharged its duty by issuing an EA and a

FONSI, the D.C. Circuit considers whether the agency's NEPA analysis:

> (1) identif[ies] accurately the relevant environmental concerns, (2) take[s] a
> hard look at the problem in preparing its Environmental Assessment, (3) ma[kes]
> a convincing case for any finding of no significant impact, and (4) show[s] why,
> if there is an impact of true significance, there are sufficient changes or
> safeguards in the project to reduce the impact to a minimum, which would
> obviate the need for an Environmental Impact Statement entirely.

*Am. Rivers v. FERC*, 895 F.3d 32, 49 (D.C. Cir. 2018); *see also Peterson*, 717 F.2d at 1413.

FOA has failed to carry its burden of showing that the Court is likely to conclude that the

December 2018 EA neglected a "relevant environmental concern[]." *Am. Rivers*, 895 F.3d at 49.

As explained above, although the BLM proceeded by EA rather than EIS, it considered the same

factors that the *Mayo* court held were sufficient to satisfy NEPA.  The EA also considered

genetic diversity and the anticipated effects of population control on "long-term population

growth."  Dkt. 46-2 at 308–09.  The most recent genetic study of the Onaqui HMA herd occurred

in 2005 and revealed low heterozygosity in the herd.  *Id.* at 308.  Although this study was

arguably outdated in 2018, the Court concludes that the genetics analysis was nevertheless

sufficient for two reasons.  First, the BLM manages the Onaqui herd as part of a larger meta-

population of wild horses across HMAs.  *Id.*  Therefore, even if the genetic diversity of one herd,

like the Onaqui herd, is low, it can be bolstered with influx from other herds.  That raises the

second point: the same 2005 study that found low heterozygosity in the Onaqui herd

recommended that "2 or 3 mares from any other herd" be added to bolster the Onaqui

population's genetic diversity.  *Id.*  The Bureau not only did this, it went well beyond, and

introduced eighteen mares and six stallions to the Onaqui Mountain HMA between 2005 and

2018.  *Id.*  "Therefore . . . the expectation is that by now the Onaqui herd has a much higher level

of heterozygosity, and still has high levels of allelic diversity."  *Id.*  Although FOA is surely

correct that a more recent genetic assessment would have strengthened the 2018 EA's analysis, BLM's judgment as to the genetic health of the population implicates its expert judgment. And given that the December 2018 EA was drafted with the goal of reducing the population to 121 animals in 2019, FOA offers no reason to believe that taking longer to do so, and instead reaching that goal in 2021, would have a greater effect on the herd's genetics.

As already discussed, the Court is unpersuaded that NEPA requires consideration of every possible implementation action or the particulars of each gather to satisfy the "hard look" requirement. *Am. Rivers*, 895 F.3d at 49. To be sure, FOA might someday show that the December 2018 EA failed to contemplate and analyze significant environmental effects posed by a subsequent gather decision. But that question goes to the second prong of the *Mayo* court's framework, and it requires a claim challenging the subsequent gather decision and compilation of the associated administrative record, neither of which are before the Court at this time.

That limitation also disposes of FOA's contention that, before deciding to proceed with the impending roundup, the BLM should have prepared a separate NEPA document—at the very least, a DNA—to ensure that the July 2021 gather does not harm "the herd's health and viability," particularly as to genetic diversity. Dkt. 62 at 35. As explained, the problem with this argument is that FOA has not sought to amend or to supplement its complaint to challenge the current gather decision as a distinct agency action and, accordingly, the BLM has neither prepared nor filed an administrative record respecting that decision. To the contrary, FOA recently "clarif[ied]" that its challenge is to the December 2018 ROD and EA. Dkt. 67 at 2. Because FOA has not challenged any agency action or decision since then, it cannot demonstrate that it is likely to succeed on any such unasserted claim.

None of this is to say that the December 2018 EA will prove sufficient to satisfy NEPA for all gathers conducted between now and December 2028.  But if FOA—or any other organization—wants to challenge a roundup that implements the December 2018 ROD and EA, it will need to challenge that future action in light of the relevant administrative record.  Only in that way will the Court be able to decide, as *Mayo* requires, whether the subsequent action was "contemplated and analyzed by the earlier NEPA analysis."  *Mayo*, 875 F.3d at 21.  But the Court should not—and may not—decide such an APA challenge based on the competing declarations offered by the BLM and FOA.  To do so would place the Court in the shoes of the administrative agency and would violate the fundamental tenet of administrative law that courts review agency decisions based solely on the record that was before the agency.  *Am. Bioscience*, 243 F.3d at 582.

