**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| FRIENDS OF ANIMALS | ) | |
| 777 Post Road, Suite 205 | ) | Case No. 1:18-cv-02029-RDM |
| Darien, CT 06820 | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES BUREAU | ) | |
| OF LAND MANAGEMENT, an agency | ) | |
| of the United States | ) | |
| 1849 C Street NW, Rm. 5665 | ) | |
| Washington DC 20240 | ) | |
| | ) | |
|     Defendant. | ) | |
| | ) | |

**THIRD AMENDED AND SUPPLEMENTAL COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

1.    Plaintiff, Friends of Animals, brings this action on its own behalf and on behalf of its adversely affected members against the United States Bureau of Land Management (BLM) to challenge the following decisions pertaining to management of wild horses on federal public lands: (1) the November 28, 2017 Decision Record and Finding of No Significant Impact for the Pine Nut Mountains Herd Management Area Plan and Environmental Assessment, DOI-BLM-NV-C020-2016-0020-EA (hereinafter, "Pine Nut Ten-Year Plan"); (2) the July 30, 2018 Decision Record and Finding of No Significant Impact for the Muddy Creek Wild Horse Herd Management Area Gather Plan and Environmental Assessment, DOI-BLM-UT-G020-2017-0032-EA (hereinafter, "Muddy Creek Ten-Year Plan"); (3) the August 27, 2018 Decision Record and Findings of No Significant Impact for the Eagle Herd Management Area Complex Wild Horse Gather Environmental Assessment,

DOI-BLM-NV-L030-2018-0004-EA (hereinafter, "Eagle Complex Ten-Year Plan"); (4) the

December 14, 2018 Decision Record and Finding of No Significant Impact for the Onaqui

Mountain Herd Management Area Population Control and Environmental Assessment, DOI-

BLM-UT-W010-2017-0009-EA (hereinafter, "Onaqui Mountain Ten-Year Plan"),

(collectively, "Long-Term Wild Horse Roundup Decisions" or "Decisions"); and (5) the

decision to remove wild horses from the Onaqui Mountain HMA in July 2021 as well as the

actual roundup and removal of wild horses from the Onaqui Mountain HMA in July 2021

("2021 Onaqui Roundup").

2.     In adopting these Long-Term Wild Horse Roundup Decisions, BLM

disregards, without explanation, its statutory and regulatory obligations to undertake

roundup specific analysis of the wild horses and their habitat, and to ensure public

participation in such decisions.

3.     In rounding up and removing wild horses from the Onaqui Mountain HMA in

2021, BLM disregarded, without explanation, its statutory and regulatory obligations to

undertake a roundup-specific analysis of the wild horses and their habitat, and to ensure

public participation in such decisions.

4.     Here, the Long-Term Wild Horse Roundup Decisions authorize ongoing,

multiple roundups and removals of wild horses for multiple years. Under the Decisions, no

further analysis of the wild horses and their habitats is required, and no public notice and

opportunity to comment will be provided before a future roundup takes place. The

Decisions identify and analyze the initial roundups (an initial roundup in 2018 of 600 or

more horses from the Pine Nut Mountains Herd Management Area (HMA), an initial

roundup in 2018 of approximately 148 wild horses from the Muddy Creek HMA, an initial

roundup of approximately 2,075 wild horses from the Eagle Complex, and an initial

roundup in 2019 of approximately 465 wild horses from the Onaqui Mountain HMA). The

Decisions do not, however, address the specifics of any future roundups that are authorized by the plans.

5.     The Wild Free-Roaming Horses and Burros Act (WHBA) and BLM's guidance documents require that decisions to round up wild horses be based on **current** information, and that management be at the minimal feasible level. 16 U.S.C. § 1333(a), (b)(2); *see also* BLM, Range Management Removal Manual, MS-4720 (2010) (hereinafter, "BLM Removal Manual"), § 4720.01. BLM must make a determination that wild horses are excess and removal is necessary prior to removing horses. 16 U.S.C. § 1333(b).

6.     BLM guidance also requires that BLM provide a site-specific National Environmental Policy Act (NEPA) analysis for each roundup decision and provide the public with opportunity to comment on such decisions. BLM, Wild Horses and Burros Management Handbook H-4700-1 (2010) (hereinafter, "BLM WHB Handbook") § 2.5. BLM guidance mandates that BLM issue roundup decisions thirty-one to seventy-six days before the proposed start date of the roundup, absent an emergency. BLM Removal Manual, § 4720.36; *see also* BLM WHB Handbook § 7.1.2.2.

7.     Citing this guidance, this Court recently stated that "before BLM can conduct a future gather, it must provide notice of its decision" within this timeframe and "provide an opportunity for administrative review of the decision." *Friends of Animals v. Haugrud*, 236 F. Supp. 3d 131, 135 (D.D.C. 2017).

8.     In adopting the Long-Term Wild Horse Decisions and rounding up wild horses after the Decisions, including the roundup and removal of wild horses from the Onaqui Mountain HMA in 2021, BLM has disregarded these obligations without explanation.

9.     Basing removal actions on the number of horses alone is not a sufficient justification to find that wild horses are "excess" and that it is necessary to remove the wild horses from public lands. *See Col. Wild Horse and Burro Coalition, Inc. v. Salazar*, 639 F.

Supp. 2d 87, 96 (D.D.C. 2009) (finding it "difficult to think of a 'management activity' that is farther from a 'minimal feasible level' than removal").

10.    In approving these Decisions, BLM has authorized future wild horse removals and fertility control treatments that could be based on outdated data, including obsolete forage data and outdated appropriate management levels (AMLs), over the next ten years or more. Additionally, BLM has cut the public out of the process and instead proposes to authorize continued roundups for ten years or more with no opportunity for the public to review or comment on its decisions.

11.    The 2021 Onaqui Roundup was based on outdated data and an outdated AML. Additionally, BLM cut the public out of the process, failed to solicit comments, failed to comply with NEPA, and deprived the public the right to appeal its decision.

12.    Unfortunately, BLM desires to take this type of long-range, but short-sighted, approach to manage wild horses for nearly all HMAs.[1]

13.    In issuing the Long-Term Wild Horse Roundup Decisions, and approving and conducting the 2021 Onaqui Roundup, BLM violated its own policy and its statutory obligations under the WHBA. BLM also failed to fulfill its obligations under NEPA.

---

[1] BLM has proposed or approved similar long-term roundup plans for the following HMAs: Antelope and Triple B Complexes Gather Plan EA (DOI-BLM-NV-E030-2017-0010-EA); Silver King HMA  Wild Horse Gather EA (DOI-BLM-NV-L000-2017-0005-EA); Smoke Creek Complex Gather EA (DOI-BLM-NV-W030-2015-0001-EA); East Pershing Complex Gather Plan EA (DOI-NV-W010-2017-0009-EA); Seaman and White River HA Wild Horse Gather EA (DOI-BLM-NV-L000-2017-0006-EA); Caliente HA Complex Wild Horse Gather EA (DOI-BLM-NV-L030-2017-0031-EA); Stinkingwater HMA Population Management Plan EA (DOI-BLM-ORWA-B050-2017-0002-EA); Cold Springs HMA Population Management Plan EA (DOI-BLM-OR-V040-2015-022-EA); Paisley Desert HMA Wild Horse Gather Plan EA (DOI-BLM-OR-L050-2009-0065-EA); South Steens HMA Population Management Plan EA (DOI-BLM-OR-B070-2013-0027-EA); Warm Springs HMA Population Management Plan EA (DOI-BLM-ORWA-B050-2018-0016-EA); Hog Creek HMA Population Management Plan EA (DOI-BLM-ORWA-V000-2017-0026-EA); North Hills Wild Horse HMAP and Gather Plan EA (DOI-BLM-UT-C010-2018-0054-EA); Sulfur Wild Horse Gather Plan EA (DOI-BLM-UT-C010-2015-0011-EA); Bible Springs Complex Wild Horse Gather and Removal and Fertility Treatment Plan EA (DOI-BLM-UT-C010-2014-0035-EA).

14.     For these reasons, and as further alleged below, Friends of Animals seeks a declaration from the Court that BLM violated the WHBA and NEPA. Friends of Animals further requests that the Court vacate and remand the Long-Term Wild Horse Roundup Decisions and Findings of No Significant Impact and the 2021 Onaqui Roundup, prohibit the removal of wild horses from in and around the impacted HMAs, prohibit the use of fertility control measures authorized by the Decisions, and order the return of wild horses to their HMAs.

## PARTIES

15.     Friends of Animals is a nonprofit, international animal advocacy organization incorporated in the state of New York since 1957. Friends of Animals has nearly 200,000 members worldwide. Friends of Animals and its members seek to free animals from cruelty and exploitation around the world, and to promote a respectful view of nonhuman, free-living and domestic animals. Friends of Animals informs its members about animal advocacy issues and its progress in addressing them through its magazine, ActionLine, its website, social media, and public events. Friends of Animals regularly advocate for the right of wild horses to live freely on public lands, and for more transparency and accountability in BLM's "management" of wild horses and burros.

16.     Friends of Animals and its members have a significant interest in the wild horses at the Pine Nut Mountains HMA, the Muddy Creek HMA, the Eagle Complex, and the Onaqui Mountain HMA. For example, Friends of Animals' member and contributor Craig Downer, a wildlife biologist specializing in the study of wild horses and their habitats, regularly visits the Pine Nut HMA and observes and studies the wild horses that reside there. Mr. Downer has written books about wild horses and has long evaluated the ramifications of the federal government's treatment of wild horse populations in the West. He has written articles about the benefits of wild horses to the ecosystem, including their positive role in fire suppression, as well as the impacts of the fertility control pesticide

porcine zona pellucida (PZP) on wild mares. Notably, Mr. Downer researched and composed a Pine Nut Mountain Ecological Report, with particular focus on wild horses, in July 2015. He also personally enjoys observing wild horses throughout the West. Many of Friends of Animals' other members and staff also enjoy observing and photographing wild horses in the Pine Nut Mountains HMA, the Muddy Creek HMA, the Eagle Complex, and the Onaqui Mountain HMA. Mr. Downer and other members' professional and recreational interests in observing, studying, and photographing the wild horses would be injured if BLM proceeds with the proposed actions laid out in the Long-Term Wild Horse Roundup Decisions and/or any of the ten-year plans proposed by BLM. Friends of Animals members' injuries are fairly traceable to BLM's conduct and would be redressed by the relief sought by Friends of Animals in this case.

17.    Defendant, the United States Bureau of Land Management, is an agency located within the Department of the Interior. The agency administers over 245 million surface acres of public lands, most of which are in twelve Western states, including Montana, Nevada, and Utah. The Pine Nut Mountains HMA, the Muddy Creek HMA, the Eagle Complex, and the Onaqui Mountain HMA are located on BLM-administered public land, and the agency is responsible for ensuring that federally-administered actions within the HMAs comply with the requirements of all federal laws.

## JURISDICTION AND VENUE

18.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question). This action presents a case and controversy arising under the WHBA and NEPA, federal statutes. This Court also has jurisdiction pursuant to 28 U.S.C. § 1346, as the United States is a defendant.

19.    This Court has authority to grant Plaintiff's requested relief pursuant to 28 U.S.C. §§ 2201-2202 (declaratory and injunctive relief) and 5 U.S.C. §§ 701-706 (Administrative Procedure Act).

20.    Venue properly lies in this Court pursuant to 28 U.S.C. § 1391(e) as Defendant, the Bureau of Land Management, is a federal agency headquartered in Washington, D.C.