3.    *2018 Decision's Compliance with Past Agency Practice*

Finally, FOA argues that the BLM departed from its past policies without reasonable explanation.  First, it argues that the Bureau did not comply with the requirement of its handbook and manual[5] to "conduct an appropriate site-specific analysis of the potential environmental impacts that could result from implementation of a proposed gather in accordance with [NEPA]." Dkt. 62 at 28 (internal quotation marks omitted) (quoting Dkt. 46 at 12).  As already discussed, however, the Bureau did prepare a site-specific EA in December 2018, and the 2018 EA contemplated that the Bureau would conduct follow-up gathers, like the one that will commence on July 13, both to attain the low end of AML and then to maintain AML.  Dkt. 46-2 at 281–82.

---

[5]  At oral argument, the Court inquired as to the difference between a handbook and a manual. Gus Warr, BLM Utah's wild horse and burro state lead, explained that a manual is more high-level than a handbook, which offers more specific implementation steps.  July 8, 2021 Hrg. Tr. (Rough at 72).

Because FOA challenges only the December 2018 actions, the BLM's failure to conduct a subsequent site-specific analysis is not before the Court.

Second, FOA argues that the BLM failed to provide the public with 30 days' notice to review and to comment on the impending gather. Dkt. 62 at 28–29. That argument fails for essentially the same reason. FOA has not filed a claim challenging the impending roundup as a discrete agency action, and, accordingly, it cannot plausibly argue that this Court is likely to strike down that roundup decision on the merits—because the agency failed to provide the required notice or for any other reason. But, even if FOA had sought to amend or to supplement its complaint to assert such a claim, it would fail: although the BLM may have proceeded with little fanfare, it provided public notice about the planned gather in late February 2021; by early March 2021, FOA's President was aware of the plan, Dkt. 64-3 at 2 (Smith Ex. 1); by June 2021, FOA's counsel was aware of the plan; and several members of the public, including those associated with FOA have, in fact, sent comments to the Bureau, Dkt. 64 at 16; *see, e.g.*, Dkt. 64-12 (Gates Decl. Ex. B). To the extent other members of the public might complain that they were denied meaningful notice, FOA cannot press such a claim.

Third, FOA argues that the Bureau's current posture constitutes an unexplained departure from past litigation positions. Dkt. 62 at 31–32. In support of that contention, FOA points to *Friends of Animals v. Haugrud*, 236 F. Supp. 3d 131 (D.D.C. 2017), where the BLM "maintain[ed] that any future gather [made pursuant to a long-term decision] would be subject to additional notice, comment, analysis, and judicial review procedures." *Id.* at 134; Dkt. 62 at 31–32. But the fact that BLM represented that, in that case, it would provide further notice and opportunity for public comment does not mean that it was required to do so or that it would do so

in other cases.  The Bureau's position in *Haugrud*, accordingly, does not conflict in material respects with the position it now takes.

Fourth, FOA argues that in both 2019 and in planning the impending gather, BLM has departed without explanation from its policy of issuing gather decisions "31 to 76 [days] before the proposed start date of the roundup."  Dkt. 62 at 29.  The handbook provides in relevant part:

> Unless an emergency situation exists, gather/removal decisions shall be issued 31-76 days prior to the proposed gather start to provide an opportunity for administrative review of the authorized officer's decision to be completed.

Dkt. 46 at 316; *see also id*. at 14 (manual).  With respect to the impending gather, FOA's argument fails for two reasons.  First, once again, FOA has not filed a claim challenging that distinct agency action.  Second, had FOA done so, it would confront the Bureau's March 2019 "Permanent Instruction Memorandum," which "supersedes" the prior guidance and now directs authorized officers to "issue removal decisions effective upon issuance . . . for situations where the removal is required . . . to preserve or maintain a thriving natural ecological balance and multiple-use relationship."  2019 Permanent Instruction Memorandum (Mar. 15, 2019), *available at* https://www.blm.gov/policy/pim-2019-004 [hereinafter "2019 Update Memorandum"]; *see also* Dkt. 64 at 22–23 & n.5 (discussing and linking to the 2019 Permanent Instruction Memorandum).  As the Permanent Instruction Memorandum explains, the prior rule was intended "to allow opponents of the gather decision to pursue an administrative challenge before going to [f]ederal [c]ourt," but the rule "did not achieve the intended purpose" because opponents often went "directly to federal court the day before or during a gather seeking a Temporary Restraining Order . . . or Preliminary Injunction."  2019 Update Memorandum.