## STATUTORY BACKGROUND

### A. Wild Free-Roaming Horses and Burros Act.

21.    In 1971, Congress passed the Wild Free-Roaming Horses and Burros Act (WHBA), 16 U.S.C. §§ 1331 *et seq*., finding that "wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West; that they contribute to the diversity of life forms within the Nation and enrich the lives of the American people; and that these horses and burros are fast disappearing from the American scene." 16 U.S.C. § 1331. Upon finding this, Congress stated its policy was that "wild free-roaming horses and burros shall be protected from capture, branding, harassment, or death, and to accomplish this they are to be considered in the area where presently found as an integral part of the natural system of public lands." *Id*.

22.    The WHBA requires BLM to "protect and manage wild free-roaming horses and burros as components of the public lands . . . in a manner that is designed to achieve and maintain a thriving, natural ecological balance on the public lands." 16 U.S.C. § 1333(a). Additionally, the WHBA requires management of wild horses and burros to be at "the minimal feasible level." *Id*.

23.    To do so, for each HMA, BLM must: (1) maintain a current inventory of wild horses in the management area; (2) determine the AML of wild horses that the HMA can sustain; and (3) determine the method of achieving the designated AML and managing horses within it. 16 U.S.C. § 1333(b)(1); 43 C.F.R. §§ 4710.2, 4710.3-1.

24.    BLM must manage wild horses "as self-sustaining populations of healthy animals in balance with other uses and the productive capacity of their habitat." 43 C.F.R. § 4700.0-6(a).

25.     BLM must undertake management activities affecting wild horses "with the goal of maintaining free-roaming behavior." 43 C.F.R. § 4700.0-6(c).

26.     In limited circumstances, the WHBA allows the removal of wild horses. However, prior to gathering or removing any wild horses from the range, the WHBA requires BLM to make a determination that: (1) "an overpopulation [of wild horses] exists on a given area of the public lands," and (2) "action is necessary to remove excess animals." 16 U.S.C. § 1333(b)(2). This decision must be based on all information "currently available" to the BLM at the time of the determination. *Id.*

27.     The WHBA defines the term "excess" as animals that "must be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area." 16 U.S.C. § 1332(f).

28.     The WHBA mandates that, when BLM is making a determination about whether an overpopulation exists, and action should be taken to remove excess animals, it should consult with various individuals. For example, BLM must consult with "qualified scientists in the field of biology and ecology, some of whom shall be independent of both Federal and State agencies," as has been recommended by the National Academy of Sciences, and others that it determines have scientific expertise and special knowledge of wild horse and burro protection, wildlife management, and animal husbandry as related to rangeland management. 16 U.S.C. § 1333(a); *see also* 43 C.F.R. § 4700.0-6.

29.     BLM should conduct management activities affecting wild horses in accordance with approved land use plans. 43 C.F.R. § 4710.1.

30.     BLM management should be at the minimum level necessary to attain the objectives identified in approved land use plans and herd management area plans. 43 C.F.R. § 4710.3.

31.     BLM may establish conditions for the removal of unauthorized livestock from public lands adjacent to or within areas occupied by wild horses to prevent undue harassment of the wild horses. 43 C.F.R. § 4710.6.

**B. The National Environmental Policy Act.**

32.     NEPA is our nation's basic charter for environmental protection.

33.     Congress enacted NEPA for two central purposes. First, Congress sought to ensure that all federal agencies examine the environmental impacts of their actions before acting. Second, Congress sought to provide the public with a statutory means to be informed about, and to comment on, the environmental impacts of proposed agency actions. *See* 40 C.F.R. § 1500.1. NEPA requires federal agencies to analyze the environmental impact of a particular federal action before proceeding with the action. *See* 42 U.S.C. § 4332(2)(C).

34.     Accordingly, before a federal agency can act in a way that significantly affects the quality of the human environment, NEPA requires the acting agency to prepare a detailed environmental impact statement (EIS) that discusses, among other things: "(i) the environmental impact of the proposed action; (ii) any adverse environmental effects; [and] (iii) alternatives to the proposed action." 42 U.S.C. § 4332(2)(C).

35.     The EIS is the cornerstone of NEPA. An EIS is required for all "major Federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(c). The requirement to prepare an EIS is broad and intended to compel agencies to take seriously the potential environmental consequences of a proposed action.

36.     Whether an agency action is "significant" enough to require preparation of an EIS involves "considerations of both context and intensity." 40 C.F.R. § 1508.27. The context of the action includes factors such as "society as a whole (human, national), the affected region, the affected interests, and the locality." 40 C.F.R. § 1508.27(a). Intensity "refers to the severity of impact" and requires BLM to consider several factors including:

impacts of the action; unique characteristics of the geographic area; the degree to which the effects of on the quality of the environment are likely to be highly controversial; the degree to which the effects on the environment are highly uncertain or involve unknown risks; the degree to which the action may have a precedential effect; whether the action is related to other actions with individually insignificant but cumulatively significant impacts; and the degree to which the action may have an adverse effect on endangered or threatened species or their critical habitat. 40 C.F.R. § 1508.27(b).

37.    Agencies may prepare an Environmental Assessment (EA) to determine whether a proposed action requires preparation of an EIS or warrants a finding of no significant impact.

38.    An EA must take a "hard look" at the potential consequences of agency actions and provide enough evidence and analysis for determining whether to prepare an EIS. Agencies must involve the public, to the extent practicable, in preparing this assessment. 40 C.F.R. § 1501.4(b).

39.    If the agency decides the impacts are not significant, it must supply a convincing statement of reasons why, and make its finding of no significant impact available to the public. 40 C.F.R. § 1501.4(e).

40.    A significant effect may exist even if the federal agency believes that, on balance, the effect will be beneficial. 40 C.F.R. § 1508.27(b)(1).

41.    Whether in an EA or EIS, an agency must adequately evaluate all potential environmental impacts of the proposed action. *See* 42 U.S.C. § 4332(2)(C). To meet this obligation, the federal agency must identify and disclose to the public all foreseeable impacts of the proposed action, including direct, indirect, and cumulative impacts. *See id.* § 4332(2); *see also* 40 C.F.R. §§ 1508.7, 1508.8.

42.    After preparing an EA or EIS, an agency may not simply rest on the original document. The agency must gather and evaluate new information that may alter the results

of its original environmental analysis and continue to take a hard look at the environmental effects of its future planned actions. *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 374 (1989).

### C. Applicable BLM Directives on Wild Horses.

43.    BLM's WHB Handbook explains that:

> Before issuing a decision to gather and remove animals, the authorized officer shall first determine whether excess WH&B are present and require immediate removal. In making this determination, the authorized officer shall analyze grazing utilization and distribution, trend in range ecological condition, actual use, climate (weather) data, current population inventory, wild horses and burros located outside the HMA in areas not designated for their long-term maintenance and other factors such as the results of land health assessments which demonstrate removal is needed to restore or maintain the range in a [thriving, natural ecological balance].

BLM WHB Handbook, § 4.3.

44.    According to BLM's WHB Management Handbook, a minimum population size of 50 effective breeding animals, or a total population size of about 150 to 200 horses, is currently recommended to maintain an acceptable level of genetic diversity within reproducing wild horse populations. BLM WHB Handbook, § 4.4.6.3.

45.    BLM's regulations provide that it can close public lands to grazing use by all or a particular kind of livestock "if necessary to provide habitat for wild horses or burros, to implement herd management actions, or to protect wild horses or burros from disease, harassment or injury." 43 C.F.R. § 4710.5.

46.    BLM directives state that an appropriate NEPA analysis and issuance of a decision is required prior to removing wild horses. *See* BLM Removal Manual, § 4720.2.21(C)(6) ("An appropriate NEPA analysis and issuance of a decision is required prior to removing animals."); *see also id.* § 4720.3 ("[T]he authorized officer shall conduct an appropriate site-specific analysis of the potential environmental impacts that could result from implementation of a proposed gather in accordance with [NEPA].")

47.     BLM's Manual also specifies that a key element of its analysis will be to make a determination of whether excess wild horses are present that require immediate removal. *Id.* § 4720.31.

48.     BLM's Manual and Handbook states that it should provide the public with thirty days to review and comment on a NEPA document or Determination of NEPA adequacy. BLM Removal Manual § 4720.35; BLM WHB Handbook, § 7.2

49.     BLM's guidelines specify that roundup and removal decisions must be issued thirty-one to seventy-six days prior to the start of the proposed roundup. BLM WHB Handbook, §§ 7.1, 7.1.2.2; BLM Removal Manual § 4720.36

50.     One of BLM's primary objectives for wild horse management is "[t]o ensure management activities are carried out at the minimum feasible level necessary to attain the objectives identified in approved land use plans (LUPs) and Herd Management Area Plans (HMAPs) and that free-roaming behavior is maintained." BLM, Wild Free-Roaming Horses and Burros Management Manual MS-4700 (2010), § 4700.02.

51.     BLM must prepare a herd management area plan for the management of wild horses. 43 C.F.R. § 4770.3-1.

52.     According to BLM's regulations and WHB Handbook, HMAPs establish short and long-term management and monitoring objectives for a specific wild horse herd and its habitat and are prepared with public involvement through a site-specific NEPA process. BLM WHB Handbook, §§ 2.5, 6, Appendix 4. HMAPs identify the actions to be taken to accomplish herd and habitat management objectives, such as identifying and setting objectives for herd composition, animal characteristics, and habitat development needs, and must be in conformance with the applicable LUPs. BLM WHB Handbook, §§ 2.5.2, 6; *see also* 43 C.F.R. § 4710.3-1.

53.     The objectives set forth in an HMAP guide future wild horse management activities in an HMA or complex over the life of the plan. BLM WHB Handbook, Appendix 4.

54.    The purpose of an HMAP is to facilitate on-the-ground implementation of the selected management strategy. The HMAP includes a Monitoring Plan and Tracking Log/Project Implementation Schedule. BLM WHB Handbook, Appendix 4.

55.    Future decisions implementing on-the-ground decisions, such as roundups and removals, must be based on current information, proper NEPA analysis, and public participation. *Id*. §§ 4.3, 4.4.6.4, 7.1, 7.1.2, 7.1.2.1; *see also* BLM Management Considerations Manual, MS-4710 (2010), § 4710.23.; BLM Removal Manual § 4720.3; BLM, National Environmental Policy Handbook, H-1790-1 (2008).

56.    BLM must provide notice of its decision to roundup and remove wild horses.

57.    BLM must provide an opportunity to appeal a decision to roundup and remove wild horses. 43 C.F.R. § 4770.3.

<b>FACTUAL ALLEGATIONS</b>

**A.  Pine Nut Ten-Year Plan.**

    **1.    Pine Nut Mountains Herd Management Area.**

58.    The Pine Nut Mountains HMA and the Pine Nut Mountains herd area (HA) are located within the Pine Nut Mountains in the northern portion of the Pine Nut Mountains, in Douglas, Lyon, and Carson City Counties, Nevada.

59.    The Pine Nut Mountain range includes approximately 397,899 acres of mixed ownership land (public, private, and Indian trust land).

60.    The Pine Nut Mountains HMA is within the administrative boundary of BLM's Carson City District, Sierra Front Field Office.

61.    The established boundary of the HMA encompasses approximately 90,900 acres of public lands and 14,692 acres of private lands.

62.    The topography of the range varies from approximately 5,000 feet in elevation to over 9,000 feet in elevation.

63.     The wild horses on the Pine Nut Mountain range were the subject of the 1961 American drama film, *The Misfits*, written by Arthur Miller, directed by John Huston, and starring Clark Gable, Marilyn Monroe and Montgomery Clift.

64.     In 1971, when Congress passed the WHBA, wild horses were present in or near the area now designated as the Pine Nut Mountains HMA.

65.     The AMLs were established in 1995 in the Final Multiple Use Decision (FMUD) which established the AMLs by individual grazing allotments within the HMA. The combined total AML for the HMA is between 118 to 179 wild horses.