With respect to BLM's December 2018 ROD and EA, FOA's argument has greater force, but for three reasons the Court remains unpersuaded that FOA is likely to succeed on the merits

with respect to the present litigation.  First, to the extent FOA maintains that the BLM waited too long before conducting its initial gather in September 2019—well beyond 76 days after the ROD—that contention requires consideration of facts outside the administrative record, which ends with the authorized officer's decision.  Second, and more substantively, the guidance explains that the purpose of the rule "is to provide an opportunity for administrative review of the decision," Dkt. 46 at 14, and there is no reason to believe that FOA was denied that opportunity.  *See* 5 U.S.C. § 705 (incorporating "the rule of prejudicial error" into judicial review).  Third, the question whether the September 2019 gather occurred too late has no evident bearing on FOA's request that the Court enjoin the impending gather.  The guidance does not foreclose phased gathers, which are "nothing new for [the] BLM," *Friends of Animals v. Pendley*, No. 19-cv-3506, 2021 WL 780818, at *10 (D.D.C. Feb. 28, 2021).  To be sure, BLM may somewhat overstate the historical pedigree of this practice, but it has identified three examples of this long-term approach.  *See Silvey*, 353 F. Supp. 3d at 1001 (examining a ten-year plan specifying the number of horses to be gathered over that period); *Pendley*, 2021 WL 780818, at *4 (considering a challenge to a 10-year gather); *Leigh v. Salazar*, No. 13-cv-6, 2014 WL 4700016, at *1 (D. Nev. Sept. 22, 2014) (considering a challenge to a multi-year gather plan).  Moreover, and even more to the point, it is clear that the BLM has frequently failed to commence gathers within 76 days of a decision based on myriad "nigh-insurmountable administrative obstacles."  *W. Rangeland Conservation*, 265 F. Supp. 3d at 1291; *see also id.* (laying out the various reasons that the BLM has historically struggled to begin removing horses in a timely fashion).  Finally, the guidance merely requires that the BLM issue its decision 31 to 76 days before "start[ing]" that gather.  Dkt. 46 at 14.  The guidance says nothing about when the gather must end.

Finally, FOA argues that "the proposed 2021 roundup cannot be reconciled with the overall procedures for wild horse management as explained in [the] BLM's handbook." Dkt. 62 at 29. Even ignoring the problem that FOA has not brought suit challenging the 2021 decision, the argument fails. Essentially, FOA argues that the handbook's categories of land use plans, HMAPs, and gather plans, as well as the distinct requirements for issuing each, make little sense if a decision that is neither a land use plan nor an HMAP can have long-term consequences of the kind contemplated by the 2018 decision. Although FOA is correct that the handbook sets forth these categories, it is also clear that the Bureau has considerable flexibility in choosing which types of plans to use and what to put in them. The handbook, for example, contemplates that the Bureau could use an array of approaches to manage an HMA. It might, for example, use a land use plan, an EA, an established AML, and a gather plan. Dkt. 46 at 314. Or the Bureau might use an AML, an HMAP, and a gather plan. *Id.* Or some other combination. Thus, although the categories may offer useful organizational tools, the handbook and manual leave the authorized officer with considerable discretion in framing her decision. FOA points to nothing in either document that expressly forbids the authorized officer from issuing a long-term gather decision.

In sum, the Court FOA has failed to carry its burden of showing a likelihood of success on the merits.

## B.     The Remaining *Winter* Factors

A party seeking a preliminary injunction must also show that it is likely to suffer an irreparable injury in the absence of preliminary relief. To meet this burden, "the harm must be certain and great . . . and so imminent that there is a clear and present need for equitable relief to prevent irreparable harm." *League of Women Voters v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (internal quotation marks omitted). FOA has offered evidence in declarations that some of its

members regularly visit the Onaqui HMA to observe, study, and photograph the horses.  *See* Dkt. 62-1 (Downer Decl.); Dkt. 62-2 (Betten Decl.); 62-3 (Stein Decl.); Dkt. 62-4 (Trabue Decl.). These individuals, FOA contends, "will suffer aesthetic harm from their reduced ability to view and photograph wild horses [in the Onaqui HMA], from their inability to see specific horses with whom they have a personal connection, and from the knowledge that horses they care deeply about are being harmed by the roundup and removal."  Dkt. 62 at 40.

Consistent with these concerns, the December 2018 EA observes that "[f]ewer wild horses could result in a reduced opportunity for viewing them by the general public," although the BLM asserts that it will attempt to mitigate these effects "by careful selections in the horses to remove from or retain within the HMA."  Dkt. 46-2 at 310.  Beyond reduced opportunities to observe and photograph wild horses in general, moreover, some FOA members assert that the roundup will deprive them of the opportunity to observe individual wild horses that they have come to know.  *See*, *e.g*., Dkt. 62-2 at 2 (Betten Decl. ¶ 6) ("[I]t still hurts that some of the wild horses I came to know were rounded up and removed in September 2019.").  One member mentions a specific "stallion in [his] thirties, Old Man," for example, that she fears could not survive the roundup."  Dkt. 62-3 at 2 (Stein Decl. ¶ 6).  Given that the September 2019 gather resulted in two deaths, and undisputed representations at oral argument that one-half percent of horses typically die during gathers, July 8, 2021 Hrg. Tr. (Rough at 57), concerns about horse mortality are not unfounded.