66.     There are nine grazing allotments within the Pine Nut Mountains HMA: Buckeye (AML 27-41); Churchill Canyon (AML 9-13); Clifton (AML 24-37); Eldorado Canyon (AML 15-22); Hackett Canyon (AML 10-15); Mill Canyon (AML 17-25); Rawe Peak (AML 3-5); Sand Canyon (AML 5-8); and Sunrise (AML 9-13).

67.     According to BLM, in 1995, the available forage was divided evenly between livestock and wild horses by grazing allotment. The FMUD established a maximum utilization rate of 55% for the combined use by livestock and wild horses.

68.     According to the Final Summary of Current Conditions, vegetation in the Pine Nut Mountains HMA is dominated by needlegrasses, Indian rice grass, squirreltail, sagebrush, rabbitbrush, bitterbrush, and pinyon-juniper woodlands.

69.     The most recent aerial inventory of wild horses within and outside of the Pine Nut Mountains HMA was conducted for each allotment in April 2016. At that time, a total of 536 horses were counted both within and outside of the Pine Nut Mountains HMA. Approximately 222 of the 536 horses were outside the HMA, which means only 314 horses were observed within the Pine Nut Mountains HMA. The counts included the following numbers of horses observed within each of the designated allotments: Churchill Canyon—8 horses; Clifton—162 horses; Eldorado Canyon—92 horses; Hackett Canyon—24 horses;

14

Mill Canyon—22 horses; Sand Canyon—4 horses; and Sunrise—2 horses. No horses were observed in Buckeye and Rawe Peak.

70.    Based on the 2016 survey, BLM estimated that the number of horses within the surveyed area (both within and outside of the HMA) was 579 horses. BLM concluded that by 2017, the current population of wild horses both within and outside the HMA would be 694 horses. This number includes an assumed population increase of 20% despite the fact that the wild horse population has been observed to increase only 17% per year.

71.    Based on the numbers provided, in April 2016, 314 wild horses resided within the Pine Nut Mountains HMA. BLM did not provide a 2017 population estimate for horses only within the Pine Nut Mountains HMA.

72.    According to BLM, wild horses have reduced the forage production on four of the grazing allotments: Clifton, Eldorado Canyon, Hackett Canyon, and Mill Canyon. These four allotments make up 46% of the HMA.

73.    Based on the numbers provided, in April 2016, a total of 300 wild horses resided within the four grazing allotments where the initial roundup will take place, and only fourteen horses resided in the remaining 54% of the HMA.

74.    According to BLM, livestock have not grazed these four allotments for several decades.

75.    According to BLM, the forage production on these four allotments has been reduced by approximately 50% due to wild horse grazing.

76.    The last roundup of the Pine Nut Mountains wild horses occurred in December 2010. At that time, according to the 2010 Clan Alpine, Pilot Mountain, and Pine Nut Herd Management Areas Gather Plan, DOI-BLM-NV-C010-2010-0019-EA, the population within the Pine Nut Mountains HMA was estimated to be approximately 148 horses. During that gather, BLM rounded up forty-five mares, treated the mares with PZP-

22, and released them back into the HMA. Sixty-five wild horses were permanently removed.

**2.    The 2001 Carson City Field Office Consolidated Resource Management Plan.**

77.    The 2001 Carson City Field Office Consolidated Resource Management Plan (hereinafter, "Carson City RMP") provides that all designated wild horse and burro ranges are devoted primarily to the protection and preservation of wild horses or burros.

78.    According to the Carson City RMP, any future adjustments in wild horses must be based on consultation with interested parties and a current analysis of data from monitoring studies, including the use of vegetation study techniques to measure ecological status and trend, grazing utilization and distribution, actual use information, and climatic data.

79.    According to the Carson City RMP, AMLs must be determined for wild horses through the resource management planning process and wild horses must be considered comparable with other resource values in the formulation of resource management plans and managed as self-sustaining populations of healthy animals in balance with other uses and the productive capacity of their habitat.

80.    According to the Carson City RMP, horse management actions must be at the minimum feasible level and BLM is obligated to maintain sound thriving populations of wild horses within HMAs.

81.    According to the Carson City RMP, wild horse ranges must be designated when it is determined to be in the public interest to manage HMAs principally, but not necessarily exclusively, for wild horses.

82.    According to the Carson City RMP, in developing an HMAP for the Pine Nut Mountains HMA, the plan must be focused on wild horse management through maintaining

or improving wild horse populations and habitats, development of water sources, and population and habitat monitoring studies.

83.     According to the Carson City RMP, an environmental review (i.e. environmental assessment) must be prepared before any projects, including wild horse roundups and removals, are developed in order to properly consider whether implementation, modification, or abandonment of the project may be considered depending on the identified impacts.

### 3.     The Pine Nut Mountains Herd Management Area Plan.

84.     The primary purpose of the Pine Nut Mountains HMAP is to outline and implement management action necessary to achieve and maintain a thriving natural ecological balance and multiple-use relationships by conducting roundups and removals of wild horses and/or implementing fertility control measures, outlining habitat goals, monitoring methods, and insuring genetic diversity of the horses within the Pine Nut Mountains HMA.

85.     Targets of the Pine Nut Mountains HMAP include limiting forage utilization to 35% use in the Mill Canyon, Clifton, Eldorado Canyon, and Hackett Canyon allotments.

86.     The Pine Nut Mountains HMAP indicates that, if habitat objectives are not met or substantially improving by 2020, management measures such as more frequent roundups and/or adjustments to AMLs for some of the allotments will be implemented.

87.     The Pine Nut Mountains HMAP further provides that emergency removals will be conducted if visual observations of wild horses show any indication of poor body condition due to drought, wildfire, range deterioration, or other unplanned/unforeseen events.

88.     The Pine Nut Mountains HMAP indicates that, when analysis shows low diversity, young horses from other HMAs or areas outside of the HMA, will be released into the HMA.

89.     The Pine Nut Mountains HMAP provides that the Pine Nut Mountains HMA will be monitored annually and will guide annual management actions over the next ten years, and wild horse inventories will be conducted on a yearly basis.

90.     According to the Pine Nut Mountains HMAP, long-term evaluations will be completed at roughly ten-year intervals, or as needed, and any significant changes needed as a result of these evaluations, such as adjustments in AML, may require appropriate NEPA analysis and documentation prior to implementation.

91.     According to the Pine Nut Mountains HMAP, the initial roundup was scheduled for January 2018, based on funding, available holding space, and national priorities, and would only occur in Clifton, Eldorado Canyon, Mill Canyon and Hackett Canyon grazing allotments. The target would be to reduce the wild horse populations to the low AML for each of these allotments. All of the horses outside of the HMA would be rounded up and removed as well.

92.     According to the Pine Nut Mountains HMAP, the initial roundup would remove approximately 338 wild horses in the four allotments. Additionally, 266 wild horse would be removed from outside of the HMA. In total, approximately 600 wild horses would be rounded up.

93.     To the best of Friends of Animals' knowledge, this roundup has not yet occurred due to protests from the community.

94.     The Pine Nut Mountains HMAP does not specifically state how many horses within the Pine Nut Mountains HMA will be rounded up and removed over the ten-year life of the plan.

95.     The Pine Nut Mountains HMAP does not specifically state that future roundups will only include horses from Clifton, Eldorado Canyon, Hackett Canyon, and Mill Canyon.

96.     The Pine Nut Mountain HMAP also indicates that the Fish Springs area, an area within the original herd area that was removed from the HMA in 1983, will be evaluated for suitability and possible designation as an HMA. Around twenty-five wild horses will be allowed to remain in this area during the evaluation.

97.     According to the Pine Nut Mountains HMAP, future management actions will include roundups to maintain horses within AML, roundups in emergency circumstances, and fertility control.

98.     According to the Pine Nut Mountains HMAP, in ten years (2028) BLM will evaluate the effectiveness of the HMAP in meeting or making progress towards meeting the targets identified in the HMAP, including possible adjustments to the AML and possible adjustments to the HMA boundaries.

99.     BLM completed a Summary of Current Conditions on June 7, 2016 (Summary). The Summary was prepared because BLM determined that, based on resource monitoring and wild horse population inventories, the AML may no longer be appropriate.

100.    The Summary found that plant species palatable to horses and livestock have declined and wild horse utilization of perennial grass species has exceeded maximum use levels within these four allotments.

101.    According to BLM, current monitoring data suggests that the current carrying capacity is approximately half of what it was when the AMLs were set in 1995.

**4.    Environmental Review for the Pine Nut Ten-Year Plan.**

102.    A draft Pine Nut Mountains Wild Horse Gather Plan EA was made available to the public for comment on December 22, 2016.

103.    The proposed action included the adoption of a Pine Nut Mountains HMAP, and an initial gather of approximately 500 horses from within the four grazing allotments (Clifton, Eldorado Canyon, Mill Canyon, and Hackett Canyon) and areas outside of the Pine

Nut Mountains HMA. According to the draft EA, initial roundup activities would not occur in the remaining grazing allotments because they are currently within AML.

104.    According to the draft EA, the purpose of the proposed action is "restore a thriving natural ecological balance and multiple use relationship on public lands in the area."

105.    According to the draft EA, the need for the proposed action "arises from impacts caused from the current overpopulation of wild horses."

106.    The proposed action (Alternative A) and Alternatives B and C included the adoption of the Pine Nut Mountains HMAP that would be implemented to manage wild horses in the Pine Nut Mountains HMA over the next ten years.

107.    All three action alternatives included rounding up and removing wild horses from within the Pine Nut Mountains HMA to low AML for each grazing allotment for the next ten years.

108.    The action alternatives were very similar to one another apart from fertility control. The preferred alternative (Alternative A) included initially using PZP-22, Zona Stat-H, or GonaCon. Alternative B was the same as Alternative A, but without any type of fertility control. Alternative C was the same as Alternative A, but includes gelding and spaying as an additional population control method, and managing 20% of the male population as a non-breeding population of geldings and 20% of the female population as a non-breeding population of mares.

109.    BLM received close to 5,000 comment submissions during the public comment period.

110.    Friends of Animals and others commented that BLM cannot authorize the continued removal and harassment of wild horses for ten years into the future.

111.    Friends of Animals and others commented that BLM failed to consider a reasonable range of alternatives.

112.    Friends of Animals suggested BLM circulate a new EIS or EA that considers five reasonable alternatives, including: (1) re-calculating AMLs to meet the needs of the Pine Nut Mountain wild horses; (2) reconsidering existing grazing permits and other uses; (3) natural population controls, such as protecting mountain lions as natural predators; (4) allowing horses in the expanded HA; and (5) making on the ground individual excess determinations consistent with BLM's responsibilities under the WHBA prior to any removals or harassment (including fertility control).

113.    Friends of Animals and others commented on the inadequate analysis of the impacts of the proposed action.

114.    Friends of Animals and others commented that BLM failed to fully consider the impacts of the proposed action and alternatives on the genetic viability of wild horses in the Pine Nut Mountains HMA.

115.    Friends of Animals and others commented that BLM failed to fully consider the impacts of fertility control measures.

116.    Friends of Animals and others commented that BLM failed to fully consider the positive impacts of wild horses on the environment, and the impact of the no action alternative.

117.    Friends of Animals and others commented that the AMLs within the Pine Nut Mountains HMA should be re-evaluated and increased in order to protect the present wild horse population without roundups, removals, and fertility control.

118.    On November 28, 2017, BLM issued the final Pine Nut Mountains HMAP, an EA, a Decision Record, and a Finding of No Significant Impact.

119.    The Pine Nut Ten-Year Plan authorized initially rounding up and removing 600 or more wild horses from both within and outside of the HMA using either helicopter or bait/water trapping to achieve low AML in each grazing allotment within the HMA, and applying fertility control treatments to slow the growth of the wild horse population.

Additional management actions include continual roundups throughout the HMA and removals, as well as fertility control treatments, to be carried out over the next ten years.