The problem for FOA, though, is that the Bureau has offered convincing evidence that the horses face an equally bleak (or worse) future if they remain on the range.  According to Michael Gates, the District Manager for the BLM West Desert District, Dkt. 64-10 at 2 (Gates Decl. ¶ 1), the Onaqui Mountain HMA is "experiencing [e]xceptional [d]rought [c]onditions,"

posing a "high" risk that the wild horses on the range "could face a dire situation at the current overpopulation if the scheduled gather is canceled or even postponed," *id.* at 3, 5 (Gates Decl. ¶¶ 6, 14). In particular, he explains that, unlike in 2020, there is insufficient "forage production . . . to help carry the horses through the summer months of 2021," *id.* at 5 (Gates Decl. ¶ 14), and that, "[if] the July gather does not proceed as planned, it is likely that BLM employees . . . will need to euthanize the animals as an act of mercy if an animal is suffering," *id.* at 4 (Gates Decl. ¶ 9). He adds that, "[i]f the scheduled gather is cancelled or postponed[,] it likely will be very difficult to reschedule due to the other areas across the [W]est which are dealing with draught impacted conditions" and also because "[t]he HMA is within a military airspace operating area, and it can take weeks or months to get clearance to operate in that area," and because "necessary contractors may become unavailable as other gathers get awarded," *id.* at 5–6 (Gates Decl. ¶ 15). In sum, "[i]f cancelled or postponed, BLM may be unable to get Onaqui back on the gather schedule even if the situation develops into an emergency, which could result in the suffering and death of individual animals in the HMA." *Id.*

Gates also attests that "[b]ringing feed to the Onaqui HMA to prevent wild horse suffering and death is not a viable alternative to removing excess animals" because "feeding of wild horses on the range . . . could lead to further degradation of the rangelands as the estimated 500 wild horses at Onaqui would congregate at feeding locations, creating soil compaction," and "[t]he horses would . . . continue to seek out and consume the vegetation on the rangelands[,] further adding to the unsustainable forage conditions." *Id.* at 6 (Gage Decl. ¶ 16). In addition, the supplemental feed might "contain noxious weed seed," which "would allow for proliferation of the noxious weed" on the range, and, moreover, "the wild horses would become accustomed to being fed and could lose [the] wild nature" that FOA's members—and others—value. *Id.*

Given this risk to the wild horses in the HMA, the Court cannot conclude that the FOA members who have offered declarations in support of FOA's motion for a preliminary injunction will suffer irreparable harm if an injunction is denied.  With or without an injunction, the horses in the HMA are at risk, and whether removed by the BLM as part of the gather or euthanized due to poor health resulting from overpopulation and the drought, those who enjoy viewing and photographing the horses may have fewer opportunities to pursue their avocations and professional studies.  FOA, for its part, disputes this, submitting an array of photographs showing healthy horses viewed recently in the Onaqui Mountain HMA, Dkt. 65-2 at 4–7 (Betten Decl.), but this is nonresponsive to the BLM's contention, which is that the horses are currently reasonably healthy but will reach dire conditions later in the year as forage runs out, Dkt. 64-10 at 3–4 (Gates Decl. ¶ 8).  And although FOA invokes the declaration of ecologist Craig Downer, who contests the need to remove horses, Dkt. 65-1 (Downer Decl.), at best this brings the question of irreparable harm into equipoise, and FOA, not the BLM, bears the burden of proof.[6] Because the horses face potential, serious harm even if FOA prevails, and because the FOA's declarants will suffer related lost opportunities to view the horses in their natural habitat, the Court concludes that FOA has failed to carry its burden of demonstrating that it or its members will likely suffer  irreparable harm if the Court fails to issue a preliminary injunction.

For similar reasons, the Court is unpersuaded that the balance of equities and the public interest tilt in favor of granting preliminary relief.  Dkt. 62 at 45.  Allowing the horses to remain on the range could imperil their health and the ecological well-being of the range.  The BLM has convincingly explained, moreover, that there is substantial uncertainty whether it would be able to reschedule the gather if delayed, not merely as a result of agency preferences or priorities, but

---

[6]  The Court offered to hear from Mr. Downer at the hearing, but FOA did not accept that offer.

also due to lack of resources and difficulty coordinating with parties outside of the agency (like the military) at a later date.  The Court, accordingly, finds that the balance of equities and the public interest are at least in equipoise and do not support granting an injunction.

**CONCLUSION**

For the reasons above, the Court will **DENY** FOA's motion for a preliminary injunction, Dkt. 62.

**SO ORDERED.**


/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  July 13, 2021