120.    In the Pine Nut Ten-Year Plan, BLM does not consider any of the alternatives proposed by Friends of Animals.

121.    In the Pine Nut Ten-Year Plan, BLM does not consider any additional alternatives from the draft EA.

122.    The Pine Nut Ten-Year Plan does not include any genetic reports on the wild horses in the Pine Nut Mountains HMA.

123.    The Pine Nut Ten-Year Plan does not include any information about the cumulative impacts of past roundups and proposed future roundups on the genetic variability and viability of the wild horses in the Pine Nut Mountains HMA.

124.    The Pine Nut Ten-Year Plan does not take a hard look at the impact of the proposed action and future actions on the genetic viability of wild horses in the Pine Nut Mountains HMA.

125.    The Pine Nut Ten-Year Plan authorizes continued use of fertility control treatments, including PZP and GonaCon.

126.    The impacts from PZP and GonaCon are controversial and involve unique and unknown risks.

127.    The Pine Nut Ten-Year Plan concludes that PZP contraception appears to be temporary and reversible and does not appear to cause out of season births.

128.    However, there are several studies that cast serious doubt on BLM's conclusions about PZP.

129.    There are several studies demonstrating that fertility control treatments may cause irreversible sterility in mares. Moreover, the most recent and reliable data indicate that these fertility controls could also cause out of season births, band instability, and a general decline in immune function.

130.    Additionally, PZP and GonaCon could cause abscesses at the injection site, negative impacts on organ systems, and long-term health effects.

131.    The Pine Nut Ten-Year Plan fails to take a hard look at the impacts of administering fertility control as authorized in the Pine Nut Ten-Year Plan.

132.    The Pine Nut Ten-Year Plan does not consider scientific information about the positive impacts of wild horses, including that wild horses help spread and fertilize seeds over large areas, prevent fires, and can benefit ecosystems.

133.    The Pine Nut Ten-Year Plan does not take a hard look at the potential for wild horses to self-regulate their populations.

**5.    BLM's Authorization to Remove Wild Horses.**

134.    BLM did not commit to analyze grazing utilization and distribution, trends in ecological conditions, actual use, and climate data before making future decisions under the Pine Nut Ten-Year Plan.

135.    BLM did not commit to provide public notice before undertaking future roundups under the Pine Nut Ten-Year Plan.

136.    BLM did not commit to provide public participation in future roundup decisions under the Pine Nut Ten-Year Plan.

137.    Range conditions, wild horse numbers, and the appropriate management level can change each year.

138.    BLM does not have information that removal is necessary throughout the term of the Pine Nut Ten-Year Plan.

139.    BLM's Pine Nut Ten-Year Plan is based on AMLs established in the 1995 FMUD.

140.    BLM failed to consider what qualifies as a self-sustaining, healthy population of wild horses and how the Pine Nut Ten-Year Plan would impact the health and sustainability of wild horses.

141.    BLM's Pine Nut Ten-Year Plan specifically states that, if Congress were to lift the current appropriations restrictions, then it is possible that horses removed from the Pine Nut Mountains HMA over the next ten years could be euthanized or sold without limitation.

142.    BLM did not take a hard look at the impact of euthanizing or selling wild horses.

143.    BLM completed several roundups in the Pine Nut HMA since it issued the Pine Nut Ten-Year Plan and reduced the population to the appropriate management level.

## B. Muddy Creek Ten-Year Plan.

### 1. Muddy Creek Herd Management Area.

144.    The Muddy Creek HMA is located six miles southeast of Emery, Utah, and approximately twenty miles south of Ferron, Utah, in the San Rafael Swell.

145.    The Muddy Creek HMA is within the administrative boundary of BLM's Green River District, Price Field Office.

146.    The Muddy Creek HMA encompasses approximately 283,400 acres of federal and state lands.

147.    In 1971, when Congress passed the WHBA, wild horses were present in or near the area now designated as the Muddy Creek HMA.

148.    Portions of eleven grazing allotments (Lone Tree, Globe Link, South Sid & Charley, Mussentuchit, Last Chance, Red Canyon, Hondo, McKay Flat, Temple Mountain, Taylor Flat, and Dry Wash) are part of the Muddy Creek HMA, and all of these allotments have grazing privileges. Several of the sites have overlapping use between wild horses and livestock causing significant competition between wild horses and livestock at these sites.

149.    The Muddy Creek HMA supports vegetation types ranging from pinyon and juniper woodland to salt desert shrub, and grasslands. The salt desert shrub vegetation

type dominates the HMA. Primary forage species are Indian ricegrass, galletta, sand dropseed, winter fat, and fourwing saltbush.

150.    The Muddy Creek has several springs and seeps as well as 40 reservoirs and the Muddy Creek itself.

151.    An aerial population inventory estimated that, in April 2017, approximately 161 to 185 adult horses resided within the Muddy Creek HMA. Based on this number, using an estimated 15% annual reproductive rate, BLM estimated that the population was approximately 195 horses on March 1, 2018, and that it would be expected to grow to approximately 224 by Fall 2018.

152.    According to BLM, additional horses may reside within the Muddy Creek HMA because: (1) wild horses may have been captured illegally by members of the public in other wild horse areas and moved into this area, and (2) domestic or estray horses may have been released into the HMA.

153.    The AML for the Muddy Creek HMA was originally established in the 1989 San Rafael Resource Management Plan (hereinafter, "1989 San Rafael RMP").

154.    The AML for the Muddy Creek HMA was adjusted in 2008 and set at 75 to 125 wild horses after the boundaries of Muddy Creek HMA were expanded to include the southern portion of the Sinbad HMA, adding approximately 8,710 acres to the HMA. At that time, BLM determined that wild horses would no longer be allowed in the northern portion of the Sinbad HMA and the Robbers Roost HMA would be made into an HA with an AML of zero.

155.    Wild horses lost a significant amount of habitat when the HMAs merged and Robbers Roost lost HMA status.

156.    BLM made only a slight AML adjustment (from 60 to 100 horses to 75 to 125 horses) to the Muddy Creek HMA when it added the approximately 8,710 acres to the Muddy Creek HMA and removed Robbers Roost from HMA status.

157.    Since 1989, four roundups have occurred within the Muddy Creek HMA in order to keep the wild horse population within AML. The last roundup occurred in July 2009 when BLM rounded up and permanently removed 86 wild horses, leaving approximately 75.

158.    According to BLM, the overriding limiting factor for the carrying capacity of wild horses in the Muddy Creek HMA is not the available forage; instead, it is the supply of reliable water during the summer months.

159.    According to BLM, the AML in the Muddy Creek HMA alone is not large enough to maintain genetic diversity without introduction of horses from outside the HMA.

160.    In 2002, Dr. Gus Cothran, BLM's expert geneticist, reported that genetic analysis from 62 wild horses rounded up from the Muddy Creek HMA in 2001 showed a very low observed heterozygosity (Ho) or individual variability. In response, BLM began translocating wild horses from other HMAs into the Muddy Creek HMA in order to improve genetic diversity. The proposed action would continue this practice.

**2.    The 2008 Price Field Office Resource Management Plan.**

161.    The Price Field Office Resource Management Plan (hereinafter, "Price RMP") provides that wild horses will be managed "to achieve and maintain viable, vigorous, and stable populations."

162.    According to the Price RMP, any "[i]ncrease and decrease in available forage will be adjusted on a case-by-case basis to support Standards for Rangeland Health."

163.    According to the Price RMP, "[e]valuation of the RMP will generally be conducted every five years per BLM policy, unless unexpected actions, new information, or significant changes in other plans, legislation, or litigation triggers an evaluation."

164.    According to the Price RMP, "BLM will continue to actively seek the views of the public, using techniques such as news releases and web-site information to ask for

participation and inform the public of new and ongoing project proposals, site-specific planning, and opportunities and timeframes for comment."

165.    The Price RMP combined the southern portion of the Sinbad HMA, which includes McKay Flat, with the Muddy Creek HMA, and removed all wild horses from the Robbers Roost HMA, leaving only two areas for wild horses—Muddy Creek HMA (283,400 acres; AML 75-125 horses) and Range Creek HMA (55,000 acres; AML 75-125 horses).

166.    Robbers Roost lost its status as an HMA, but maintained HA status for future management considerations should conditions change.

167.    According to the Price RMP, the AML in the Muddy Creek HMA will be periodically evaluated and subject to adjustment in HMA gather plans and environmental assessments based on monitoring data and best science methods.

168.    According to the Price RMP, BLM intended to prepare an HMAP for the Muddy Creek HMA by 2015. However, according to the September 2015 Price RMP Five-Year Evaluation Report, BLM modified its decision and now intends to prepare a HMAP for the Muddy Creek HMA by 2020.

169.    According to the Price RMP Five-Year Evaluation Report, BLM intends to adjust the northern boundary of the Muddy Creek HMA.

170.    BLM has not prepared an HMAP for the Muddy Creek HMA.

**3.    Environmental Review for the Muddy Creek Ten-Year Plan.**

171.    A draft Muddy Creek Wild Horse Herd Management Area Gather Plan EA was made available to the public on April 19, 2018.

172.    According to the draft EA, the purpose of the proposed action is "to  remove excess wild horses from within and outside the HMA, to manage wild horses to achieve and maintain established AML ranges for the HMA and to reduce the wild horse population growth rate in order to prevent undue or unnecessary degradation of the public lands by protecting rangeland resources from deterioration associated with an overpopulation of

excess wild horses within and outside the HMA, and to restore a thriving natural ecological balance and multiple use relationship" on the Muddy Creek HMA.

173.    According to the draft EA, the need for the proposed action "is to protect rangeland resources and to prevent unnecessary or undue degradation of the public lands associated with excess populations of wild horses within the HMA and use of rangeland resources by horses outside the HMA boundaries."

174.    According to the draft EA, "[u]tilization levels on the HMA have been moderate on most of the uplands and heavy near portions of the Muddy Creek, as well as a few springs and reservoirs."

175.    The proposed action included initially rounding up and removing approximately 148 wild horses (approximately 66% of the existing wild horses) and returning to conduct follow-up roundups over a ten-year period to remove additional wild horses to maintain the low range of AML. BLM would also apply fertility control as soon as the population is within AML.

176.    Neither the no action alternative nor the two action alternatives include the development or adoption of an HMAP.

177.    Both action alternatives include rounding up and removing wild horses from within the Muddy Creek HMA to low AML for the next ten years.

178.    The action alternatives were very similar to one another apart from fertility control. The proposed alternative (Alternative 2) included using PZP-22, GonaCon, or the most current formulation as soon as the population is within AML. Alternative 3 would be the same as the proposed alternative, but without any type of fertility control or sex ratio adjustment.

179.    BLM received close to 4,000 comment submissions during the public comment period.

180.    Friends of Animals and others commented that BLM cannot authorize the continued removal and harassment of wild horses for ten years into the future.

181.    Friends of Animals and others commented that BLM failed to consider a reasonable range of alternatives.

182.    Friends of Animals suggested BLM circulate a new EIS or EA that considers four reasonable alternatives, including: (1) re-calculating the AML to meet the needs of the Muddy Creek wild horses; (2) natural population controls, such as protecting mountain lions as natural predators; (3) limiting conflicting uses that have adverse impacts to the environment, such as livestock grazing; and (4) making on-the-ground individual excess determinations consistent with BLM's responsibilities under the WHBA prior to any removals or harassment (including fertility control).

183.    Friends of Animals and others commented on the inadequate analysis of the impacts of the proposed action.

184.    Friends of Animals and others commented that BLM failed to fully consider the impacts of the proposed action and alternatives on the genetic viability of wild horses in the Muddy Creek HMA.

185.    Friends of Animals and others commented that BLM failed to fully consider the impacts of fertility control measures.

186.    Friends of Animals and others commented that BLM failed to fully consider the positive impacts of wild horses on the environment, and the impact of the no action alternative.

187.    Friends of Animals and others commented that the AMLs within the Muddy Creek HMA should be re-evaluated and increased in order to protect the present wild horse population without roundups, removals, and fertility control.

188.    On July 30, 2018, BLM issued the final Muddy Creek Wild Horse Gather EA, a Decision Record, and a Finding of No Significant Impact.

189.    The Muddy Creek Ten-Year Plan authorizes the initial roundup and permanent removal of 60-70% of the wild horse population, or approximately 149 wild horses, using helicopter or bait/water trapping to achieve low AML, and applying fertility control treatments. Additional management actions include continual roundups and removals as well as fertility control treatments to be carried out over the next ten years.

190.    In the Muddy Creek Ten-Year Plan, BLM does not consider any of the alternatives proposed by Friends of Animals.

191.    In the Muddy Creek Ten-Year Plan, BLM does not consider any additional alternatives from the draft EA.

192.    The Muddy Creek Ten-Year Plan does not include any genetic reports on the wild horses in the Muddy Creek HMA.

193.    The Muddy Creek Ten-Year Plan does not include any information about the cumulative impacts of past roundups and proposed future roundups on the genetic variability and viability of the wild horses in the Muddy Creek HMA.

194.    The Muddy Creek Ten-Year Plan does not take a hard look at the impact of the proposed action and future actions on the genetic viability of the wild horses in the Muddy Creek HMA.

195.    The Muddy Creek Ten-Year Plan authorizes continued use of fertility control treatments, including PZP and GonaCon.

196.    The impacts from PZP and GonaCon are controversial and involve unique and unknown risks.

197.    The Muddy Creek Ten-Year Plan concludes that PZP contraception appears to be temporary and reversible and does not appear to cause out of season births.

198.    However, there are several studies that cast serious doubt on BLM's conclusions about PZP.

199.     There are several studies demonstrating that fertility control treatments may cause irreversible sterility in mares. Moreover, the most recent and reliable data indicate that these fertility controls could also cause out of season births, band instability, and general decline in immune function.

200.     Additionally, PZP and GonaCon could cause abscesses at the injection site, negative impacts on organ systems, and long-term health effects.

201.     The Muddy Creek Ten-Year Plan fails to take a hard look at the impacts of administering fertility control as authorized in the Muddy Creek Ten-Year Plan.

202.     The Muddy Creek Ten-Year Plan does not consider scientific information about the positive impacts of wild horses, including that wild horses help spread and fertilize seeds over large areas, prevent fires, and can benefit ecosystems.

203.     The Muddy Creek Ten-Year Plan does not take a hard look at the potential for wild horses to self-regulate their populations.

**4.      BLM's Authorization to Remove Wild Horses from the Muddy Creek Herd Management Area.**

204.     BLM did not commit to analyze grazing utilization and distribution, trends in ecological conditions, actual use, and climate data before making future decisions under the Muddy Creek Ten-Year Plan.

205.     BLM did not commit to provide public notice before undertaking future roundups under the Muddy Creek Ten-Year Plan.

206.     BLM did not commit to provide public participation in future roundup decisions under the Muddy Creek Ten-Year Plan.

207.     Range conditions, wild horse numbers, and the appropriate management level can change each year.

208.     BLM does not have information that removal is necessary throughout the term of the Muddy Creek Ten-Year Plan.

209.    BLM's Muddy Creek Ten-Year Plan is based on AMLs established in 1989 and adjusted in 2008, when the boundaries of the HMA were expanded to include the southern portion of the Sinbad HMA and Robbers Roost lost HMA status. At that time, horses were no longer allowed in either the northern portion of the Sinbad HMA or Robbers Roost.

210.    BLM failed to consider what qualifies as a self-sustaining, healthy population of wild horses and how the Muddy Creek Ten-Year Plan would impact the health and sustainability of wild horses.

211.    The Muddy Creek Ten-Year Plan specifically states that, if Congress were to lift the current appropriations restrictions, then it is possible that wild horses removed from the Muddy Creek HMA over the next ten years could be euthanized or sold without limitation. BLM did not take a hard look at the impact of euthanizing or selling wild horses.

212.    BLM completed the removal of wild horses to the appropriate management level in the Muddy Creek HMA.

**C.  Eagle Complex Ten-Year Plan.**

**1.  The Eagle Complex HMAs.**

213.    The Eagle Complex consist of the Eagle HMA, Chokecherry HMA, and Mt. Elinor HMA.

214.    The Eagle HMA consist of approximately 670,000 acres of public land located in northeastern Lincoln County approximately 30 miles southeast of Ely, Nevada, and 20 miles northeast of Caliente, Nevada.

215.    The Chokecherry HMA consists of approximately 38,995 acres of public land, and the Mt. Elinore HMA consist of approximately 34,047 acres of public land. The Chokecherry and Mt. Elinore HMAs are in western Iron and Beaver Counties approximately 50 miles northwest of Cedar City, Utah.

216.    According to BLM, wild horses from the Eagle Complex move between Utah and Nevada and the three HMAs.

217.    The Eagle Complex is within the administrative boundary of BLM's Caliente, Nevada Field Office and Cedar City, Utah Field Office.

218.    In 1971, when Congress passed the WHBA, wild horses were present in or near the areas now designated as the Eagle Complex.

219.    The Eagle, Chokecherry, and Mt. Elinore HMAs include portions of several livestock grazing allotments. Permitted livestock grazing use in the HMAs includes both cattle and sheep grazing during all seasons of the year. In some grazing allotments cattle grazing exceeds the permitted use. Cattle and sheep grazing also occurs in areas immediately adjacent to the Eagle Complex HMAs.

220.    According to BLM, an aerial population inventory estimated that, in February 2017, the Eagle HMA had an estimated wild horse population of 1,859; the Mt Elinore HMA had an estimated population of 128; and the Chokecherry HMA had an estimated population of 233.

221.    According to the Final EA for the Eagle Complex Ten-Year Plan, the 1983 Pinyon Management Framework Plan established the AMLs for the Chokecherry and Mt. Elinore HMAs and the Ely Resource Management Plan established the AML for the Eagle HMA.

222.    BLM has not prepared an HMAP for the Eagle, Chokecherry, and Mt. Elinore HMAs.

**2.    The 2008 Ely Resource Management Plan.**

223.    According to BLM, all BLM Nevada land use plans are monitored and formally evaluated at five-year intervals after the plan is approved.

224.    The Ely Resource Management Plan (hereinafter, "Ely RMP") provides that BLM should adjust the AML based on monitoring data and perform adjustments typically, but not exclusively, in conjunction with the watershed analysis process.

225.    The Ely RMP directs BLM to manage wild horse for herd viability and sustainability and states that herds should consist of healthy animals that exhibit diverse age structure, good conformation, and any characteristics unique to the specific herd. The Ely RMP also directs BLM to manage sex ratios, phenotypic traits, reproductive cycles, and other population dynamics on an HMA basis.

226.    According to the Ely RMP, BLM should periodically gather aerial and ground census information to determine the number of adults and foals, colors, special characteristics, and overall health of each wild horse herd. Aerial counts should occur at a minimum of once every three years. Other herd data, including the ratio of mares to studs, age classes, colors, special characteristics, and overall health should be collected during roundups and at the time wild horses are processed for adoption.

227.    According to the Ely RMP, "BLM will continue to actively seek the views of the public, using techniques such as news releases and web-site information to ask for participation and inform the public of new and ongoing project proposals, site-specific planning, and opportunities and timeframes for comment."

**3. The 1983 Pinyon Management Framework Plan.**

228.    The Pinyon Management Framework Plan (hereinafter, "1983 Pinyon MFP") was intended as a transitional plan to be analyzed and revised at five-year intervals.

229.    BLM did not analyze or revise the 1983 Pinyon MFP.

230.    According to the 1983 Pinyon MFP, BLM was to undertake certain wild horse objectives and actions pending the results of monitoring studies on herd viability, range condition, viewing opportunities, cooperative management opportunities, and range development proposals.

231.    According to the 1983 Pinyon MFP, the number of herd units would not be established at the time of the MFP, but would depend on the results of monitoring studies.

232.    According to the 1983 Pinyon MFP, the short-term action (approximately two years) was to maintain the horses between 1971 and 1982 inventory levels.

233.    BLM did not establish a long-term AML range in the 1983 Pinyon MFP.

234.    BLM has not undertaken monitoring studies on herd viability, range condition, viewing opportunities, cooperative management opportunities, and range development proposals for the Chokecherry and Mr. Elinore HMAs.

**4. Environmental Review for the Eagle Complex Ten-Year Plan.**

235.    A Preliminary Eagle Complex Wild Horse Gather EA was made available to the public on May 9, 2018.

236.    According to the Preliminary EA, the purpose of the proposed action is "to remove excess wild horses from within and outside the Eagle Complex, to manage wild horses to achieve and maintain established AML ranges for the complex, to reduce the wild horse population growth rate in order to prevent undue or unnecessary degradation of the public lands associated with an overpopulation excess wild horses within and outside the complex, and to restore a thriving natural ecological balance and multiple use relationship on the public lands" on the Eagle Complex.

237.    The proposed action included initially rounding up and removing approximately 1,998 wild horses (approximately 90% of the existing wild horses) and returning to conduct follow-up roundups over a ten-year period to remove additional wild horses and administer fertility controls.

238.    Neither the no action alternative nor the action alternatives include the development or adoption of an HMAP.

239.    All action alternatives include initially rounding up and removing 90% of the wild horses from within and around the Eagle Complex and returning over the course of the next ten years to continually roundup and remove wild horses.

240.    The action alternatives were very similar to one another apart from fertility control. Alternatives A and B included using PZP-22, GonaCon, or the most current formulation as soon as the population is within AML. Alternative C would be the same as Alternatives A and B, but without any type of fertility control or sex ratio adjustment.

241.    Numerous individuals, organizations, and agencies submitted comments to BLM during the public comment period.

242.    Friends of Animals and others commented that BLM cannot authorize the continued removal and harassment of wild horses for ten years into the future.

243.    Friends of Animals and others commented that BLM failed to consider a reasonable range of alternatives.

244.    Friends of Animals suggested BLM circulate a new EIS or EA that considers four reasonable alternatives, including: (1) re-calculating the AML; (2) natural population controls, such as protecting mountain lions as natural predators; (3) limiting conflicting uses that have adverse impacts to the environment, such as livestock grazing; and (4) making on-the-ground individual excess determinations consistent with BLM's responsibilities under the WHBA prior to any removals or harassment (including fertility control).

245.    Friends of Animals and others commented on the inadequate analysis of the impacts of the proposed action.

246.    Friends of Animals and others commented that BLM failed to fully consider the impacts of the proposed action and alternatives on the genetic diversity and health of wild horses in the Eagle Complex.

247.    Friends of Animals and others commented that BLM failed to fully consider the impacts of fertility control measures.

248.    Friends of Animals and others commented that BLM failed to take a hard look at range conditions and population trends.

249.    Friends of Animals and others commented that BLM failed to fully consider the positive impacts of wild horses on the environment, and the impact of the no action alternative.

250.    Friends of Animals and others commented that the AMLs within the Eagle Complex should be re-evaluated and increased in order to protect the present wild horse population without roundups, removals, and fertility control.

251.    On August 27, 2018, BLM issued the Final Eagle Complex Wild Horse Gather EA, Decision Record, and Finding of No Significant Impact.

252.    The Eagle Complex Ten-Year Plan authorizes the initial roundup and permanent removal of 90% of the wild horse population, or approximately 2,075 wild horses, using helicopter or bait/water trapping to achieve low AML, and applying fertility control treatments. Additional management actions include continual roundups and removals as well as fertility control treatments to be carried out over the next ten years.

253.    In the Eagle Complex Ten-Year Plan, BLM does not consider any of the alternatives proposed by Friends of Animals.

254.    In the Eagle Complex Ten-Year Plan, BLM does not consider any additional alternatives from the draft EA.

255.    The Eagle Complex Ten-Year Plan does not include any genetic reports on the wild horses in the Eagle Complex HMAs, nor does it take a hard look at the impact of the proposed action and future actions on the genetic viability of the wild horses in the Eagle Complex HMAs.

256.    The Eagle Complex Ten-Year Plan does not include any information about the cumulative impacts of past roundups and proposed future roundups on the genetic variability and viability of the wild horses in the Eagle Complex HMAs.

257.    The Eagle Complex Ten-Year Plan concludes that PZP contraception appears to be temporary and reversible and does not appear to cause out of season births.

258.    However, there are several studies that cast serious doubt on BLM's conclusions about PZP.

259.    There are several studies demonstrating that fertility control treatments may cause irreversible sterility in mares. Moreover, the most recent and reliable data indicate that these fertility controls could also cause out of season births, band instability, and general decline in immune function.

260.    Additionally, PZP and GonaCon could cause abscesses at the injection site, negative impacts on organ systems, and long-term health effects.

261.    The Final EA for the Eagle Complex Ten-Year Plan refers to Table 3.8-2 of the Ely Proposed RMP/Final EIS and 1983 Pinyon MFP to conclude that the wild horse reproductive viability is adequate.

262.    However, Table 3.8-2 of the Ely Proposed RMP/Final EIS does not include any of the Eagle Complex HMAs or demonstrate their reproductive viability. Similarly, the 1983 Pinyon MFP does not show that any of the Eagle Complex HMAs are genetically viable.

263.    There is no analysis of the current genetic health viability or variability of the HMAs in the Eagle Complex.

264.    The Eagle Complex Ten-Year Plan fails to take a hard look at the impacts of administering fertility control as authorized in the Eagle Complex Ten-Year Plan

265.    The Eagle Complex Creek Ten-Year Plan does not consider scientific information about the positive impacts of wild horses, including that wild horses help spread and fertilize seeds over large areas, prevent fires, and can benefit ecosystems.

266.    The Eagle Complex Ten-Year Plan does not take a hard look at the potential for wild horses to self-regulate their populations.

267.    The Eagle Complex Ten-Year Plan specifically states that, if Congress were to lift the current appropriations restrictions, then it is possible that wild horses removed

from the Eagle Complex HMA over the next ten years could be euthanized or sold without limitation.

268.    BLM did not take a hard look at the impact of euthanizing or selling wild horses.

**5.    BLM's Authorization to Remove Wild Horses from the Eagle Complex Herd Management Areas.**

269.    BLM did not commit to analyze grazing utilization and distribution, trends in ecological conditions, actual use, and climate data before making future decisions under the Eagle Complex Ten-Year Plan.

270.    BLM did not commit to provide public notice before undertaking future roundups under the Eagle Complex Ten-Year Plan.

271.    BLM did not commit to provide public participation in future roundup decisions under the Eagle Complex Ten-Year Plan.

272.    Range conditions, wild horse numbers, and the appropriate management level can change each year.

273.    BLM does not have information that removal is necessary throughout the term of the Eagle Complex Ten-Year Plan.

274.    BLM failed to consider what qualifies as a self-sustaining, healthy population of wild horses and how the Eagle Complex Ten-Year Plan would impact the health and sustainability of wild horses.

275.    The Eagle Complex Ten-Year Plan authorizes continued use of fertility control treatments, including PZP and GonaCon.

276.    The impacts from PZP and GonaCon are controversial and involve unique and unknown risks.

277.    BLM has completed three roundups of wild horses since it issued the Eagle Complex Ten-Year Plan and removed 2,996 wild horses from the range.

278. Thirty-seven wild horses were killed in Eagle Complex roundups since 2018.

279. There is no longer an overpopulation of wild horses in the Eagle complex and no need to remove additional wild horses.

**D. The Onaqui Mountain Ten-Year Plan.**

**1. The Onaqui Mountain HMA.**

280. The Onaqui Mountain HMA is located in central Tooele County, Utah and administered by BLM's Salt Lake Field Office. It is located forty air miles southwest of Salt Lake City and extends from Johnson's Pass south to Lookout Pass.

281. Wild horses occupied the Onaqui Mountains at the time the WHBA was passed in 1971.

282. The Onaqui Mountain HMA encompasses approximately 205,394 acres of public land, and the surrounding HA provides an additional 240,997 acres of viable wild horse habitat. Department of Defense lands occur immediately adjacent to the HMA.

283. The Onaqui Mountain HMA/HA intersects with ten BLM grazing allotments that encompass approximately 267,802 acres of public land. Privately owned land as well as land controlled by the State of Utah's School and Institutional Trust Lands Administration are also grazed by livestock in association with a BLM Allotment or privately held pastures. Both cattle and sheep graze in these allotments.

284. In February 2003, the Onaqui Mountain HMA AML and boundary were amended by the Decision Record issued for the Wild Horse Appropriate Management Level and Herd Management Area/Herd Boundary EA, FONSI, and DR, UT-020-2002-100 (hereinafter, "2003 Decision").

285. The 2003 Decision set the AML for Onaqui Mountain HMA at 159 wild horses or a range of between 121 to 210 wild horses.

286. According to the 2003 Decision, future adjustments of wild horse numbers would most likely occur through roundups.

287.    According to the 2003 Decision, BLM should adjust the number of horses following appropriate environmental analysis.

288.    In May 2015, BLM issued the Onaqui Mountain Herd Management Area Fertility Control EA, FONSI, and DR, UT-W010-2014-0021-EA (hereinafter, "2015 Decision").

289.    The 2015 Decision addressed the use of Zona-Stat-H to dose mares through darting.

290.    Actions within the Onaqui Mountain HMA are also governed by the Approved Resource Management Plan Amendment for greater sage-grouse for the Great Basin Region (ARMPA).

291.    The most recent genetic diversity sampling in the Onaqui Mountain HMA herd was conducted by Dr. Gus Cothran in 2005. Results indicated that the Onaqui herd had higher than average numbers of genetic variants in the markers used, but a low heterozygosity at the time.

292.    There have been ten roundups in the Onaqui Mountain HMA between when Congress passed the WHBA in 1971 and the 2018 Decision.

293.    According to a November 2017 population inventory, observers visually confirmed the presence of 399 adult wild horses and 46 foals, or a total of 445 wild horses, both within and outside of the Onaqui Mountain HMA. Using this number, BLM estimated a total population of 456 wild horses. Using the 2017 population number, BLM estimates that by the time a roundup could occur in 2019, the population will be approximately 586 wild horses.

**2.    The Pony Express Resource Management Plan.**

294.    The Pony Express RMP was issued in January 1990.

41

295.    The Pony Express RMP set the AML within Onaqui Mountain HMA at 45 wild horses (540 AUMs). The AML was amended by the 2003 Decision and set at a range of 121 to 210 wild horses (1,908 AUMs).

296.    According to the Pony Express RMP, allotments will be monitored approximately once every ten years to assure that resource deterioration is not occurring.

297.    According to the Pony Express RMP, forage allocations for livestock, wild horses, and affected wildlife species are based upon the best data available for each allotment.

298.    According to the Pony Express RMP, "BLM personnel will develop Habitat Management Plans (HMPs) to protect, improve and maintain all important wildlife habitat. . . . All important public land habitat areas within the Pony Express Resource Area shall be covered by an HMP."

299.    BLM has not prepared a Habitat Management Plan or Herd Management Area Plan for the Onaqui Mountain HMA.

300.    According to the Pony Express RMP, "[a]ll actions that would involve soil, water, and air resources will continue to be evaluated on a case-by-case basis. Evaluations will consider the impacts of any proposed actions to soil, water, and air resources in the affected area."

301.    According to the Pony Express RMP, cultural resources "will continue to be evaluated on a case-by-case basis. Such evaluation will consider the impacts of any proposed action to the cultural resources in the affected area."

**3.    Environmental Review of the Onaqui Mountain Ten-Year Plan.**

302.    On September 27, 2017, BLM's Salt Lake Field Office issued a Scoping Notice alerting the public of its proposed Population Control, Gather, and Research for the Onaqui Wild Horse Herd Management Area Project. According to the Scoping Notice, BLM estimated that 325 wild horses would need to be removed to achieve low AML. The

42

Scoping Notice stated that the proposed roundups would begin in the summer of 2018 and extend for multiple years and did not indicate that it was going to be a ten-year plan.

303.    BLM's Salt Lake Field Office conducted a public scoping period from October 2, 2017 to October 31, 2017. BLM received approximately 6,003 comments and one petition (with 7,798 names) from the public during the scoping period, including a comment from Friends of Animals.

304.    In its Scoping Comment, Friends of Animals addressed several concerns with the proposed action, including: (1) that the proposed action would significantly diminish the public's ability to observe and enjoy the wild horses in the Onaqui Mountain HMA; (2) BLM's failure to consider the impact of wild horses, compared to other activities, in making its determination regarding whether removal is necessary; (3) the lack of a defined time limit; (4) BLM's failure to consider reasonable alternatives, including adjusting the AML, natural population controls, studying the interaction of wild horses with sage-grouse without removing wild horses, reducing or eliminating other uses, such as sheep and cattle grazing; and (5) expanding the Onaqui Mountain HMA to include the surrounding HA.

305.    On June 12, 2018, BLM released a draft Onaqui Mountain Herd Management Area Population Control EA.

306.    According to the draft EA, the decision to be made is to determine if using roundups and fertility control on wild horses in the Onaqui Mountain HMA should be part of long-term management of the herd and under what conditions such roundups and fertility control might be approved.

307.    According to the draft EA, the estimated population would be approximately 500 wild horses in 2018.

308.    The draft EA analyzed three alternatives. The proposed action (Alternative A) analyzed in the draft EA included initially rounding up 90% of the existing wild horses

(approximately 450 wild horses) from in and around the Onaqui Mountain HMA using both helicopters and water traps.

309.    According to the draft EA, under Alternative A, the initial roundup would permanently remove approximately 379 wild horses. Additionally, up to 40 wild horses would be given a one-year dose of PZP and would be returned to the HMA.

310.    According to the draft EA, under Alternative A, BLM would return an undisclosed number of times over the next ten years to roundup and remove an undisclosed number of additional wild horses.

311.    Alternative B included the same actions analyzed in Alternative A with the addition of GonaCon as a fertility control treatment. Under Alternative B, GonaCon could be used instead of, or in addition to, PZP for mares that have foaled or mares that do not respond to PZP.

312.    Alternative C (the no action alternative) would include no gather operations but would continue the PZP darting program established under the 2015 Decision.

313.    According to the draft EA, the proposed action would include "protective measures" pursuant to the Interdisciplinary Team checklist, including air quality measures; cultural resource measures; fuels/fire management measures; invasive species/noxious weeds measures; lands/access measures; migratory birds measures; greater sage-grouse measures; soils and vegetation measures; threatened, endangered, candidate, or special status animal and plant species measures; travel/transportation measures; watershed measures; water resources/quality  measures; wetlands/riparian zones and floodplains measures; and livestock grazing measures that allow BLM to coordinate roundup and maintenance activities with existing livestock grazing permittees.

314.    "Protective measures" are not described or defined in any of BLM's handbooks or manuals.

315.    Cumulative impacts are identified in the draft EA as past, present, and reasonably foreseeable actions applicable to the assessment area. BLM lists nine actions in the draft EA that may result in impacts, including livestock grazing authorizations and permit issuance; recreation use; invasive/noxious weed inventory and treatments; hazardous fuels and habitat restoration treatments; wildfire stabilization and rehabilitation plans; land tenue adjustments; rights-of-ways; travel and transportation management (Sheeprock Mountains); and research proposals. According to the draft EA, the "period of time is over a 10 year  period that coincides with population cycles and trends over AML."

316.    BLM offered a public comment period on the draft EA from June, 13, 2018 to July 12, 2018.

317.    BLM received approximately 7,885 comments, including from Friends of Animals.

318.    Friends of Animals and others commented that BLM cannot authorize the continued removal and harassment of wild horses for ten years into the future.

319.    Friends of Animals and others commented that BLM failed to analyze any action alternative that includes an option other than rounding up and permanently removing a majority of the wild horses.

320.    Friends of Animals and others commented that BLM should circulate an EIS that analyzes additional alternatives, including adjusting the AML in the Onaqui Mountain HMA to support additional horses, and/or expanding the HMA to include the viable horse habitat in the surrounding HA.

321.    Friends of Animals and others commented that the proposed action would result in major environmental impacts that warrant preparation of an EIS.

322.    Friends of Animals and others commented that BLM does not have the authority to remove and harass wild horses within the Onaqui Mountain HMA for ten years into the future.

323.    Friends of Animals and others commented that BLM should consider reducing the amount of forage allocated to private ranchers for grazing cattle and sheep.

324.    Friends of Animals and others commented that BLM should consider natural controls, including protecting predators, such as mountain lions.

325.    Friends of Animals commented that BLM failed to consider the positive impacts of horses and that BLM unfairly attributes a disproportionate share of range deterioration in the HMA to wild horses.

326.    On December 14, 2018, BLM issued the final Onaqui Mountain HMA Population Control EA, a Decision Record, and a Finding of No Significant Impact.

327.    According to the final Onaqui Mountain HMA Population Control EA, the decision to be made is if the removal of wild horses in the Onaqui Mountain HMA via helicopter and trapping roundups and the use of fertility control methods, including PZP, GonaCon, and sterilizations (spaying and neutering) should be part of the management of the herd, and under what conditions (protective measures and/or standard operating procedures).

328.    According to the final Onaqui Mountain HMA Population Control EA, based on comments received from local governments, BLM decided to analyze sterilization (neutering or spaying) as a population control method in Alternative B.

329.    Sterilization was not considered in the draft EA.

330.    The Onaqui Mountain Ten-Year Plan authorizes action not analyzed in the draft EA.

331.    The Onaqui Mountain Ten-Year Plan authorizes the initial roundup and permanent removal of 465 wild horses inside and adjacent to the Onaqui Mountain HMA

using helicopter and water trapping to achieve low AML. The Onaqui Mountain Ten-Year Plan also authorizes BLM to return an unspecified number of times over a ten-year period to conduct additional roundups and administer fertility control. In its final decision, BLM also authorized the use of GonaCon as analyzed in Alternative B.

332.    The final decision did not adopt or approve the use of permanent sterilization methods (spaying and neutering) as analyzed in the final Onaqui Mountain Population Control EA.

333.    It remains unclear whether or not BLM intends to use permanent sterilization methods in future actions within the Onaqui Mountain HMA.

334.    According to the final EA for the Onaqui Mountain HMA, in addition to the Comprehensive Animal Welfare Policy (CAWP) requirements, the "protective measures" described in the draft EA would be applied during roundups and fertility control activities.

335.    According to the final EA for the Onaqui Mountain HMA, "protective measures" would continue to be reviewed and to be applied to actions under BLM jurisdiction.

336.    Cumulative impacts are identified in the final EA for the Onaqui Mountain HMA as past, present, and reasonably foreseeable actions applicable to the assessment area. BLM lists twelve actions (as opposed to the nine listed in the draft EA) that may result in impacts. Actions listed in the final EA that were not listed in the draft EA include oil and gas leasing and development; maintenance or reconstruction of existing infrastructure; and land use planning amendments or revisions or resource specific activity-level plans. According to the final EA for the Onaqui Mountain HMA, the "timeframe for effects analysis is a 10-year period that coincides with population cycles and trends over AML."

337.    According to the final EA for the Onaqui Mountain HMA, these past, present, and reasonably foreseeable actions could continue over the next ten to fifteen years and would likely consist of changes in available water or forage for wild horses.

338.    According to the final EA for the Onaqui Mountain HMA, BLM declined to consider whether to re-evaluate the AML or adjust livestock numbers despite the numerous comments requesting that BLM re-evaluate the AML or adjust livestock numbers.

339.    The final EA for the Onaqui Mountain Ten-Year Plan stated that BLM would continue to conduct monitoring activities in the HMA, including monitoring the herd's genetic diversity. The Final EA also stated that continued genetic diversity monitoring would allow the BLM to be alerted if, at any point in the future, genetic diversity levels become low.

340.    According to Comment Report for the final EA for the Onaqui Mountain HMA, increasing or decreasing the AML from what was established in 2003 is not warranted.

341.    According to the Comment Report for the final EA for the Onaqui Mountain HMA, livestock grazing management on the allotments that are intersected by the HMA will be reviewed during the routine permit renewal process that is resuming again in 2019. This effort will include an assessment of rangeland health and to what extent livestock use might be contributing to any downward trends in rangeland health.

342.    According to the final EA for the Onaqui Mountain HMA, if Congress decides to remove the current prohibition on euthanizing healthy horses and/or selling wild horses without limitation, healthy wild horses removed from Onaqui Mountain HMA could potentially be euthanized and/or sold without limitation.

343.    BLM did not take a hard look at the impacts of euthanizing or selling wild horses.

344.    In the Onaqui Mountain Ten-Year Plan, BLM does not consider any of the alternatives proposed by Friends of Animals.

345.    In the Onaqui Mountain Ten-Year Plan, BLM considers only one additional alternative from the draft EA—permanent sterilization.

346.    The Onaqui Mountain Ten-Year Plan does not include any genetic reports for the Onaqui Mountain HMA wild horses.

347.    The Onaqui Mountain Ten-Year Plan does not include information about the cumulative impacts of past roundups and future roundups on the genetic variability and viability of wild horses in the Onaqui Mountain HMA.

348.    The Onaqui Mountain HMA does not take a hard look at the impact of the proposed action and future actions on the genetic viability of wild horses in the Onaqui Mountain HMA.

349.    The Onaqui Mountain Ten-Year Plan authorizes continued use of fertility control treatments, including PZP and GonaCon.

350.    The impacts of PZP and GonaCon are controversial and involve unknown risks.

351.    The Onaqui Mountain Ten-Year Plan concludes that PZP appears to be temporary and reversible, does not cause out of season births, that behavioral changes have no negative impacts, and that using PZP preserves herd genetics.

352.    Numerous studies cast serious doubt on BLM's conclusions about PZP, including studies demonstrating that fertility control treatments may cause irreversible sterility in mares and that it can cause out of season births, band instability, and a general decline in immune function.

353.    Additionally, PZP and GonaCon could cause abscesses at the injection site, negative impacts on organ systems, and long-term health effects that could impact herd genetics.

354.    The Onaqui Mountain Ten-Year Plan fails to take a hard look at the impacts of administering fertility control.

355.    The Onaqui Mountain Ten-Year Plan does not consider scientific information about the positive impacts of wild horses, including that wild horses help spread and fertilize seeds over large areas, help to prevent fires, and can benefit ecosystems.

356.    The Onaqui Mountain Ten-Year Plan does not take a hard look at the potential for wild horses to self-regulate their populations.

**4.    BLM's Authorization to Remove Horses from the Onaqui Mountain HMA.**

357.    BLM did not commit to analyze grazing utilization and distribution, trends in ecological conditions, actual use, and climate data before making future decisions under the Onaqui Mountain Ten-Year Plan.

358.     BLM did not commit to provide public participation in future roundup decisions under the Onaqui Mountain Ten-Year Plan.

359.    Range conditions, wild horse numbers, and the appropriate management level can change each year.

360.    BLM stated that fencing restricting wild horses from a portion of the Onaqui Mountain HMA would be removed upon successful reseeding and establishment of plants.

361.    BLM does not have information that removal is necessary throughout the term of the Onaqui Mountain Ten-Year Plan.

362.    BLM's Onaqui Mountain Ten-Year Plan is based on AMLs established in 2003 when both the AML and boundary were amended.

363.    BLM failed to consider what qualifies as a self-sustaining, healthy population of wild horses and how the Onaqui Mountain Ten-Year Plan would impact the health and sustainability of wild horses.

364.    BLM does not have information that removal is necessary throughout the term of the Onaqui Mountain Ten-Year Plan.

365.    The Onaqui Mountain Ten-Year Plan authorizes continued use of fertility control treatments, including PZP and GonaCon.

366.    The impacts from PZP and GonaCon are controversial and involve unique and unknown risks.

**5. Completion of the Initial Onaqui Mountain HMA Roundup**

367.    BLM started the initial roundup on the Onaqui Mountain HMA, 271 days after the Long-Term Roundup Decision, on September 11, 2019.

368.    BLM planned to remove approximately 200 wild horses in September 2019.

369.     BLM actually removed 241 wild horses from the Onaqui Mountain HMA in September 2019.

370.    BLM completed the planned roundup on September 19, 2019.

371.    Two horses were killed in the roundup. One mare was euthanized after severely injuring herself in roundup operations. Another mare was euthanized after breaking a leg during the roundup.

372.    BLM also removed nine wild horses in October 2019 and another nine in August 2020.

**6. The 2021 Onaqui Roundup**

373.    BLM posted a proposed schedule that listed the start date for a proposed roundup of wild horses on the Onaqui Mountain HMA on July 11, 2021. The first time that BLM listed this start date for a wild horse gather was on June 15, 2021.

374.    BLM's proposed schedule indicated that it proposed to roundup 400 wild horses and remove 296 from the Onaqui Mountain HMA.

375.    People and organizations reached out to BLM requesting that it consider significant new circumstances and alternatives to the proposed 2021 roundup.

376.    People also held rallies pleading for BLM to reconsider the removal of wild horses from the Onaqui Mountain HMA in 2021. Professional filmmakers even produced a short film documenting some of the opposition to the 2021 Onaqui roundup.[2] BLM did not publicly analyze or respond to any of the information from the public.

377.    BLM began helicopter drive-trapping operations on July 13, 2021 and concluded on July 18, 2021. BLM rounded up 435 wild horses, including 186 stallions, 202 mares, and 47 foals from the Onaqui Mountain HMA. It released one wild horse for undisclosed reasons.

378.    Another wild horse died in the 2021 Onaqui Roundup. After being chased into a crowed pen, the healthy young mare was kicked by another wild horse and suffered a broken ankle. Subsequently, BLM agents euthanized the young mare.

379.    On average the wild horses that BLM rounded up in 2021 were not in bad health.

380.    BLM states that the wild horses that were permanently removed will be available for adoption on October 12-19, 2021.

381.    BLM released 14 wild horses back to the Onaqui Mountain HMA on August 8, 2021, and released 109 wild horses on August 9, 2021.

382.    The condition of the wild horses that BLM rounded up significantly deteriorated after BLM took the wild horses off the range.

383.    The condition of the wild horses that BLM left on the range did not deteriorate over the same time period.

384.    BLM did not release wild horses back to the same areas where the wild horses lived before the roundup.

_____

[2] *See* Final Plea for President Biden to Save the Onaqui by Ashley Avis in association with Marty Irby. Available from https://www.youtube.com/watch?v=dJVGJyOotlQ

385.     At least one wild horse, who was in good health before BLM conducted the 2021 Onaqui Roundup, died shortly after being released back to the range.

386.     BLM removed wild horses below the upper end of the AML against recommendations of the genetic report for the Onaqui Mountain HMA.

387.     BLM failed to analyze or disclose current conditions warranting the 2021 removal including the following: grazing utilization and distribution; trend in range ecological condition; actual use; climate (weather) data; current population inventory; wild horses and burros located outside the HMA, or in herd areas (HAs) not designated for their long-term maintenance; and other factors such as the results of land health assessments.

388.     BLM permits cattle and sheep to graze on the Onaqui Mountain HMA. The amount of forage cattle and sheep are permitted to consume is measured in Animal Unit Months (AUMs), which is the amount of forage necessary for the sustenance of one cow, one horse, or five sheep for a period of one month.

389.     BLM allocates 24,982 AUMs to cattle and sheep within the Onaqui Mountain HMA.

390.     BLM has not reduced the amount of cattle and sheep grazing that is occurring in the Onaqui Mountain HMA in 2021 as of the date of this complaint.

391.     BLM failed to make a determination based on current information that the roundup of 435 wild horses and permanent removal of 312 was necessary.

392.     BLM removed wild horses below the AML.

393.     BLM did not solicit comments from the public about the 2021 Onaqui Roundup.

394.     BLM did not conduct a NEPA analysis for the 2021 Onaqui Roundup.

395.     BLM did not consider alternatives to the 2021 Onaqui Roundup.

396.    BLM did not involve the public in the decision-making process for the 2021 Onaqui Roundup.

397.    BLM did not determine that involving the public in the decision-making process for the 2021 Onaqui Roundup was not practicable.

398.    BLM failed to make a finding of no significant impact for the 2021 Onaqui Roundup.

399.    BLM failed to make a determination of NEPA adequacy for the 2021 Onaqui Roundup.

400.    The impacts of the 2021 Onaqui Roundup were not adequately analyzed in any previous NEPA documents.

401.    Prior to the 2021 Onaqui Roundup, BLM failed to conduct genetic sampling of the Onaqui wild horses.

402.    Prior to the 2021 Onaqui Roundup, BLM failed to remove fencing as it had previously committed to do.

403.    Range conditions, wild horse numbers, and the appropriate management level changed between when BLM issued the Onaqui Mountain Ten-Year Plan and conducted the 2021 Onaqui Roundup.

404.    New studies have been published on the positive impact of wild horses since BLM issued the Onaqui Mountain Ten-Year Plan.

405.    New articles have been published with evidence that wild horses adopted from BLM are being sold to slaughter.

406.    There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed Onaqui Mountain Ten-Year Plan since it issued the final EA and FONSI in 2018.

407.    BLM also made substantial changes to the proposed action in the Onaqui Mountain Ten-Year Plan, such as restricting wild horses from a significant portion of the

range when no longer warranted and failing to monitor the health and sustainability of the herd.

408.    The 2021 Onaqui Roundup was not based on current information.

409.    The 2021 Onaqui Roundup was not an emergency action.

410.    BLM failed to consider what qualifies as a self-sustaining, healthy population of wild horses and how the 2021 Onaqui Roundup would impact the health and sustainability of wild horses.

411.    BLM did not consult with independent, qualified scientists in the field of biology and ecology, interested parties, or others that it determined to have scientific expertise and special knowledge of wild horse protection, wildlife management, and animal husbandry as related to rangeland management before determining to remove wild horses from the range in July 2021.

412.    BLM never analyzed the impact of the 2021 Onaqui Roundup in combination with the previous roundups conducted under the 2018 Onaqui Mountain Ten-Year Plan.

413.    On July 1, 2021, BLM issued a press release stating that it planned to gather wild horses on July 11, 2021 ("July 2021 Press Release").

414.    In the July 2021 Press Release, BLM stated that the estimated population of wild horses was 475.

415.    BLM did not disclose how it reached its 2021 population estimate, did not cite any support or evidence for this information and did not accept comments on this position. BLM's estimate of 475 wild horses in July 2021 was not accurate.

416.    According to the July 2021 Press Release, horses declined in body condition over the last year due to drought and forage condition.

417.    BLM did not cite any support or evidence for its claims about the horses declined body condition and did not solicit comments on this position. BLM did not analyze this information in any existing NEPA document. BLM's claim was not accurate.

418.    According to the July 2021 Press Release the gather was "necessary to address several issues in the herd management area." However, BLM never expressly stated what those issues were, provided support for that statement, or involved interested parties and the public in its decision-making process.

419.    BLM failed to make a finding, based on current information, that there was an overpopulation of wild horses and removal was necessary in July 2021.

420.    Removal of wild horses from the Onaqui Mountain HMA in July 2021 was not needed to preserve and maintain a thriving natural ecological balance.

421.    BLM failed to issue a record of decision before conducting the 2021 Onaqui Roundup.

422.    BLM did not provide a right to appeal the 2021 Onaqui Roundup.

## CLAIMS

### FIRST CAUSE OF ACTION
### (VIOLATIONS OF THE WILD FREE-ROAMING HORSES AND BURROS ACT)

423.    Friends of Animals herein incorporates all allegations contained in the preceding paragraphs.

424.    On the above facts and legal obligations, Defendant violated the WHBA by failing to comply with applicable land use plans, and failing to make an appropriate determination that wild horses are excess and removal is necessary prior to authorizing the permanent removal of horses over a ten-year, or undefined, term from the Pine Nut HMA, Muddy Creek HMA, the Eagle Complex HMAs, and the Onaqui Mountain HMA.

425.    BLM does not have statutory authority to continually remove wild horses for a period of ten years based on a single decision.

426.    On the above facts and legal obligations, Defendant violated the WHBA by failing to comply with applicable land use plans and failing to make an appropriate

determination that wild horses are excess and removal is necessary before rounding up and removing wild horses from the Onaqui Mountain HMA in 2021.

427.    On the above facts and legal obligations, Defendant violated the WHBA by removing wild horses in July 2021 without consulting with the United States Fish and Wildlife Service, wildlife agencies of the State or States wherein wild free-roaming horses and burros are located, such individuals independent of Federal and State government as have been recommended by the National Academy of Sciences, and such other individuals that have scientific expertise and special knowledge of wild horse and burro protection, wildlife management and animal husbandry as related to rangeland management.

428.    Defendant's Long-Term Roundup Decisions and the 2021 Onaqui Roundup are therefore arbitrary, capricious, an abuse of discretion, not in accordance with law or required procedure, and in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, and must be set aside under the Administrative Procedure Act, 5 U.S.C. § 706.

## SECOND CAUSE OF ACTION
## (APA: UNEXPLAINED DEPARTURE FROM AGENCY GUIDELINES AND REGULATIONS)

429.    Friends of Animals herein incorporates all allegations contained in the preceding paragraphs.

430.    BLM's policy mandates that BLM issue a site-specific NEPA document analysis or Determination of NEPA Adequacy prior to each roundup, and that such document be provided to interested parties for a 30-day review and comment period absent an emergency.

431.    BLM's policy further mandates that a removal decision should be issued thirty-one to seventy-six days prior to removal.

432.    BLM's regulations require BLM to prepare a herd management area plan.

433.    The Long-Term Roundup Decisions authorize continued roundups and removals for ten years, or an indefinite amount of time, without prior notice to the public and an opportunity to comment on future roundups.

434.    BLM did not provide any site-specific NEPA analysis or Determination of NEPA Adequacy for the 2021 Onaqui Roundup for interested parties to review.

435.    BLM did not solicit public comments on the 2021 Onaqui Roundup.

436.    BLM did not issue a removal decision regarding the 2021 Onaqui Roundup.

437.    BLM did not provide an opportunity for administrative review of the 2021 Onaqui Roundup.

438.    BLM has not prepared a herd management area plan for the Eagle, Chokecherry, Mt. Elinore, Muddy Creek, and Onaqui HMAs.

439.    Defendant did not provide any explanation for departing from BLM's policy and regulations when it approved the Long-Term Roundup Decisions or 2021 Onaqui Roundup.

440.    Defendant's failure to follow federal regulations and its own policies, without explanation, when issuing the Long-Term Roundup Decisions and conducting the 2021 Onaqui Roundup is arbitrary, capricious, an abuse of discretion, and not in accordance with law or required procedure, and must be set aside under the Administrative Procedure Act, 5 U.S.C. § 706.

### THIRD CAUSE OF ACTION
### (VIOLATION OF NEPA: FAILURE TO PREPARE AN ENVIRONMENTAL IMPACT STATEMENT)

441.    Friends of Animals herein incorporates all allegations contained in the preceding paragraphs.

442.    The implementation of the Long-Term Roundup Decisions and the 2021 Onaqui Roundup constitute major federal actions that will significantly affect the quality of

the human environment, and therefore an Environmental Impact Statement is required under NEPA.

443.    Defendant failed to make a convincing case for its Findings of No Significant Impact for the Long-Term Roundup Decision.

444.    In issuing the Long-Term Roundup Decisions and the 2021 Onaqui Roundup without Environmental Impact Statements, Defendant's actions are arbitrary and capricious, an abuse of discretion, and not in accordance with the law or required procedure, and must be set aside under the Administrative Procedure Act, 5 U.S.C. § 706.

## FOURTH CAUSE OF ACTION
### (VIOLATIONS OF NEPA)

445.    Friends of Animals herein incorporates all allegations contained in the preceding paragraphs.

446.    Defendant failed to provide a full and fair discussion of the significant environmental impacts of the Long-Term Roundup Decisions and 2021 Onaqui Roundup.

447.    On the above facts and legal obligations, Defendant violated NEPA by failing to independently and adequately analyze the direct, indirect, cumulative, and site-specific effects of the 2021 Onaqui Roundup, and the Long-Term Roundup Decisions that purport to authorize BLM to continually round up, permanently remove, and administer fertility control to wild horses from the Pine Nut Mountains HMA, Muddy Creek HMA, Eagle Complex HMAs, and the Onaqui Mountain HMA.

448.    In issuing the Long-Term Roundup Decisions and conducting the 2021 Onaqui Roundup without a complete and independent analysis of the direct, indirect, cumulative, and site-specific impacts of the proposed actions and alternative actions, Defendant's actions are arbitrary and capricious, an abuse of discretion, and not in accordance with law or required procedure, and should be set aside under the Administrative Procedure Act, 5 U.S.C. § 706.

449.    In failing to issue any NEPA analysis, DNA, or FONSI for the 2021 Onaqui

Roundup, Defendant's actions are arbitrary and capricious, an abuse of discretion, and not

in accordance with law or required procedure, and should be set aside under the

Administrative Procedure Act, 5 U.S.C. § 706.

## REQUEST FOR RELIEF

Friends of Animals respectfully requests that this Court enter judgment providing the

following relief:

A. Declare that Defendant's Long-Term Roundup Decisions and the 2021 Onaqui
Roundup violate the Wild Free-Roaming Horses and Burros Act and the
Administrative Procedure Act;

B. Declare that the Decision Records and Findings of No Significant Impact for the
Long-Term Roundup Decisions violate the National Environmental Policy Act
and the Administrative Procedure Act;

C. Declare that Defendant violated the National Environmental Policy Act and the
Administrative Procedure Act by conducting the 2021 Onaqui Roundup with no
NEPA analysis or public involvement;

D. Enjoin any action authorized by the 2021 Onaqui Roundup and Defendant's
Long-Term Roundup Decisions at issue in this case unless and until the
violations of federal law set forth herein have been corrected to the satisfaction
of this Court;

E. Order that any wild horses in BLM's control or possession that have been
removed from the range pursuant to the 2021 Onaqui Roundup or the Long-
Term Roundup Decisions be returned to the HMAs that they were removed
from;

F. Vacate and remand back to BLM the Long-Term Roundup Decisions and the
2021 Onaqui Roundup;

G. Award Plaintiff reasonable costs, litigation expenses, and attorney's fees
associated with this litigation pursuant to the Equal Access to Justice Act, 28
U.S.C. § 2412 *et seq*., and/or all other applicable authorities; and/or

H. Grant such further relief as the Court deems just and equitable.

Dated:  August 10, 2021                          Respectfully submitted,

                                                 /s/ Jennifer Best
                                                 Jennifer Best (DC Bar # CO0056)

Assistant Legal Director
Friends of Animals
Wildlife Law Program
7500 E. Arapahoe Road, Suite 385
Centennial, CO 80112
Tel: 720.949.7791
jennifer@friendsofanimals.org

*Attorney for Plaintiff*