## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| FRIENDS OF ANIMALS, |  |
| *Plaintiff*, |  |
| v. |  |
| U.S. BUREAU OF LAND MANAGEMENT, | Civil Action No. 18-2029 (RDM) |
| *Defendant*, |  |
| STATE OF UTAH, |  |
| *Defendant-Intervenor*. |  |

## <u>MEMORANDUM OPINION</u>

The Wild Free-Roaming Horses and Burros Act ("WHA" or the "Act"), 16 U.S.C. § 1331 *et seq.*, seeks to strike an equilibrium between preserving and protecting free-roaming wild horses as "living symbols of the historic and pioneer spirit of the West," *id.* § 1331, and ensuring that wild horse populations do not exceed levels that are sustainable for the wild horse herds and the "natural ecological balance [of] the range," *id.* § 1333(b)(2).  To do so, the WHA confers substantial discretion on the Bureau of Land Management (the "Bureau" or "BLM") to manage the herds and their environs, but it also requires that the Bureau exercise that discretion based on current information, consultation with expert agencies and individuals, and the priorities identified in the Act.

This case addresses the tension between these competing considerations.  In particular, the case requires the Court to decide whether the Bureau exceeded its authority when it adopted four ten-year management plans for controlling wild horse populations in certain herd management areas ("HMAs").  In the Bureau's view, the process that accompanied the adoption

of these ten-year plans is all the process that the WHA and the related rules and laws require. Plaintiff, Friends of Animals, takes the opposite view.  It alleges that every time that the Bureau gathers wild horses over the ten-year period, it must engage in the required consultation, ensure that the relevant scientific information is up to date, consider whether the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, requires the preparation of an environmental assessment ("EA") or an environmental impact statement ("EIS"), and provide public notice and an opportunity for comment.

As explained below, the best reading of the statute lies somewhere between these extremes.  Although polar opposites, the positions that the parties urge upon the Court share the common virtue of simplicity:  It is easy to apply and to enforce a rule that requires consultation, up-to-date information, NEPA review, and public notice and comment only once every ten years, and it is easy to apply and to enforce a rule that requires this process each and every time the Bureau gathers wild horses.  The problem that both arguments face, however, is that Congress did not create a bright-line rule at either end of the spectrum.  Instead, the Act vests the Bureau with broad discretion in managing and protecting "wild free-roaming horses and burros as components of the public lands," but it also requires that the Bureau make its decisions based on current information and input from expert agencies and individuals; that when the Bureau concludes that it "is necessary to remove excess animals," it act promptly "to remove excess animals . . . so as to achieve appropriate management levels;" and that the Bureau proceed in a specified "order and priority" of steps "until all excess animals have been removed" from the range.  16 U.S.C. § 1333.

These statutory directives impose enforceable obligations on the Bureau.  Determining whether the Bureau has complied with these obligations, however, demands a more nuanced

assessment than either party proposes, and it requires the type of case-by-case assessment that both sides would rather avoid.  When the Bureau promptly commences a gather after completing the required steps, pauses to assess the progress that it has made, and then promptly re-initiates the then-uncompleted gather, for example, it is unlikely that further process would be required.  But, on the other end of the spectrum, further process would likely be required where the Bureau begins and completes a gather—achieving "appropriate management levels" ("AML")—only to commence a second, distinct gather at a later date based on new information.  Not every case, moreover, will require the same additional process.  In some circumstances, for example, the Bureau might be able to determine that the existing NEPA documentation is adequate, while, in other circumstances, it might be required to prepare a new EA.  What matters for present purposes is that the Bureau must consider how the unique circumstances presented at different times, in different places, and under different conditions affect the administrative process that must precede a particular gather—and that it may not make a blanket determination that will invariably cover all gathers for the next decade.

As explained further below, the Court will accordingly grant Plaintiff a very limited form of relief; it will set aside each of the four ten-year plans at issue in this litigation, but only to the extent that they purport to authorize new gathers, after the Bureau has already achieved AML, and it will remand the case to the Bureau to clarify the ten-year plans to ensure that future gathers conducted pursuant to those plans are not unreasonably delayed.  The Court is unpersuaded, however, by Plaintiff's as-applied challenges to the 2021 Onaqui Mountain Herd Management Area gather, its NEPA challenge to the ten-year gather plans, and its claim that the Bureau has departed from its prior policy without explanation.

The Court will, accordingly, grant in part and deny in part Defendant's, Dkt. 112, and

Defendant-Intervenor's, Dkt. 113, motions for partial dismissal and summary judgment, and will

grant in part and deny in part Plaintiff's cross-motion for summary judgment, Dkt. 116.

## I. BACKGROUND

**A.      Statutory Background**

1.      *Wild Free-Roaming Horses and Burros Act*

In 1971, Congress enacted the Wild Free-Roaming Horses and Burros Act after finding

that "wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of

the West" and "contribute to the diversity of life forms within the Nation and enrich the lives of

the American people."  16 U.S.C. § 1331.  As originally enacted, the Act authorized—but did not

require—the Bureau to destroy "old, sick, or lame animals . . . in the most humane manner

possible," if it found that the "area [was] overpopulated" and that "such action [was] the only

practical way to remove excess animals from the area."  Pub. L. No. 92-195, 85 Stat. 650 (Dec.

15, 1971).

In 1978, Congress amended the Act after an excess of horses had "ravaged public lands."

*Friends of Animals v. United States Bureau of Land Mgmt.*, 514 F. Supp. 3d 290, 293 (D.D.C.

2021) ("*FOA I*").  As amended, the WHA requires the Bureau to "maintain a current inventory of

wild free-roaming horses and burros on given areas of the public lands" for the purpose of

(1) "mak[ing] determinations as to whether and where an overpopulation exists and whether

action should be taken to remove excess animals;" (2) "determin[ing] appropriate management

levels ["AMLs"] of wild free-roaming horses and burros on these areas of the public lands;" and

(3) "determin[ing] whether appropriate management levels should be achieved by the removal or

destruction of excess animals, or other options (such as sterilization, or natural controls on

population levels)." 16 U.S.C. § 1333(b)(1). "In making such determinations[,]" the Bureau is required to "consult with the United States Fish and Wildlife Service, wildlife agencies of the State or States wherein wild free-roaming horses and burros are located, such individuals independent of Federal and State government as have been recommended by the National Academy of Sciences, and such other individuals" with "scientific expertise and special knowledge of wild horse and burro protection, wildlife management and animal husbandry as related to rangeland management." *Id.*

The Bureau has significant discretion in determining whether AMLs should be achieved through removals or through other options such as fertility controls. Once the Bureau makes the determinations that it is necessary to remove excess wild horses, however, the statute requires that the Bureau act. Among other things, the WHA requires that the Bureau "immediately remove excess animals from the range so as to achieve appropriate management levels" and lists the "order and priority" that it must follow "until all excess animals have been removed so as to restore a thriving natural ecological balance to the range." *Id.* § 1333(b)(2). Under that order, the Bureau must start by humanely destroying "old, sick, or lame animals;" must then remove animals for adoption, and, finally, must "cause additional excess wild free-roaming horses and burros for which an adoption demand . . . does not exist to be destroyed in the most humane and cost[-]efficient manner possible." *Id.*

Under the governing regulations, the Bureau is required to establish "herd management areas" ("HMAs") and to consider, within those HMAs, "the appropriate management level for the herd, the habitat requirements of the animals, the relationships with other uses of the public and adjacent private lands, and" the need to engage in the minimum level of management necessary. 43 C.F.R. § 4710.3-1; *see also id.* § 4710.4. The Bureau is further required to

"prepare a herd management area plan [('HMAP')], which may cover one or more herd management areas." *Id.* To "determine high-level goals and standards for resource management of a region, the Bureau also establishes resource management plans ('RMPs')—that is, land use plans that govern multiple HMAs." *FOA I*, 514 F. Supp. 3d at 294; *see also* 43 C.F.R. § 4710.1.

2. *National Environmental Policy Act*

NEPA requires federal agencies to take a "hard look" at the environmental consequences before carrying out federal actions. *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 374 (1989). The statute accomplishes this by imposing procedural duties that serve "twin aims." "First, [NEPA] 'places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action.'" *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983) (quoting *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978)). "Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decision[-]making process." *Id.* For a "major Federal action[] significantly affecting the quality of the human environment," NEPA requires the lead agency to prepare "a detailed statement" that describes the project's environmental impact and considers alternatives. 42 U.S.C. § 4332(2)(C).

To determine whether a proposed action will significantly affect the environment, the governing regulations require agencies to prepare an environmental assessment ("EA") that considers the action's environmental impacts as well as alternatives to the proposed action. 40 C.F.R. §§ 1501.4(b) (2018), 1508.9 (2018); *see also id.* § 1501.5 (2021); 85 Fed. Reg. 43,304 (July 16, 2020). An EA is a "concise public document" used to determine whether the agency should prepare a more comprehensive environmental impact statement ("EIS") for projects likely to have a significant environmental impact, *id.* § 1508.9(a) (2018); *see also id.* § 1508.1(h)

(2021), or a "finding of no significant impact" ("FONSI"), *id.* §§ 1501.4(e) (2018), 1508.13 (2018); *see also id.* §§ 1508.1(*l*) (2021), 1501.6 (2021).  Regulations also require the agency to "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures."  *Id.* § 1506.6 (2018); *accord id.* § 1506.6 (2021).

The Bureau's Wild Horses and Burros Management Handbook ("Handbook") sets forth the relationship between NEPA and management decisions that the BLM might make pursuant to the WHA.  The Handbook provides that the AML for each HMA "shall be expressed as a population range within which" wild horses and burros "can be managed for the long term." Dkt. 124 at 250. "The AML upper limit shall be established as the maximum number of" wild horses and burros that "results in a [thriving natural ecological balance] and avoids a deterioration of the range," and the "lower limit shall normally be established at a number that allows the population to grow . . . to the upper limit over a 4-5 year period, without any interim gathers to remove excess" wild horses and burros, although "[s]ome HMAs may require more frequent removals to maintain population size within AML."  *Id.*

The Handbook further requires that the Bureau conduct "[a]n interdisciplinary and site-specific environmental analysis and decision process (NEPA) with public involvement" when the Bureau establishes or adjusts the AML.  *Id.* at 251.  An "[i]n-depth AML evaluation[,]" in turn, is required "when review of resource monitoring and population inventory data indicates [that] the [existing] AML may no longer be appropriate."  *Id.*  In making that determination, the Bureau is required to consider a host of factors, including "[c]hanges in environmental conditions," "[t]he presence of any newly listed Threatened, Endangered or Sensitive Species," and "[a]ny additional resource monitoring, population inventory or other relevant data collected since [the existing] AML was established."  *Id.*

7

Before the Bureau removes excess animals to achieve the AML, it must create a "[g]ather [p]lan[]" that includes a "site-specific environmental analysis" that meets NEPA requirements. *Id.* at 281.  The "authorized [BLM] officer" is required to "provide the public 30 days to review and comment on the NEPA document, typically an [e]nvironmental [a]ssessment that documents and analyzes the environmental effects of [ ] BLM's [p]roposed [a]ction."  *Id.* at 282.  Then, the Bureau must issue a final gather decision including a "decision record" (hereinafter "ROD") summarizing and responding to substantive comments and setting "gather decisions effective upon a date established in the decision."  *Id.* at 281.  "Unless an emergency situation exists, gather/removal decisions shall be issued 31–76 days prior to the proposed gather start to provide an opportunity for administrative review of the . . . decision to be completed."  *Id.*

There is an exception to the rule that a gather plan must contain a NEPA-compliant site-specific environmental analysis.  "Before conducting a new NEPA analysis for a proposed [g]ather [p]lan," the Bureau should review "existing NEPA documentation . . . to determine if it is adequate."  *Id.* at 282.  "Changes in numbers of [wild horses] since the previous gather that result in changes in forage utilization, use patterns, and/or ecological conditions and trends, or changing environmental conditions such as drought . . . may require that a new NEPA analysis be conducted."  *Id.*  "If the existing NEPA documentation appears to be adequate, . . . the issuance of a [Determination of NEPA Adequacy ("DNA")] may be appropriate."  *Id.*

**B.    Factual Background**

The Third Amended Complaint asserts facial challenges to the four ten-year management plans set for the Pine Nut Mountains HMA, the Muddy Creek HMA, the Eagle Complex HMAs, and the Onaqui Mountain HMA, and it also asserts an as-applied challenge to the Bureau's removal of wild horses from the Onaqui Mountain HMA in July 2021.

1.      *Onaqui Mountain*

The Onaqui Mountain HMA spans about 240,153 acres in Toole Count, Utah.  *Friends of Animals v. United States Bureau of Land Mgmt.*, 548 F. Supp. 3d 39, 49 (D.D.C. 2021) ("*FOA II*").  On December 14, 2018, the Bureau's Salt Lake Field Office issued a ROD and corresponding FONSI for the HMA.  *See* Dkt. 124-3 at 151.  At the time, the HMA contained an estimated 510 wild horses, although the Onaqui Mountain ROD estimated "that by the time a gather could occur in 2019[,] the population would be approximately 586 wild horse[s]."  *Id.* at 152.  In the ROD, the Bureau decided to achieve the Onaqui Mountain AML (159 horses with a 121–210 range) by "removing"—that is, "gathering"—approximately 465 wild horses inside and adjacent to the HMA in an initial gather," while "return[ing] periodically over a period of ten years to maintain AML by removing excess wild horses and by administering the fertility control vaccine[s]," *porcine zona pellucida* ("PZP") and GonaCon-Equine.  *Id.*  The Bureau also planned to monitor the herd over the ten-year period, including for health, genetic diversity, population size and growth, and habitat conditions.  *Id.*  As required, the Bureau prepared an EA that "analyze[d] the environmental impacts associated with the proposed gather, removal, and fertility measures."  *Id.*  Based on the Bureau's "review and consideration of the EA" and related FONSI, it decided to conduct the initial gather (of approximately 465 wild horses) and also to adjust "the target removal number" at some later time "based [upon] updated population inventories for the HMA and the resulting projection of excess animals over AML."  *Id.* at 152–53.  The Onaqui Mountain ROD made no accommodation, however, for any further administrative process—such as, further consultation or NEPA analysis—preceding any such adjustment.

In September 2019, the Bureau gathered and removed 241 horses from the Onaqui Mountain HMA.  *See* Dkt. 64-10 at 2 (Gates Decl. ¶ 4) (S.A.R. 236). [1]  An additional eighteen horses were removed between October 2019 and August 2020.  *Id.*  The initial gather, accordingly, fell well short of the 465 wild horses that the ROD targeted for removal.  Based on an aerial inventory in February 2020 and other modeling capabilities, the Bureau estimated that 474 wild horses, not including newborn foals, remained in the Onaqui Mountain HMA as of March 2021.  Dkt. 124-4 at 29.

A severe drought in the American West resulted in little to no vegetative growth in parts of the Onaqui Mountain HMA.  Dkt. 64-10 at 3 (Gates Decl. ¶¶ 6–7).  The toll on the Onaqui Mountain HMA horses was severe:  "During the summer of 2020[,] horses were observed to have lost 200–300 pounds and some were in body conditions 3–4 (thin to moderately thin)," on the average body condition score, and "[d]uring the 2020–21 winter and early spring 2021[,] several horses were seen with a body condition of 2 (very thin)."  *Id.* (Gates Decl. ¶ 8).  "Often[,] horses in this body condition have [a] low probability of survival."  *Id.*  A Bureau field specialist, accordingly, predicted a "risk of a potentially rapid deterioration in body condition," which would "result in suffering and, for some individual animals, death."  *Id.* at 4 (Gates Decl. ¶ 9).  "The continued drought and yearlong grazing of excessive wild horse numbers" also "put[] the region at ecological risk."  *Id.* (Gates Decl. ¶ 10).  The Bureau, as a result of these pressing

---

[1]  Many of the declarations submitted during the preliminary injunction briefing were added to the supplemental administrative record.  To the extent the Court cites to declarations that are not contained in the relevant administrative record, it relies on those declarations for only limited purposes—either to decide whether the Court has jurisdiction to consider each of Plaintiff's claims, *see CTS Corp. v. E.P.A.*, 759 F.3d 52, 57 (D.C. Cir. 2014); Dkt. 120 at 35; Dkt. 123 at 34, or to ensure that the Bureau "considered all of the relevant factors," *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996); *Daikin Applied Americas, Inc. v. EPA*, 39 F.4th 701, 716 (D.C. Cir. 2022).  The Court has not relied on the extra-record declarations, however, to fill-in any missing (or post-hoc) rationales for the agency's actions.

circumstances, placed the Onaqui Mountain HMA on the list of priority gathers for the summer of 2021. *Id.* (Gates Decl. ¶ 11).

After this Court denied Plaintiff's motion for a preliminary injunction, which sought to stop the July 2021 gather, *see FOA II*, 548 F. Supp. 3d at 46, the Bureau proceeded with the gather. *See* Dkt. 112-2 at 4 (Warr Decl. ¶ 14). From July 14, 2021 to July 18, 2021, the Bureau gathered 435 wild horses, with one escaping back to the range and one euthanized after it was injured. *Id.* at 5 (Warr Decl. ¶ 15). A month later, on August 8, 9, and 24, 2021, the Bureau released 124 horses back to the HMA after treating some of the mares with a fertility control vaccine. *Id.* at 5 & n.1 (Warr Decl. ¶¶ 15–16). The rest of the horses that were gathered were either adopted, sold, died, or are still awaiting adoption or sale. *Id.* at 5 (Warr Decl. ¶ 15). The population estimate after the July 2021 gather was 253 horses. *Id.* at 6 (Warr Decl. ¶ 20). The population estimate as of March 1, 2023, was 285 horses (not including newborn foals), which still exceeds the AML. Dkt. 125-1 at 3 (2d Warr Decl. ¶ 9). The Bureau could have attained AML, however, had it not returned 124 horses to the HMA. As of August 4, 2023, there were six horses from the gather awaiting adoption or sale. *Id.* (2d Warr Decl. ¶ 8).

### 2. *Muddy Creek*

The Muddy Creek HMA covers about 283,400 acres of land near Emery, Utah. Dkt. 124-1 at 42. The AML for this HMA is 75–125 wild horses. *Id.* at 100. On July 30, 2018, the Bureau issued the Muddy Creek ten-year plan. *See id.* at 236. It determined that an "excess of wild horses[, approximately 179% of the AML, were] present within the Muddy Creek HMA and need[ed] to be removed to restore a thriving natural ecological balance." *Id.* at 234. Accordingly, the Muddy Creek ROD authorized the Bureau to gather and remove approximately 149 horses "after July 2018." *Id.* at 232. The ROD explained that, "[b]ased on past gather

11

success in the Muddy Creek HMA area," the Bureau estimated that "only 60–70% of the
population can be gathered in a single year, which would be between 134 and 156 head." *Id.*
Beyond authorizing the initial gather—that is, the gather of approximately 149 horses—the
Muddy Creek ROD approved a recommendation to "return periodically to gather excess wild
horses to maintain AML and [to] administer or boost[] population control measures to the other
gathered horses over a period of ten years from the date of the initial gather operation." *Id.* at
110; *see also id.* at 233 (approving Alternative 2). The Bureau further explained that, "[a]fter the
initial gather, the target removal number would be adjusted accordingly based off population
inventories for the HMA and the resulting projection of excess animals over AML." *Id.* at 110.

On September 11, 2018, the Bureau began its initial gather in the Muddy Creek HMA.
Dkt. 112-2 at 3 (Warr Decl. ¶ 7). Over three days, 153 horses were removed, leaving
approximately 76 to 100 wild horses in the Muddy Creek HMA, within the AML of 75 to 125
horses. *Id.* According to the Bureau, "[a]ll healthy excess horses removed during the 2018
Muddy Creek gather have been adopted, sold (with limitations), or have been placed into off-
range pastures." *Id.* (Warr Decl. ¶ 8). Two years later, Gus Warr, the Bureau's Utah Wild Horse
& Burro Program Manager, *id.* at 1 (Warr Decl. ¶ 1), observed that, "[e]xceptional drought
conditions [were] currently occurring on the Muddy Creek HMA and have . . . impact[ed] forage
production and water availability in the area" and that, as a result, "the overpopulation of wild
horses [existing in 2022] will be hard-pressed to find sufficient forage to sustain them[selves]
through the upcoming winter . . . ." *Id.* at 3 (Warr Decl. ¶ 9). It was thus "critical," in Warr's
view, "that the remaining excess wild horses be gathered and removed consistent with the ten-
year 2018 gather plan decision to ensure that the area is managed within [AML] to ensure a
thriving natural ecological balance." *Id.* (Warr Decl. ¶ 10). He further noted that the current

estimated population at Muddy Creek (as of the date of his September 15, 2022 declaration) was 194 horses and that the Bureau's Utah office had therefore submitted a request to Bureau for a 2023 gather and removal in an effort to return the population back to AML. *Id.* at 4 (Warr Decl. ¶ 11).

3.     *Eagle Complex*

Eagle Complex is made up of three different HMAs (Eagle HMA, Mt. Elinore HMA, and Chokecherry HMA) and covers a total of 743,042 acres of public land near Ely, Nevada. Dkt. 124 at 22. The AML for Eagle Complex is 145–265 wild horses. *Id.* The Bureau issued its ROD for Eagle Complex on August 27, 2018. Dkt. 124 at 161–64. The Bureau found that there were approximately 2,220 wild horses in the Complex, well above the AML range of 145–265. *Id.* at 161. The Bureau, accordingly, determined that it needed to gather and to remove approximately 2,075 wild horses and to "return periodically to gather and remove remaining excess wild horses to achieve and maintain AML and to administer or booster population control measures . . . over a period of ten years from the date of the initial gather" until AML was achieved. *Id.* The Bureau explained that, "[a]fter the initial gather, the target removal number would be adjusted as needed based on population inventories for the Complex that identify the remaining number of excess animals over AML." *Id.* The Bureau committed that "[p]opulation inventories and routine resource/habitat monitoring would be completed between gather cycles to document current population levels, growth rates, and areas of continued resource concern (horses concentrations, riparian impacts, over-utilization, etc.) prior to any follow-up gather." *Id.* at 31.

Since finalizing the Eagle Complex ten-year plan, the Bureau has conducted three helicopter gathers (in September 2018, January–February 2020, and January–February 2021) to

13

remove excess horses and apply fertility controls.  Dkt. 112-3 at 3 (Thompson Decl. ¶ 6).

Although 2,993 excess horses have been removed to date, the Bureau's Nevada Wild Horse and

Burro Program Manager, Ruth Thompson, explained in a September 2022 declaration that "post-

gather inventories have revealed that pre-gather counts significantly underestimated the number

of animals present."  *Id.*  "As a result, as of March 2022, there remain[ed] an estimated 930 wild

horses, which is 641 percent over the low end of AML," and with the FY2023 foal crop, that

number was expected to increase to 1,205.  *Id.*  But, notwithstanding this excess, the Bureau did

not anticipate that an Eagle Complex gather would occur in the near future "absent a change in

national priority due to the ongoing drought conditions in Nevada or if emergency conditions

should arise."  *Id.* (Thompson Decl. ¶ 7).  "Beyond FY2022," however, "follow-up gathers will

be needed under the 10-year gather plan decision to finish bringing the wild horse population" to

the low AML.  *Id.* at 4 (Thompson Decl. ¶ 8).  She explained that the remaining excess horses in

the area "continue to cause resource degradation on the public lands," and "Eagle Complex has

received little to no forage production due to limited moisture," and has also suffered multiple

wildfires.  *Id.* (Thompson Decl. ¶¶ 10–11).  Finally, Thompson observed as follows:

> The ten-year decision authorizes follow-on gathers to maintain AML[.]
> However, because the Complex has not yet reached low AML, at least one or
> more additional gather(s) will be needed to reach low AML given the large
> population of excess animals and challenges in spotting and capturing the
> animals within the Complex due to terrain and tree cover.  Low AML is therefore
> unlikely to be achieved before 2023 or even later.  In the absence of fertility
> controls, it can take approximately 4–5 years for the population to grow in excess
> of high AML.  However, the use of follow-up gathers to apply fertility controls
> will reduce population growth and will extend the number of years before high
> AML is exceeded—which could occur after the ten-year decision period (2018–
> 2028) has ended.

*Id.* at 5 (Thompson Decl. ¶ 13).

4.     *Pine Nut Mountains*

The Pine Nut Mountains HMA is located in the Douglas, Lyon, and Carson City counties of Nevada.  Dkt. 124-2 at 18.  The HMA, which encompasses about 90,900 acres of public lands, has an AML of between 118–179.  *Id.*  The Bureau issued the Pine Nut ROD on November 28, 2017.  *Id.* at 11.  At that time, the Bureau estimated an existing population of 694 wild horses. *Id.* at 19.  As in the other HMAs, the Bureau determined that the overpopulation of wild horses in the Pine Nut Mountains HMA threatened the "thriving natural ecological balance and multiple use relationship on public lands" and removal of excess wild horses was necessary.  *Id.* at 23.  As the Bureau explained in the EA, "the overpopulation of wild horses" had "caused soil compaction, removal of vegetation in riparian areas, reduction of perennial grasses and forbs, and an increase in bare soil." *Id.* at 24.  The ROD authorized an initial gather of approximately 500 excess horses and set a ten-year time horizon for the plan's management objectives.  *Id.* at 10–11.  As approved in the ROD, the Pine Nut Mountains HMA "is designed to, over the next 10[ ]years, achieve and maintain a population size within the established AML" and to "establish [both] short and long term management and monitoring objectives for the wild horse herd." *Id.* at 23.  After completion of the initial gather, "subsequent gathers and removals would occur" under the ten-year plan "to maintain AML and [to] vaccinate and revaccinate the mares with contraceptives." *Id.* at 42.

Since the Bureau issued the Pine Nut ROD, it has removed 376 excess horses from the HMA through two gathers, one in February and the other in July 2019.  Dkt. 112-3 at 5 (Thompson Decl. ¶ 14).  As of September 15, 2022, the estimated population in this HMA was 278 wild horses, 52% over the low end of AML.  *Id.*  As of that date, the Bureau had not scheduled a follow-up gather due to other national priorities, but it predicted that follow-up

gathers would be needed to bring the HMA's population to the low AML and to apply fertility measures. *Id.* at 6 (Thompson Decl. ¶¶ 15–16). The Bureau predicted that "rangeland resources will continue to deteriorate and critical forage resources such as bunch grasses will be permanently lost, leading to increased proliferation of non-native grasses that not only increase wildfire risk, but also result in the further loss of native vegetation critical for wildlife habitat and for rangeland health." *Id.* at 7 (Thompson Decl. ¶ 21).

## C.   Procedural Background

This not the first chapter in this long-running dispute, which has already generated two lengthy opinions, *see FOA I*, 514 F. Supp. 3d 290 (D.D.C. 2021); *FOA II*, 548 F. Supp. 3d 39 (D.D.C. 2021), and four versions of Plaintiff's complaint, *see* Dkt. 1; Dkt. 5; Dkt. 17; Dkt. 77. For present purposes, only a portion of this history is relevant.

### 1.   *Plaintiff's Original, First, and Second Amended Complaints*

On August 29, 2018, Friends of Animals ("FOA"), "a nonprofit, international animal advocacy organization" with "nearly 200,000 members worldwide," Dkt.1 at 4 (Compl. ¶ 13), filed this suit against the Bureau to challenge two decisions regarding the management of wild horses on federal public lands, *id.* at 1 (Compl. ¶ 1). Those decisions—(1) the November 28, 2017 ROD and Finding of No Significant Impact for the Pine Nut Mountains Herd Management Area Plan and Environmental Assessment, and (2) the July 30, 2018 ROD and Finding of No Significant Impact for the Muddy Creek Wild Horse Herd Management Area Gather Plan and Environmental Assessment—"authorized ongoing, multiple roundups and removals of wild horses from" those HMAs without requiring "further analysis of the horses and their habitats" or further "public notice and opportunity to comment." *Id.* at 1–2 (Compl. ¶¶ 1, 3). FOA alleged those decisions violated the WHA, the APA, and NEPA. *Id.* at 31–35 (Compl. ¶¶ 201–30).

16

Two weeks later, FOA filed its First Amended Complaint, which added similar challenges to two additional long-term plans: (1) the August 3, 2018 ROD and Finding of No Significant Impact for the Pryor Mountain Wild Horse Range Bait/Water Trapping Gather and Fertility Control Environmental Assessment and (2) the August 27, 2018 ROD and Findings of No Significant Impact for the Eagle Herd Management Area Complex Wild Horse Gather Environmental Assessment.  *See* Dkt. 5 at 1–2 (Am. Compl. ¶ 1).  Then, in February 2019, FOA filed its Second Amended Complaint, dropping its challenge to the Pryor Mountain Long-Term Plan but adding a challenge to the December 14, 2018 ROD and Finding of No Significant Impact for the Onaqui Mountain Herd Management Area Population Control and Environmental Assessment.  *See* Dkt. 17 at 1–2 (2d Am. Compl. ¶ 1).

As a result, when this Court issued its first decision in this case, FOA was challenging the Pine Nut ten-year plan, the Muddy Creek ten-year plan, the Eagle Complex ten-year plan, and the Onaqui Mountain ten-year plan on the grounds that: (1) the plans violate the WHA; (2) the plans constitute an unexplained departure from agency guidelines under the APA; (3) the Bureau had failed to prepared an EIS, as required under NEPA; and (4) the Bureau had failed to take a "hard look" at the environmental consequences of the plans, as required by NEPA.  Dkt. 17 at 50–52 (2d Am. Compl. ¶¶ 352–68).  The parties cross-moved for summary judgment.  *See* Dkts. 37, 39.  By that time, the Bureau had already "completed the initial gathers" of wild horses "in each of the four HMAs."  *FOA I*, 514 F. Supp. 3d at 296.

On January 22, 2021, the Court denied "both motions for summary judgment without prejudice because genuine issues of material facts remain[ed] as to whether th[e] case present[ed] a live controversy ripe for resolution."  *Id.* at 292.  The Court first concluded that, as to Plaintiff's challenges to the completed initial gathers, there was "substantial doubt about

whether [those] challenges . . . remain[ed] live." *Id.* at 299.  Because "the challenged conduct already occurred," the Court was left unconvinced it could grant any effective relief with respect to the initial gathers.  *Id.*  Although FOA argued that, if ordered to do so, the Bureau could "return some or all of the gathered horses to the range," the record was "nonexistent" on whether the Bureau could, in fact, return any removed horses.  *Id.*  The Court, accordingly, denied both cross-motions for summary judgment without prejudice as to the completed gathers.  *Id.* at 300.

The Court next addressed FOA's challenge to future actions the Bureau might take—that is, "administering contraceptives to horses or removing them through future gathers"—and expressed doubt (at least on the then-current record) that this challenge was ripe for review.  *Id.* at 300–06.  Starting with the "fitness" prong of the prudential ripeness test, the Court identified several concerns.  First, "the challenged Decisions contemplate[d] future, discrete agency actions," yet "set no timetables."  *Id.* at 302.  Second, "the Decisions condition[ed] future actions on available funding, facility capacity, and Bureau priorities," and "although the Gather Decisions contemplate[d] that future gathers may occur without a further environmental assessment and without public comment, that is a decision that Bureau officials w[ould] have to make in the future."  *Id.* at 302–03.  Third, as to Plaintiff's contention that the WHA "precludes the Bureau from conducting gathers based on stale information and analyses[,] . . . the strength of that argument" potentially turned "on the passage of time and intervening conditions."  *Id.* at 303.  Fourth, the same was also true with respect to FOA's NEPA arguments, because "[t]he length of time that passes between an agency's conduct of a NEPA analysis and the contemplated action may bear on the adequacy of that analysis, particularly if conditions have changed in material respects."  *Id.*

As to the "hardship" prong, the Court was unpersuaded (at least on the then-current record) that "any burden to the parties that might result from postponing review" would "outweigh[] the institutional interest in postponing review." *Id.* at 306. The Court noted, in particular, that the Bureau committed that it would provide the public with 30-days' notice before any future gathers and that, as a result, FOA could "avoid any hardship by seeking judicial review," including by filing a motion for a preliminary injunction, "before the [prospective] action occurs." *Id.* at 305.

The Court stressed, however, that its "decision [wa]s a limited one:"

> The Court merely concludes that its doubt about the justiciability of FOA's claims precludes it from reaching the merits of the parties' dispute on the present record. The Court has not concluded that FOA's complaint should be dismissed at this time. In light of this decision, the Bureau is free to seek dismissal of some or all of FOA's claims as non-justiciable, and the parties are free to renew their cross-motions for summary judgment in whole or in part. If either party elects to take the latter course, however, it must demonstrate that the issues raised in such a motion are ripe for judicial consideration and have not been mooted by intervening events.

*Id.* at 306.

### 2.   *2021 Discovery and Preliminary Injunction Proceedings*

Following that decision, the Court authorized the parties to engage in limited discovery regarding the justiciability of Plaintiff's claims and to submit supplemental briefs on that issue. *See* Dkt. 56; Min. Order (May 19, 2021). Before those briefs were filed, however, FOA moved for a preliminary injunction, seeking to stop the Bureau's upcoming gather of 400 wild horses from the Onaqui Mountain HMA. *See* Dkt. 62 at 10. The Court denied that motion. *See FOA II*, 548 F. Supp. 3d at 46. Addressing FOA's likelihood of success on the merits, the Court explained that "FOA ha[d] not challenged the current gather decision as a discrete agency action but, rather, continue[d] to focus on the Bureau's" 2018 ROD for the Onaqui Mountain HMA, *id.*

at 56, so the Court was bound by the "administrative record as it existed when the Court issued its prior decision." *Id.* at 57.

With that limitation in mind, the Court considered FOA's claims. *Id.* The Court held that the WHA challenge was either not fit for judicial review or that it was unsupported by the administrative record, which consisted of only those materials that were before the Bureau when it approved the Onaqui Mountain ten-year plan in 2018. *See* 548 F. Supp. 3d at 59. The Court concluded that the passage of about 30 months between the Bureau's 2018 decision and the upcoming gather was not categorically barred by the WHA because the Bureau had yet to reach its goal for gathering wild horses as set forth in the ROD. As the Court explained, "the upcoming gather [wa]s reasonably viewed as a continuation of the Bureau's initial gather, which was supported by current excess and necessity determinations." *Id.* The Court rejected the argument that long-term gather plans necessarily violate "the statutory command that the Secretary act 'immediately' after making a finding that it 'is necessary to remove excess animals.'" *Id.* (quoting 16 U.S.C. § 1333(b)(2)). "Read in context," the Court held, "that direction requires the Secretary to begin the process of removing animals promptly," not to finish that process "immediately." *Id.*

The Court also held that the 2018 EA that the Bureau prepared for the Onaqui Mountain HMA satisfied the dictates of NEPA. As the D.C. Circuit explained in *Mayo v. Reynolds*, 875 F.3d 11 (D.C. Cir. 2017), when an agency has taken a hard look at the long-term environmental consequences of a staged process in its initial EA, it is not necessarily required to "analyze the effects of each specific implementation step to satisfy the dictates of NEPA." *Id.* at 62 (citing *Mayo*, 875 F.3d at 21). Applying that principle to the pending motion for a preliminary injunction, the Court concluded that "FOA has failed to carry its burden of showing that the

Court [was] likely to conclude that the December 2018 EA neglected a relevant environmental concern." *Id.* at 64 (internal citation and quotation omitted). The Court cautioned, however:

> None of this is to say that the December 2018 EA will prove sufficient to satisfy NEPA for all gathers conducted between now and December 2028. But if FOA—or any other organization—wants to challenge a roundup that implements the December 2018 ROD and EA, it will need to challenge that future action in light of the relevant administrative record.

*Id.* at 65.

The Court then addressed whether the Bureau complied with agency policy when it issued the 2018 ROD. The Court first rejected FOA's contention that the Bureau failed to comply with the Handbook's policy that the agency "'conduct an appropriate site-specific analysis of the potential environmental impacts that could result from implementation of a proposed gather in accordance" with NEPA. *Id.* The Court explained that "the Bureau did prepare a site-specific EA in December 2018, and the 2018 EA contemplated that the Bureau would conduct follow-up gathers, like the one that" the Bureau planned to conduct in July 2021. *Id.* And because, at that point in the litigation, FOA challenged "only the December 2018 actions," the Bureau's asserted "failure to conduct a subsequent site-specific analysis [was] not before the Court." *Id.*

Next, the Court rejected FOA's contention that the Bureau had failed to provide the public with 30-days' notice before conducting the impending gather. *Id.* First, like the preceding argument, it confused that facial challenge to the 2018 ROD with an as-applied challenge to the impending gather. *Id.* Second, the Bureau had in fact provided 30-days' public notice and that FOA's President was aware of the plan. *Id.* The Court was also unpersuaded that the Bureau's position constituted an unexplained departure from its past litigation positions given that it regarded a different agency action, in a different case, and did not bind the agency to do so

in any other case. *Id.* at 66. Finally, the Court was unpersuaded that the Bureau had disregarded the Handbook provision that "'[u]nless an emergency situation exists, gather/removal decisions shall be issued 31–76 days prior to the proposed gather start,'" in order "'to provide an opportunity for administrative review.'" *Id.* (quoting Dkt. 46 at 316). Once again, FOA had not challenged the impending gather, and the Bureau's March 2019 Permanent Instruction Memorandum "'supersede[d]' prior guidance and now directs authorized officers to 'issue removal decisions effective upon issuance . . . where the removal is required . . . to preserve or maintain a thriving natural ecological balance and multiple-use relationship.'" *Id.* (citation omitted).

Finally, the Court found that the balance of the equities and the public interest did not favor injunctive relief, in large part because the Bureau "offered convincing evidence that the horses face[d] an equally bleak (or worse) future if they remain on the range." *Id.* at 69. In short, "whether removed by the [Bureau] as part of the gather or euthanized due to poor health resulting from overpopulation and the drought, those who enjoy viewing and photographing the horses may have fewer opportunities to pursue their avocations and professional studies." *Id.*

3.   *Plaintiff's Third Amended Complaint*

Following that decision, FOA filed its fourth (and now operative) complaint, *see* Dkt. 77 (TAC). Like the Second Amended Complaint, this Third Amended Complaint challenges the RODs and FONSIs for the Onaqui Mountain, Muddy Creek, Eagle Complex, and Pine Nut Mountains Herd Management Area Plans and EAs. *See* Dkt. 75-2 at 2 (TAC Redline ¶ 1). FOA now adds a fifth challenge, however, to the Bureau's "decision to remove wild horses from the Onaqui Mountain HMA in July 2021 as well as the actual roundup and removal of wild horses from the Onaqui Mountain HMA in July 2021 ("2021 Onaqui Roundup"). *Id.* The parties have

again cross-moved for summary judgment.  *See* Dkts. 112, 116.  In addition, with leave of the

Court, the State of Utah intervened as a party defendant in this litigation, *see* Dkt. 80; Dkt. 81;

Min. Entry (Jan. 18, 2022); Dkt. 100; Min. Entry (July 18, 2022), and the State has filed its own

motion for summary judgment, Dkt. 113.  Although the State "adopts the points and arguments

proffered by" the Bureau, its brief offers additional argument about "whether the 10-year gather

provisions of the Decisions violate the timing provisions of the WHA."  *Id.* at 6.

## II. LEGAL STANDARD

The Bureau and the State of Utah move to dismiss, in part, and for summary judgment in

part, while FOA cross-moves for summary judgment.

### A.    Motion to Dismiss

Although the Bureau invokes Rule 12(b)(6), which permits a party to "test[ ] the legal

sufficiency of a complaint," *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002), its motion

to dismiss is more properly brought under Rule 12(b)(1), which permits a party to challenge the

courts subject-matter jurisdiction, *see Sandpiper Residents Ass'n v. United States Dep't of Hous.*

*& Urb. Dev.*, No. 20-cv-1783, 2022 WL 1604717, at *6 (D.D.C. May 21, 2022) ("A motion to

dismiss a complaint as moot is properly brought under Rule 12(b)(1) because mootness deprives

the court of jurisdiction."); *Matthew A. Goldstein, PLLC v. U.S. Dep't of State*, 153 F. Supp. 3d

319, 330 (D.D.C. 2016) ("[M]otions to dismiss on the grounds of ripeness and mootness have

consistently been brought under Rule 12(b)(1), because those justiciability concerns typically

implicate the court's subject-matter jurisdiction.").

A motion to dismiss under Rule 12(b)(1) may raise a "facial" or "factual" challenge to

the Court's jurisdiction.  A facial challenge asks whether the plaintiff has pleaded facts sufficient

to establish jurisdiction, while a factual challenge asks the Court to "consider the complaint

supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992). Whether the motion to dismiss is facial or factual, the plaintiff bears the burden of establishing by a preponderance of the evidence that the Court has subject-matter jurisdiction. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

## B.     Motion for Summary Judgment

"Both the [WHA] and NEPA lack a specific statutory review provision and, consequently, challenges alleging violations of these statutes are brought pursuant to the" Administrative Procedure Act ("APA"). *Am. Wild Horse Campaign v. Bernhardt*, 442 F. Supp. 3d 127, 143 (D.D.C. 2020). The APA instructs courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," as well as agency action taken "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2). In an APA case, summary judgment "serves as a 'mechanism for deciding, as a matter of law, whether the agency action is . . . consistent with the APA standard of review.'" *Fisher v. Pension Benefit Guar. Corp.*, 468 F. Supp. 3d 7, 18 (D.D.C. 2020) (quoting *Cayuga Nation v. Bernhardt*, 374 F. Supp. 3d 1, 9 (D.D.C. 2019)). In such cases, "the district judge sits as an appellate tribunal," and "the entire case on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (internal quotation marks and citation omitted).

## III.  ANALYSIS

FOA's Third Amended Complaint and the parties' cross-motions for summary judgment raise a host of issues. The Court starts, as it must, with jurisdiction.

A.      **Justiciability**

1.      *FOA's challenge to the 2021 Onaqui Mountain Gather is not moot*

The Bureau first argues that FOA's challenge to the completed 2021 Onaqui Mountain,

gather, which took place in July 2021, is moot.  Dkt. 112-1 at 30–33.  In the Bureau's view, the

gather is now complete and, as a result, "no live controversy" exists "for which the Court can

grant effective relief."  *Id.* at 30.  In other words, any injury FOA—or its members—may have

suffered is no longer "redressable."  *See Lujan*, 504 U.S. at 561; *see also McBryde v. Comm. to

Rev. Cir. Council Conduct & Disability Orders of the Jud. Conf. of the U.S.*, 264 F.3d 52, 55

(D.C. Cir. 2001) ("[Where] events outrun the controversy such that the [C]ourt can grant no

meaningful relief, the case must be dismissed as moot.").  For support, the Bureau points to

precedent from the D.C. Circuit and this Court holding—unsurprisingly—that courts lack

jurisdiction to consider a challenge to a gather that has "been completed" because "[i]t is

'impossible for the court to grant any effectual relief whatever' with respect to the challenged

gathers."  *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 22 (D.C. Cir.

2006) (citation omitted); *see also In Def. of Animals v. Salazar*, 713 F. Supp. 2d 20, 25 (D.D.C.

2010) ("Because the gather in question has already occurred, the first category of claims is now

moot and thus is not justiciable."); *Fund for Animals v. U.S. Bureau of Land Mgmt.*, 357 F. Supp.

2d 225, 230 (D.D.C. 2004) ("[O]nce the gather was completed and the wild horses were either

sold or destroyed there was nothing a court thereafter could do to reestablish the preexisting

status quo.").

To the extent there is nothing a court can do to unravel a completed gather, those

precedents are undoubtedly correct and controlling.  Here, however, FOA maintains that at least

one form of effective relief is available: those horses that were gathered and have not yet been

adopted, euthanized, or returned the range could be returned.  As FOA observes, this Court previously raised that prospect, and courts outside of this Circuit have held that a claim seeking the return of horses that were improperly removed is not moot, merely because the gather has been completed.  *See Friends of Animals v. U.S. Bureau of Land Mgmt.*, No. 16-cv-1670, 2017 U.S. Dist. LEXIS 37859, *7–*10 (D. Or. Mar. 16, 2017); *Am. Wild Horse Pres. Campaign v. Jewell*, No. 14-cv-0152, 2015 U.S. Dist. LEXIS 179234, at *17 (D. Wy. Mar. 3, 2015), *rev'd in part on other grounds*, 847 F.3d 1174 (10th Cir. 2016); *see also In Def. of Animals v. U.S. Dep't of Interior*, 648 F.3d 1012, 1014 (9th Cir. 2011) (Rawlinson, J., dissenting) ("A claim for relief is not moot so long as we can provide effective relief, in this case return of the horses to their native habitat.").  Those decisions bear on the present question for two reasons.  First, FOA's Third Amended Complaint asks the Court to "[o]rder that any wild horses in BLM's control or possession that have been removed from the range pursuant to the 2021 Onaqui Roundup or the Long-Term Roundup Decisions be returned to the HMAs that they were removed from."  Dkt. 75-1 at 60 (Request for Relief ¶ E).  Second, the Bureau has represented to the Court that six of the horses gathered during the July 2018 Onaqui Mountain Herd gather "remain in [Bureau] holding facilities."  Dkt. 125 at 1.  Circumstances like those presented here were neither raised nor considered in any of the cases that the Bureau invokes in support of its mootness argument.

The Bureau offers only one response to this line of reasoning:  It maintains that the APA "does not authorize the Court to direct [the Bureau] to take specific affirmative actions" and, in particular, that the Court may not "substitute its judgment for" the Bureau's regarding whether to "return [the] gathered Onaqui Mountain HMA horses to the range."  Dkt. 112-1 at 31.  The Bureau adds in passing, moreover, that were the Court to order the return of the horses, those horses "would face a bleak future."  *Id.* at 33.  There are two problems, however, with that

response.  First, it goes to the merits rather than mootness—that is, the Bureau seeks to put that

cart before the horse.  Second, even if the Bureau was correct, and this Court lacks authority to

direct that an agency take a specific, remedial action, the Court undoubtedly has authority to

remand the matter to the agency to consider, in the first instance, whether—in light of the

Court's holding and any further process that the Court might require—some or all of the

remaining horses should be returned.  That form of relief is common in APA cases, and any

uncertainty regarding the decision that the agency—as opposed to agency counsel—might make

on remand does not deprive the Court of jurisdiction to decide whether a remand is warranted.

Here, FOA alleges that the Bureau "failed to make a determination based on current

information that the roundup of 435 wild horses and permanent removal of 312 was necessary,"

Dkt. 77 at 53 (TAC ¶ 391); "did not consult with independent, qualified scientists . . . before

determining to remove wild horses from the range in July 2021," *id.* at 55 (TAC ¶ 411); "failed

to make a finding, based on current information, that there was an overpopulation of wild horses

and removal was necessary in July 2021," *id.* at 56 (TAC ¶ 419); "did not conduct a NEPA

analysis for the 2021 Onaqui Roundup," *id.* at 53 (TAC ¶ 394), "failed to make a finding of no

significant impact for the 2021 Onaqui Roundup," *id.* at 54 (TAC ¶ 398); "failed to make a

determination of NEPA adequacy," *id.* (TAC ¶ 399); and "did not solicit public comments on the

2021 Onaqui Roundup," *id.* at 58 (TAC ¶ 435).  If FOA is correct on the merits, then a remand

might be warranted, and, as the Bureau itself stresses, this Court should not step into the shoes of

the administrative agency—and thus should not base its jurisdictional decision on speculation

about what the agency might do, if the matter were remanded to it for further consideration.

To be sure, an APA plaintiff's procedural interest "must be tethered to some concrete

interest adversely affected by the procedural deprivation," such as a "concrete aesthetic and

recreational interest[]." *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013). But, here, the record establishes that FOA members have such an interest; identified members regularly visit the HMAs at issue and have professional and recreational interests in the horses, including their "enjoy[ment] observing and photographing wild horses" in the HMAs, including the Onaqui Mountain HMA, such that they would be injured by the removal of non-excess horses from the areas.  Dkt. 77 at 5–6; *see also* Dkt. 116-1 (Downer Decl.); Dkt. 116-2 (Molvar Decl.). [2]  In procedural injury cases, the "redressability and imminence requirements" are "relaxed."  *WildEarth Guardians*, 738 F.3d at 305–06.  As a result, FOA does not need to show that, but for the procedural deficiency, the agency would have acted differently or will act differently upon reconsideration.  *Id.*  Instead, it need only show that the omitted procedural steps are connected to a substantive decision that may have been wrongly decided because of the omitted steps and that the substantive decision is connected to FOA's injury.  *Id.*

Finally, the Bureau also argues that FOA's challenges to the other completed gathers— the Pine Nut, Muddy Creek, Eagle Complex, and first Onaqui Mountain HMA gathers that the Bureau conducted after this case was filed in 2018—are moot.  Dkt. 112-1 at 33–34.  The Court need not resolve that question.  In its cross-motion for summary judgment, FOA concedes that it "is not challenging those specific roundups, only the [RODs] as a whole under which those roundups were conducted."  Dkt. 116 at 52–53 n.10.  The Bureau, in turn, does not maintain that any of Plaintiff's challenges to the RODs are moot.  In short, other than Plaintiff's challenge to the July 2021 Onaqui Mountain HMA gather, the parties agree that the challenged decisions are

---

[2] "Although judicial review of an agency action at the summary judgment stage is generally limited to the administrative record," as noted above, *see supra* p.10 n.2, "the Court may look beyond the administrative record to determine whether a case has become moot, an issue that implicates its jurisdiction to hear the case."  *Pub. Emps. for Env't Resp. v. Nat'l Park Serv.*, 605 F. Supp. 3d 28, 38 (D.D.C. 2022).

final, that they remain in effect and remain legally operative, and that they have affected, and are likely to continue to affect, the cognizable interests of identified members of FOA.

The Court, accordingly, rejects the Bureau's contention that the controversy over the July 2021 Onaqui Mountain gather is moot.

2. *FOA's facial challenges to the 2017 and 2018 RODs and FONSIs are ripe*

The heart of FOA's challenge is not the as-applied challenge to the 2021 Onaqui Mountain HMA gather but rather its facial challenges to the Bureau's 2017 and 2018 RODs and EAs, which set ten-year management plans for the four areas at issue. Dkt. 77 at 57. In *FOA I*, the Court expressed "doubt about the justiciability of FOA's claims" and, as relevant here, noted that, "at least on the . . . record" then before the Court, it was "unconvinced" that the dispute satisfied the requirements of prudential ripeness. 514 F. Supp. 3d at 300, 306. In particular, the Court was concerned that the challenged RODs "contemplate[d] future, discrete agency actions . . . over the course of ten years" and that "when and under what circumstances those action [would] occur remain[ed] to be determined. *Id.* at 302.

Two developments since the Court issued that decision, however, have led the Court to conclude that FOA's challenges to the four ten-year RODs are ripe. First, as the case has progressed, it has become increasing clear that "FOA has elected to pursue what is, in essence, a facial challenge to the 2018 actions." *FOA II*, 548 F. Supp. 3d at 59; *see also* Dkt. 77 at 51–56 (TAC). As explained further below, moreover, it is possible to disentangle FOA's purely legal, facial challenge to the plans from the factual implementation of those plans.

Second, after this Court issued its decision in *FOA I*, the D.C. Circuit issued its decision in *Western Watersheds Project v. Haaland*, 850 F. App'x 14 (D.C. Cir. 2021). That case involved a challenge to a 2008 resource management plan, which called for the removal of all

wild horses from a portion of the State of Nevada on the ground that the area lacked "'sufficient habitat resources.'" *Id.* at 14. "[T]he Bureau began to implement [the] resource management plan by taking the formal steps required for a roundup in October 2009," although it "acknowledged . . . that '[m]ore than one gather would likely be needed to remove all of the wild horses.'" *Id.* Almost a decade later, the Bureau decided to conduct a further roundup, and the plaintiffs in that case brought suit to stop the roundup. *Id.* at 15. The district court and the court of appeals, however, agreed that plaintiffs' claims were barred by the general six-year statute of limitation, 28 U.S.C. § 2401(a). *Id.* at 15–16. As the D.C. Circuit explained, the resource management plan, which was issued in 2008, constituted the relevant final agency action, and "any challenge to [that agency action] ripened in 2009," when the Bureau began the first roundup. *Id.* at 15. It made no difference, moreover, "[t]hat the Bureau anticipated [that] it would need multiple roundups to accomplish its zero-horses goal;" rather, "[t]he statute of limitations clock started with the first roundup, when the claim 'first accrue[d].'" *Id.* (emphasis omitted).

Taken together, the Court draws several conclusions from these developments. First, and most significantly, to the extent FOA seeks to bring a facial challenge to the 2017 and 2018 ten-year plans, it was obligated to do so within six years of the first gather conducted for each of the plans. Although FOA brought suit well within the statute of limitations, it was not free to wait to see how the plans were implemented over the years. In a situation such as this, where the case is fit for review and there are no agency or judicial interests favoring delay, there is typically no need for a plaintiff to show hardship under the prudential ripeness doctrine. *See Teva Pharms. USA, Inc. v. Sebelius*, 595 F.3d 1303, 1310 (D.C. Cir. 2010) (quoting *Elec. Power Supply Ass'n v. FERC,* 391 F.3d 1255, 1263 (D.C. Cir. 2004)). But, in any event, the uncertainty that would

come with the risk of losing the right to sue altogether, based on the running of the statute of limitations, would constitute a substantial hardship.

Second, the Court needs to focus on the precise agency action that the plaintiff challenges.  In *Western Watersheds Project*, the challenged action was a 2008 resource management plan, and, here, putting aside FOA's as-applied challenge to the 2021 Onaqui Mountain gather, the challenged actions are the 2017 and 2018 RODs and EAs.

Third, the Court need not resolve fact-specific questions regarding the implementation of those decisions to resolve FOA's facial challenges to those actions.  If, as with the 2021 Onaqui Mountain gather, FOA can identify a separate agency action—authorization of a subsequent gather, for example—it may be able to challenge that discrete agency action based on the relevant administrative record and agency action.  But the parties and the Court need to draw clear lines between FOA's purely legal challenges to the 2017 and 2018 ten-year plans, and any challenges to any separate, final agency action taken.

The D.C. Circuit has explained "that 'a case is ripe when it presents a concrete legal dispute [and] no further factual development is essential to clarify the issues . . .' and the issue 'has crystallized sufficiently for purposes of judicial review."  *In re Al-Nashiri*, 47 F.4th 820, 826 (D.C. Cir. 2022) (quoting *Rio Grande Pipeline Co. v. FERC*, 178 F.3d 533, 540 (D.C. Cir. 1999)).  "When a petitioner raises a purely legal question, [the Court] assume[s] that issue is suitable for judicial review," although it considers "whether the agency or the court will benefit from deferring review until the agency's policies have crystallized and the question arises in some more concrete and final form."  *Rio Grande Pipeline Co.*, 178 F.3d at 540.  For the reasons explained above, the Court is now convinced that FOA's facial challenges to the 2017 and 2018 ten-year plans turn on questions of statutory interpretation that are legal rather than factual in

nature.  As presented, the question of the Bureau's authority under the WHA to issue the four

ten-year plans does not turn on "contingent future events that may not occur as anticipated, or

indeed may not occur at all."  *In re Al-Nashiri*, 47 F.4th at 826 (quoting *Texas v. United States*,

523 U.S. 296, 300 (1998)); *cf. W. Rangeland Conservation Ass'n v. Zinke*, 265 F. Supp. 3d 1267,

1280 (D. Utah 2017) ("Whether BLM is under an obligation to 'immediately' remove excess

animals from certain HMAs and whether the agency's 'phased-in' approach actually fulfills that

obligation are not 'abstract disagreements' the court must avoid.").  Rather, each plan constitutes

a final agency action that took effect no later than the first, implementing gather and that remains

in effect today.

Even the Bureau acknowledges that "certain elements of [its] Ten-Year Gather Plans are

ripe for judicial review."  Dkt. 120 at 11.  To be sure, it also maintains that "Plaintiff's claims

related to future maintenance gathers are too speculative and uncertain for this Court to grant

relief."  *Id.*  With respect to these future gathers, the Bureau notes that it will need to "determine

the scale and timing of [the] gathers based on national removal priorities, holding space

availability, and budgetary and staff considerations."  *Id.* at 13.  But that is just the point.  To the

extent FOA brings a facial—that is, a purely legal—challenge to the ten-year plans, it may do so

now, and, to the extent FOA seeks to challenge any discrete, future agency actions—that is,

future agency decisions based on facts or circumstances that fall outside the current

administrative record—it needs to wait for that discrete agency action to occur before it brings

the action.  Indeed, both parties appear to agree with this assessment.

As to these future agency actions, the Bureau emphasizes that "Plaintiff[] will have both

notice and an opportunity for judicial review," *id.* at 14, and FOA, in turn, stresses that it "has

not brought a 'challenge to any future maintenance gathers,'" and, instead, challenges the

lawfulness of the 2017 and 2018 ten-year gather plans.  Dkt. 123 at 30.  Those plans were

"issued years ago," took effect "immediately, and "authorize BLM to conduct additional

roundups without issuing new excess determinations or conducting new NEPA analysis."  *Id.*

Understood in this light, FOA is not challenging future gathers under the WHA, NEPA, or the

APA,[3] and thus lack of a concrete record regarding the conduct of those future gathers does not

render FOA's facial challenge to the 2017 and 2018 plans unripe.

 The Court, accordingly, concludes that FOA's facial challenges to the four RODs and

FONSIs are ripe for consideration.

**B.     Wild Free-Roaming Horses and Burros Act**

 This, then, brings the Court to FOA's central claim in this case—that the WHA does not

permit the Bureau to issue "long-term, open-ended roundup decisions" and that, as a result, the

Bureau exceeded its statutory authority when it adopted each of the four ten-year plans at issue.

Dkt. 116 at 15.  In FOA's view, this conclusion follows from the language of the Act, which

requires the Bureau to make its determinations regarding the need to remove excess animals

based on "current information and consultation with independent parties" and, after determining

that it "is necessary to remove excess animals," to "immediately remove" those animals, 16

U.S.C. § 1333(b), as well as the statutory purpose to protect wild horses and to permit removal

only under limited circumstances.  Dkt. 116 at 15–33.  The Bureau disagrees and argues that

nothing in the WHA (or any other law or regulation) requires that it make "a new excess

determination for every gather operation that is necessary to complete the removal of excess

---

[3] The Court will hold FOA to its characterization of its own claims.  When FOA argues, for
example, that "BLM violated its own policy of providing the public 30 days to review and
comment on a site-specific NEPA document analyzing a proposed roundup," Dkt. 116 at 37, the
Court takes the argument *not* as posing an unripe challenge to some future roundup plan but,
rather, as a challenge to the procedures established in the 2017 and 2018 ten-year gather plans.

animals under a larger gather plan." Dkt. 120 at 14.  In the Bureau's view, the obligation to

consider "current" information applies only "to the initial excess determination"—that is, the

determination made in the ten-year plans—and the obligation to act "immediately" applies only

to initiating efforts to achieve AML and does not apply to additional efforts to *maintain* AML or

to maintain "a thriving natural ecological balances to the range," 16 U.S.C. § 1333(b), for the

duration of the ten-year plan.  Dkt. 112-1 at 38–39.  As explained below, the Court concludes

that the best reading of the statute lies between these poles.

      1.     *Statutory Text*

     The Court starts with the statutory text, *see Bartenwerfer v. Buckley*, 598 U.S. 69, 74

(2023), which (1) vests the Bureau with substantial discretion to manage herds of wild free-

roaming horses, (2) requires that the agency base its decisions on currently available information

and consultation with expert agencies and individuals, and (3) specifies when, in what order and

priority, and to what extent the agency should act.  16 U.S.C. § 1333.

     First, section 1333(a) declares "[a]ll wild free-roaming horses and burros . . . to be under

the jurisdiction of the Secretary" of the Interior and vests the Secretary—acting through the

Bureau—with the authority and responsibility "to protect and manage wild free-roaming horses

and burros as components of the public lands."  *Id.* § 1333(a).  The standards that the WHA sets,

moreover, require the exercise of expert judgment and the balancing of competing interests.  The

Act requires, for example, that the Bureau "manage wild free-roaming horses and burros in a

manner designed to achieve and maintain a thriving natural ecological balance on the public

lands"—without specifying what that balance is—and directs it to employ "management

activities . . . at the minimal feasible level"—without specifying what that level is.  *Id.*

Second, although Congress vested the Bureau with broad discretion, it also took steps to ensure that the Bureau based its decisions on accurate information and science, rather than pressure from interest groups or guesswork. "[T]o ensure that the data upon which . . . determination[s] of excess numbers [are] calculated is as accurate as possible," H.R. Rep. 95-1737 at 14 (1978), the WHA requires the Bureau to "consider the recommendations of qualified scientists in the field of biology and ecology, some of whom shall be independent of both Federal and State agencies," 16 U.S.C. § 1333(a), and who "have been recommended by the National Academy of Sciences," *id.* § 1333(b)(1), as well as "such other individuals whom [the Bureau] determines have scientific expertise and special knowledge of wild horse and burro protection, wildlife management and animal husbandry as related to range management," *id.* As the conferees explained, they "expect[ed] that this consultation [would] be taken seriously[] and" that the Bureau would "carefully consider the views of the experts recommended by the National Academy of Science, as well as other experts the Secretary may identify." H.R. Rep. 95-1737 at 14. Further emphasizing the requirement that the Bureau's "determination[s] of what constitutes excess animals" be based on sound scientific research and information, Congress also required the Bureau to enter into a "contract for a research study of such animals with such individuals independent of Federal and Sate government as may be recommended by the National Academy of Sciences for having [relevant] scientific expertise and specialized expertise." 16 U.S.C. § 1333(b)(3).

Congress also required the Bureau to "maintain a current inventory of wild free-roaming horses and burros on given areas of public lands" and to use that information, along with input from the U.S. Fish and Wildlife Service, State wildlife agencies, and the individual experts, in [1] making "determinations as to whether and where an overpopulation exists and whether

actions should be taken to remove excess animals; [2] determin[ing] appropriate management levels for wild free-roaming horses and burros on these areas of the public land; and [3] determin[ing] whether appropriate management levels should be achieved by the removal or destruction of excess animals or other options (such as sterilization, or natural controls on population levels)." *Id.* § 1333(b)(1).

Third, Congress then specified whether, when, and in what order and priority the Bureau should act (with this information in hand) to "achieve and maintain a thriving natural ecological balance on the public lands," *id.* § 1333(a). The Act provides:

> Where the [Bureau] determines on the basis of (i) the current inventory of lands within [its] jurisdiction; (ii) information contained in any land use planning completed pursuant to [the Federal Land Policy and Management Act of 1976]; (iii) information contained in court ordered environmental impact statements . . . and (iv) such additional information as becomes available to [it] from time to time, including that information developed in the research study mandated by this section, or in the absence of the information contained in (i-iv) above on the basis of all information currently available to him, that an overpopulation exists on a given area of the public lands and that action is necessary to remove excess animals, [it] shall immediately remove excess animals from the range so as to achieve appropriate management levels.

*Id.* § 1333(b)(2). It then provides that the Bureau shall act "in the following order and priority, until all excess animals have been removed so as to restore a thriving natural ecological balance to the range, and protect the range from the deterioration associated with overpopulation." *Id.* Under that "order and priority," the Bureau must first humanely destroy "old, sick, or lame animals." *Id.* § 1333(b)(2)(A). It must then humanely capture and remove animals for adoption. *Id.* § 1333(b)(2)(B). And, finally, it must "destroy" the "excess wild free-roaming horses and burros for which an adoption demand . . . does not exist" in "the most humane and cost[-] efficient manner possible." *Id.* § 1333(b)(2)(C).

In summary, then, the WHA confers substantial administrative discretion on the Bureau, but it requires that the agency consult with knowledgeable scientists and "maintain a current inventory of wild . . . horses;" that it base its decisions to remove excess animals on various sources of information or, "in the absence of th[at] information," on "all information currently available to [it];" that, once it has determined—on that basis—"that an overpopulation exists . . . and that action is necessary to remove excess animals," the agency must "immediately remove [those] excess animals . . . so as to achieve appropriate management levels;" and, finally, that the agency must follow the order and priority specified in the statute, "until all excess animals have been removed so as to restore a thriving natural ecological balance to the range[] and [to] protect the range from the deterioration associated with overpopulation." *Id.* § 1333(b)(1)–(2).

In Plaintiff's view, the challenged ten-year plans cannot be reconciled with this statutory structure. The Court agrees that the Act does not permit the Bureau to authorize gathers over a ten-year period without regard to whether it has already achieved AML, without regard to the statutory mandate of expedition, and without regard to new or evolving information and scientific input. But it goes too far to suggest, as FOA does, that each gather—even a continuation of a gather that was started months before and is not yet complete—requires an entirely new process, including a new inventory, new expert consultation, a new NEPA analysis, and a new opportunity for public notice and comment. None of FOA's textual arguments proves as much as the organization contends.

### a.

FOA first argues that because each gather requires a "*current* inventory of wild free-roaming horses and burros," 16 U.S.C. § 1333(b)(1) (emphasis added), the Bureau may not authorize gathers years in the future based on inventory that, inevitably, will no longer be

"current."  That argument, however, confuses two distinct duties that Congress imposed on the Bureau.  The first duty is to "maintain a current inventory of wild free-roaming horses and burros on given areas of public lands."  *Id.*  To be sure, "[t]he purpose of [that] inventory" is, among other things, "to make determinations as whether and where an overpopulation exists and whether action should be taken to remove excess animals."  *Id.*  But Congress did not preclude the Bureau from making removal decisions in the absence of "a current inventory"—or an inventory that will remain "current" at the time the gathers occur.  The first duty is simply to "maintain a current inventory," and, were the Bureau to fail to do so, an interested party with standing might be able to bring suit to compel the agency to comply with that duty—that is, to "maintain a current inventory."  *Id.* § 1333(b)(1).

The second duty is the duty more directly at issue in this case.  It is the duty to "immediately remove excess animals from the range" when the Bureau determines on the basis of "the current inventory of lands," "information contained in any land use planning," "information contained in court ordered environmental impact statements," and "such additional information as becomes available to" the Bureau "from time to time, including . . . information developed in the research study mandated by" the WHA "that an overpopulation exits."  *Id.* § 1333(b)(2).  But, notably, this list does *not* include "a current inventory of wild free-roaming horses and burros," and, in any event, the operative provision affirmatively grants the Bureau authority to act even "in the absence of the information" listed in the provision.  *Id.*  Under those circumstances, the Bureau may act "on the basis of all information currently available to" it.  *Id.*  In short, to the extent that FOA contends that the WHA bars the Bureau from authorizing future gathers because, by the time the gather occurs, the inventory of wild horses will no longer be "current," it is mistaken.

The U.S. District Court for the District of Nevada and the Ninth Circuit share this understanding of the Act.  *See Friends of Animals v. Silvey*, 353 F. Supp. 3d 991, 1006 (D. Nev. 2018), *aff'd* 820 F. App'x 513, 517 (9th Cir. 2020).  As the district court explained:

> FOA insists that defendants cannot act on the basis of current wild horse population inventories and information in approving a ten-year gather plan. . . .  FOA mischaracterizes the plain language of the WH[A] to require [the Bureau] to make a new excess determination for each and every round up authorized under a gather plan and base that new excess determination on information then available at the time of that particular round up.  Such an interpretation of the WH[A] is in direct conflict with the specific language of the statute which "entitles BLM to act 'on the basis of all information currently available to [it]'" in making its excess determination.

353 F. Supp. 3d at 1006 (citations omitted).  "Contrary to FOA's argument," the district court concluded, "the WH[A] contemplates a single excess determination prior to approval of a gather plan.  There is no requirement that a separate determination be made for each individual round up approved under a gather plan and the court shall not read such a requirement into the WHBA."  *Id.*  The Ninth Circuit agreed, adding:

> [T]he "current information" requirement in the Act applies only to the determination that an excess exists and that action must be taken.  The Act's current-information requirement does not apply to BLM's choice-of-removal method.  Here, BLM chose to address the single overpopulation determination gradually, over the course of ten years, through a series of gathers.  Because BLM founded its [initial] excess-population determination on currently available information, it complied with the requirements of the Act.

820 F. App'x at 517.

FOA is correct, however, that the WHA places a premium on "current" information; the Act requires the Bureau to act based on the best information that is currently available to it.  That requirement does not preclude staged gather plans.  But it may mean that, once the excess animals are removed and AML is achieved, the Bureau must then consider the "current inventory" and all other "information currently available to" it when it decides whether to authorize a further set of gathers to return the range (again) to AML, 16 U.S.C. § 1333(b)(2), and

it means that the Bureau may not disregard significant information that comes to its attention even before it has achieved AML.  To the extent the Act requires the agency to make decisions based on the information currently available to it, the ten-year plans cannot override that statutory direction and permit the Bureau to make future gather decisions without considering the *then*-available inventory and other information.

**b.**

FOA also argues that the ten-year plans violate the WHA "because they authorize [the Bureau] to remove wild horses based on an initial excess determination or AML, without determining if removal of those wild horses is necessary."  Dkt. 116 at 24.  FOA is correct that the statute requires both a finding "that an overpopulation exists" *and* "that action is necessary to remove excess animals."  16 U.S.C. § 1333(b)(2); *see Wyoming v. U.S. Dep't of Interior*, 839 F.3d 938, 944 (10th Cir. 2016) (holding that the obligation to immediately remove the animals is not triggered unless both premises are met).  But to the extent FOA intends to argue that the Bureau never made the necessity finding, it is incorrect.  Each of the RODs and accompanying EA's include that finding.  *See* Dkt. 124 at 25 (Eagle Complex); Dkt. 124-1 at 101 (Muddy Creek); Dkt. 124-2 at 23–24 (Pine Nut); Dkt. 123-3 at 153 (Onaqui).  Nor does FOA offer any basis to doubt that those findings satisfy 43 C.F.R. § 4770.3(c), which permits a decision to become effective upon issuance when "removal is required by applicable law or is necessary to preserve or maintain a thriving ecological balance and multiple use relationship," *id.*  And, to the extent FOA contends that the Bureau could not possibly have made the necessity findings with respect to gathers that might not occur for years, it overstates the relevant requirement.  The Court agrees that a point may come when, based on all information then-available to the Bureau, there is reason to believe that a follow-on gather (or an entirely new gather) is unnecessary and

40

thus unauthorized.  That does not mean, however, that the Bureau can never authorize a series of gathers over a period of years based on its expert assessment that the entire series of gathers are necessary to achieve AML and to restore the range.

### c.

FOA turns next to the Act's various consultation requirements.  In pressing this argument, FOA does not argue that the Bureau failed to consult with experts and federal and state agencies before adopting the ten-year plans.  *See generally* Dkt. 77 (TAC).  Rather, it argues that the plans unlawfully authorize the Bureau to conduct gathers in the future based on the original overpopulation and necessity determination, rather than new consultations and determinations.  In FOA's view, the WHA precludes the Bureau from removing horses from the range without first consulting with independent experts about each and every gather.  Dkt. 116 at 25–26.  To hold otherwise, according to FOA, would permit the Bureau to rely "indefinitely . . . on one determination and never . . . to consult with independent parties again," thereby "void[ing] the consultation requirements."  *Id.* at 26.

Presented in the categorical terms that FOA urges, this argument finds no support in the text of the statute.  FOA is, of course, correct that the statute emphasizes the importance of consultation with "qualified scientists" (including independent experts) and expert federal and state agencies.  16 U.S.C. § 1333(a)–(b).  It is clear that Congress intended for the Bureau to benefit from expert input, to take that input "seriously," and to "carefully consider the views of experts recommend by the National Academy of Science, as well as other experts."  H.R. Rep. 95-1737 at 14.  But nothing in the statute (or its legislative history) suggests that the Bureau must consult with those experts before it conducts each and every gather—even where a gather merely constitutes a continuation of an earlier gather that failed to remove the requisite number of

horses.  What the statute requires is consultation to inform the Bureau's decisions about whether an overpopulation exists and whether action should be taken to remove excess animals.  Once that agency makes those determinations, it is free to implement them without further consultation.

Yet again, however, there is a grain of truth to FOA's argument, which requires rejection of the Bureau's equally categorical counter-position.  At some point, by authorizing initial gathers and, then, "maintenance" gathers over a period of many years, the Bureau might well undermine the consultation process, upon which Congress placed so much weight.  It would violate the Act, in this respect, to establish an AML and to recognize a need to remove excess animals for each HMA after consulting with experts, but then to leave it to the implementation stage—without any further consultation—to decide whether to initiate entirely new gathers (as opposed to completing initial gathers) in light of changed circumstances over a period of many years.  This does not mean that consultation is required each time the Bureau returns to the range to complete a gather.  But there may be limits on the Bureau's authority to use a multi-year gather plan as a means of circumventing the consultation requirement.

### d.

FOA also places substantial weight on the statutory requirement that once the Bureau determines "that an overpopulation exists . . . and that action is necessary to remove excess animals," it must "*immediately* remove [the] excess animals."  16 U.S.C. § 1333(b)(2) (emphasis added).  In Plaintiff's view, the statutory command that the agency act "immediately" precludes the adoption of long-term gather plans, like those at issue here.  *See* Dkt. 116 at 27.

The Court addressed this argument in *FOA II* and continues to adhere to the views expressed there.  The Court wrote:

Similarly, FOA has failed to demonstrate that it is likely to prevail on the merits of its contention that long-term gather plans are precluded by the statutory command that the [Bureau] act "immediately" after making a finding that it "is necessary to remove excess animals." 16 U.S.C. § 1333(b)(2). Read in context, that direction requires the [Bureau] to begin the process of removing animals promptly. But the very next sentence of the statute recognized that the process may proceed in stages *"until"* the goal of restoring "a thriving natural ecological balance to the range" is achieved. *Id.* Indeed, reading the statute to require the [Bureau] to act "without *any* intervening delay . . . would contravene the ultimate purposes of the WHA by forcing [the] [Bureau] to act recklessly and without regard for the continuing viability or humane treatment of creatures it is specifically tasked with preserving." *W. Rangeland Conservation Ass'n v. Zinke*, 265 F. Supp. 3d 1267, 1284 (D. Utah 2017). Nor is there any reason to conclude that Congress required that the [Bureau] act "immediately" to ensure that the information that [it] relied upon was as current as possible. Rather, as the D.C. Circuit has explained, the 1978 amendments to the WHA—which introduced that language upon which FOA relies—was adopted "to cut back on the protection the [WHA] affords wild horses, and to reemphasize other uses of the natural resources wild horses consume." *Am. Horse Prot. Ass'n, Inc. v. Watt*, 694 F.2d 1310, 1316 (D.C. Cir. 1982).

To be sure, the statute requires the immediate removal of "excess animals . . . so as to achieve" AML. But requiring immediate action so as to achieve something is not the same thing as immediately achieving that goal. One might immediately stop eating dessert "so as to achieve" a five-pound loss of weight. But that does not mean that the moratorium on desserts begins and ends on day one. The same is true here. The statute requires the [Bureau] to remove wild horses promptly after deciding that "an overpopulation exists," but that does not mean that the [Bureau's] efforts must come to an end immediately—or shortly after "immediately." Rather, the WHA merely requires that the [Bureau] make progress toward the AML through the removal of horses "immediately," and the [Bureau's] September 2019 gather, which commenced less than a year after the 2018 decision, likely falls within the "discretionary space" the statute affords to the Bureau to act "immediately." *W. Rangeland Conservation Ass'n*, 265 F. Supp. 3d at 1284.

The Court does not doubt that there is some limit on how long a single gather determination may meaningfully apply. The problem FOA faces in this case, however, is that it has merely challenged the December 2018 ROD and EA, and it has not amended or supplemented its complaint to challenge the current plan. As a result, the administrative record is limited to the [Bureau's] December 2018 actions, and the Court cannot conclude that FOA is likely to prevail in showing that it was unreasonable or contrary to law for the [Bureau] in December 2018 to authorize a series of gathers over a period of approximately 30 months.

548 F. Supp 3d at 59–60.

Other statutory clues further support the Court's conclusion in *FOA II* that the term "immediately" requires that the agency promptly begin the process of removing excess animals but does not require that it complete that process "without interval of time," *Immediately*, Webster's Third New International Dictionary 1129 (1993).  For one, the statute requires the Bureau to "immediately remove excess animals," but does not require that it "immediately remove [*all*] excess animals."  16 U.S.C. § 1333(b)(2).  That omission is notable because, in the very next sentence, the statute requires that the Bureau continue to act "until *all* excess animals have been removed."  *Id.* (emphasis added).

The word "until" itself contemplates the passage of time—it means "up to the time that," *Until*, Webster's Third New International Dictionary 2513 (1993).  And by directing that the Bureau proceed in the "*order and priority*" specified in the WHA "until all excess animals have been removed," the statute necessarily contemplates that the Bureau will take a step-by-step approach over a period of time.  *See* 16 U.S.C. § 1333(b)(2) (emphasis added).  The Bureau must first destroy "old, sick, [and] lame" wild horses.  *Id*. § 1333(b)(2)(A).  It must then capture and remove healthy horses and find "qualified individuals" to adopt those animals.  *Id.* § 1333(b)(2)(B).  And, finally, if and only if those efforts are insufficient, the Bureau must destroy any remaining, excess animals.  *Id.* § 1333(b)(2)(C).  To take just one hypothetical example of the delay this process could contemplate, imagine that the Bureau initially rounds up 200 horses, doing its best to round up only the sick and lame ones but ultimately gathering only 50 that are sick or lame, while observing that other sick and lame horses remain on the range.  To satisfy the statutory mandate, the Bureau could gather as many of those additional sick or lame horses in a successive gather before it proceeded to the next step in the required "order and priority"—that is, placing the additional horses up for adoption.

44

FOA disagrees with this reasoning and argues that the statute permits only those gathers that proceed "immediately" after the Bureau determines that an overpopulation exists and that action is necessary to remove excess animals. Dkt. 116 at 27. In support, it invokes another decision from this Court, *Friends of Animals v. Culver*, 610 F. Supp. 3d 157, 170–71 (D.D.C. 2022). In that case, Judge Kollar-Kotelly agreed with FOA that "ten years . . . simply cannot mean, as a matter of the plain language of the WHBA, 'immediately.'" *Id.* at 171. In *Culver*, FOA challenged a 2019 decision approving a phased removal of excess horses from the Twin Peaks HMA over a ten-year period. *Id.* at 165. The Bureau had conducted a survey in 2019 that revealed 2,338 wild horses, which far exceeded the HMA's AML. *Id.* In November 2019, after issuing an EA, the Bureau approved the plan to "gather and remove as many excess wild horses . . . as feasible . . . for a period of 10 years from the initial gather until low AML [448 horses and 72 burros] is reached." *Id.* at 165. For almost three years afterwards, however, BLM did not plan for an initial gather. *Id.* at 166.

Before the first gather occurred in July 2022, FOA challenged the ten-year plan, raising many of the same arguments it raises now. In Judge Kollar-Kotelly's view, FOA's contention that the WHA requires the Bureau to "immediately remove excess animals" sufficed, and she granted summary judgment in FOA's favor on that ground alone. *Id.* at 171. She reasoned that the word "immediately" means "without delay" or "instant" and that, accepting this definition, "ten years . . . simply cannot mean . . . 'immediately.'" *Id.* at 169, 171 (quoting Black's Law Dictionary). She was also unconvinced by the dessert analogy discussed in *FOA II*. *Id.* at 170.

Ultimately, however, there is far less daylight between *Culver* and *FOA II* than FOA suggests. *FOA II* did not read the word "immediately" out of the statute. To the contrary, the Court observed that the WHA "requires the [Bureau] to remove wild horses promptly after

deciding that 'an overpopulation exists'" and to "make progress toward AML through the removal of horses 'immediately'" and that there is no doubt that the WHA imposes "some limit on how long a single gather determination may meaningfully apply." *FOA II*, 548 F. Supp. 3d at 60. But, in the Court's view, FOA was unlikely "to prevail in showing that" the Bureau acted "unreasonably or contrary to law" by authorizing "a series of gathers over a period of approximately 30 months." *Id.* Similarly, although *Culver* holds that "immediately" unambiguously means "without delay" or "instant" and that "ten years . . . cannot mean . . . 'immediately,'" the Court also observed that the term "must be construed to mean that that '[the Bureau] may only delay necessary removal actions insofar was necessary to plan and execute the action safely and effectively.'" 610 F. Supp. 3d at 170 (quoting *W. Rangeland*, 265 F. Supp. 3d at 1285). The most substantial problem that the Bureau faced in that case—which it also faces here—was that it did not even "'propose that it [would] need all ten years to achieve AML in the first instance,'" much less that it could only "safely and effectively" achieve AML over such a lengthy period of time. *Id.* (citation omitted).

Nor did the result in *Culver* depart, in practical effect, from the Court's holding in *FOA II* that FOA was unlikely "to prevail in showing that" the Bureau acted "unreasonably or contrary to law" when it authorized "a series of gathers over a period of *approximately 30 months*." 548 F. Supp. 3d at 60 (emphasis added). In particular, in addressing remedy, *Culver* observed that the Bureau's "legal error [was] relatively minor" and that "vacatur of the" ten-year gather plan "would harm the ecological interests that the Decision [was] necessary to protect." 610 F. Supp. 3d at 172. Even more to the point, *Culver* observed that "it appears likely that [the Bureau] can both accomplish its statutory duties while reducing the time period for the completion of those duties." *Id.* at 173. The Court, accordingly, remanded the case without vacatur. The Bureau

then, unimpeded by a judicial decision, proceeded with the initial gather—*approximately 32 months* after the agency decided that an overpopulation existed and that it was necessary to remove excess animals.  *Id.* at 165–66; *see also* Bureau of Land Mgmt., *2022 Twin Peaks Herd Management Area Wild Horse and Burro Gather*, https://www.blm.gov/programs/wild-horse-and-burro/herd-management/gathers-and-removals/northern-california-do/2022-twin.[4]  Notably, that was the first gather conducted pursuant to the plan at issue in *Culver*.  Here, in contrast, the Bureau commenced initial gathers pursuant to all four of the ten-year plans within *17 months* of issuance of the plan.  See Dkt. 52 at 2.  FOA, moreover, is not challenging those initial gathers. *See* Dkt. 116 at 52–53 n.10; Dkt. 123 at 32.

For these reasons, and for the reasons set forth in *FOA II*, the Court remains unconvinced that the WHA requires the Bureau to achieve AML "immediately" after deciding that it is necessary to remove excess animals and, even more importantly, that the agency's failure to plan to act with sufficient dispatch requires setting aside the gather plan—thereby *delaying* any such removal.  Plaintiff's position that the term "immediately" should be construed to require a new NEPA analysis, a new notice and comment period, and a new opportunity for administrative review for each and every gather is at odds with the most natural reading of the word and with the statutory purpose to ensure that excess horses are in fact removed *without* undue delay. Indeed, the Court is guided by the D.C. Circuit's observation that "Congress judged that prompt action was needed to redress the imbalance [on the range] that had developed" and thus "directed that excess horses should be removed *expeditiously*."  *Am. Horses Prot. Ass'n, Inc. v. Watt*, 694 F.2d 1310, 1316 (D.C. Cir. 1982).  That does not mean that a staged gather plan is necessarily

---

[4] The Court takes judicial notice of information posted on the official website of a government agency.  *See Pharm. Rsch. & Manufacturers of Am. v. United States Dep't of Health & Hum. Servs.*, 43 F. Supp. 3d 28, 33 (D.D.C. 2014).

unlawful, as FOA urges, but nor does it mean that the Bureau is free to take an entire decade to act, as the Bureau suggests.

**e.**

FOA's final textual argument is its most persuasive.  The operative statutory text authorizes—and requires—the Bureau to remove excess animals from the range "so as to *achieve* appropriate management levels," and it directs that the Bureau follow the specified "order and priority" "*until* all excess animals have been removed."  16 U.S.C. § 1333(b)(2) (emphasis added).  But, as FOA argues, the four ten-year plans purport to "authorize the continued removal of wild horses, even after excess animals have been removed and AMLs have been achieved."  Dkt. 116 at 32.  FOA is correct on both the facts and the law.

To start, FOA is correct that each of the ten-year plans at issue purports to authorize the Bureau to "return periodically" to the range, even after *achieving* AML, "to gather and remove remaining excess wild horses to *maintain* AML . . .  over a period of ten years from the initial gather operation."  Dkt 124 at 161 (Eagle Complex) (emphasis added); see also Dkt. 124-1 at 99, 110 (Muddy Creek); Dkt. 124-2 at 42 (Pine Nut); Dkt. 124-3 at 152 (Onaqui).  The Bureau contemplates, moreover, that this process will require it to "adjust[]" "target removal number[s]" "based on population inventories . . . that identify the remaining number of excess animals over AML."  Dkt. 124 at 161 (Eagle Complex); *see also* Dkt. 124-1 at 110; Dkt. 124-3 at 153.  It is far from evident how this "maintenance" process differs from the type of "excess animal" determination for which the Act establishes a process that is informed by the Bureau's review and consideration of the specified sources of information.  *See* 16 U.S.C. § 1333(b)(2).  Although the Bureau refers to these gathers as "maintenance" gathers, they are—in fact—gathers based on

new determinations that "an overpopulation exits" in the HMA and that "action is necessary to remove excess animals." *Id*.

FOA is also correct on the law.  Although section 1333(a) requires the Bureau "to achieve and maintain a thriving natural ecological balance on the public lands," the provision at issue for present purposes, section 1333(b)(2), says nothing about "maintenance."  And, more importantly, it authorizes the Bureau to remove excess animal only to the extent needed "to achieve appropriate management levels" and only "until all excess animals have been removed so as to restore" the range.  *Id*. § 1333(b)(2).  As noted above, the word "until" means "up to the time" that the excess animals have been removed—not after that time and for the next several years.  To hold otherwise, moreover, would upset the broader statutory scheme, which requires that the Bureau conduct its "management activities . . . at the minimal feasible level," "in consultation with [state] wildlife agenc[ies]," based on "the recommendations of qualified scientists," *id*. § 1333(a), and the Bureau's consideration of "all information currently available to" it, *id*. § 1333(b)(2).  The Bureau might conclude based on that input, for example, that "other options (such as sterilization, or natural controls on population levels)" or fertility controls would constitute the "minimal feasible level" of management necessary to "maintain a thriving natural ecological balance" and that it is not "necessary to remove excess animals" after achieving AML.  *Id*. § 1333(b)(1)–(2).  And, finally, the Bureau cannot plausibly point to exigent circumstances or practical hurdles to justify its need to act years down the road.

In short, despite the implication that a "maintenance" gather merely preserves the status quo, a decision to conduct a gather *after* the Bureau has already achieved AML and *after* the herd has once again grown to the point that "an overpopulation exists," constitutes a

determination that a *new* "overpopulation exists" and that a *new* "action is necessary to remove [the] excess animals," *id.* § 1333(b)(2).

*   *   *

In sum, then, the Court construes the WHA to permit the Bureau to adopt gather plans that contemplate conducting a staged gather over a period of time but, at the same time, to require that the Bureau conduct the required gathers as promptly as reasonably possible after making a necessary-to-remove-excess-animals determination pursuant to section 1333(b)(2); that after those gathers achieve AML, the Bureau return to the processes required by section 1333(b)(2) before authorizing future gathers; that it base each new necessary-to-remove-excess-animals determination on current information and meaningful consultation with federal, state and independent experts; and that it not ignore material, new information that comes to its attention over time.

### 2.    *Application to Ten-Year Plans*

FOA does not challenge any of the initial gathers conducted under the four ten-year plans at issue in this case.  It does, however, challenge the plans to the extent they authorize future gathers.  The Court agrees in part and disagrees in part with FOA's arguments.

For the reasons above, the Court is unpersuaded that the plans are facially unlawful merely because they authorize multiple gathers over a period of years.  Here, however, the plans do more than that, and, to the extent that they purport to authorize further gathers after the plan has achieved AML, they violate the WHA and the APA.  Similarly, although the line is more difficult to draw based on the existing record, the plans are also unlawful to the extent that they authorize future gathers that are not conducted as promptly as reasonably possible or that authorize future gathers even where, by the time those gathers occur, the Bureau knows (or has

reason to know) that they are based on information or consultations that are materially out-of-date—*e.g.*, they are based on severe drought conditions that no longer exist.  In short, the Bureau may not grant itself carte blanche to conduct gathers many years from now, without regard to the statutory requirements.  But because the Bureau is better situated than the Court to draw those lines in the first instance, the Court will remand the matter to the Bureau, which can revise the RODs to clarify which future gathers will require further process before they can proceed.  *See Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 549 (1978).  To better understand the scope of this holding, the Court will briefly describe the relevant provisions of the four ten-year plans at issue.

In July 2018, the Bureau approved the proposed agency action detailed in the Muddy Creek Wild Horse Herd Management Area Gather Plan.  Dkt. 124-1 at 233.  That plan "allow[s] for an initial gather and follow-up maintenance gathers to be conducted over the next 10 years from the date of the initial gather operation to achieve and maintain appropriate management levels."  *Id.* at 99.  Specifically, the Bureau "determined that 120 to 148 excess wild horses . . . need[ed] to be removed beginning in 2018 in order to achieve the established AML [and to] restore a thriving natural ecological balance," amongst other goals.  *Id.* at 101.  The plan authorizes the Bureau to "gather and remove approximately 66% of the existing wild horses (approximately 148 animals . . . in the initial gather) *and [to] return periodically to gather excess wild horses to maintain AML* . . . over a period of ten years from the date of the initial gather operation."  *Id.* at 110.  Notably, the plan contemplates that even after achieving AML, the Bureau will conduct "subsequent maintenance gather activities," although the timing of those maintenance gathers will turn on budgetary restrictions and "competing priorities."  *Id.* at 111.  "[T]he target removal number" for the periodic maintenance gathers, moreover, "would be

adjusted . . . based off [intervening] population inventories for the HMA and the resulting

projection of excess animals over AML." *Id.* at 110.  In short, the plan purports to authorize

future gathers, after AML is achieved, the scope of which will be based on inventories and

projections that do not yet exist.

In August 2018, the Bureau issued a ROD for the Eagle Complex HMAs (Eagle,

Chokecherry, and Mt. Elinore HMAs) that adopted a combination of the proposed actions and an

alternative described in the Eagle Complex EA.  Dkt. 124 at 162.  Under that plan, the Bureau

will "gather and remove approximately 90% of the existing wild horses (approximately 2,075)

and return periodically to gather and remove remaining excess wild horses to achieve *and*

*maintain* AML."  *Id* (emphasis added).  Like with the Muddy Creek decision, if the initial gather

achieved AML, the Bureau would conduct "subsequent maintenance gather activities would be

conducted in a manner consistent with those described for the initial gather" and the timing of

those maintenance gathers could be affected by budgetary limitations and "competing priorities."

*Id.* at 31.  The plan authorizes these maintenance gathers "over the . . . ten year" period following

the initial gather, and new "[p]opulation inventories and routine resource/habitat monitoring

would be conducted between gather cycles to document current population level, growth rates,

and areas of continued resource concern."  *Id.* at 30–31.

In December 2018, Bureau issued a ROD for the Onaqui Mountain HMA.  Dkt. 124-3 at

151.  Under this plan, the Bureau will "achieve AML by removing approximately 465 wild

horses inside and adjacent to the HMA in an initial gather."  *Id.* at 152.  "Following the initial

gather," moreover, the Bureau will "return periodically over a period of ten years to maintain

AML by removing excess wild horses and by administering the fertility control vaccine[s]" of

PZP and GonaCon-Equine.  *Id.* at 152.  Like the other two plans, the Onaqui Mountain ROD

specified not only that "[i]f gather efficiencies during the initial gather do not allow for the attainment of the proposed action (*i.e.*, not enough horses are successfully captured to reach low AML), the BLM would return to remove excess horses above AML," *id.* at 173, but also that "follow-up gathers, as frequently as needed, would be conducted over a 10-year period to remove any additional wild horses necessary to *maintain* the wild horse population at AML," *id.* at 174 (emphasis added).  And, as with the Muddy Creek and Eagle Complex plans, the Onaqui Mountain plan contemplates basing these maintenance gather decisions on "adjusted" removal number derived from "updated population inventories for the HMA" and updated "projection[s] of excess animals over AML." *Id.*

In November 2017, the Bureau issued a ROD for the Pine Nut Mountains HMA.  Dkt. 124-2 at 235.  Although the plan approved in that ROD is less detailed than the other three plans, presumably because it came first, it authorizes the Bureau to conduct an initial gather of approximately 500 excess horses. *Id*.  Like the other plans, however, it not only authorizes an initial gather to attain AML, but also authorizes maintenance gathers over the next ten years. *Id.* at 23, 42.  And like the other plans, it contemplates that the Bureau will conduct a further inventory following the initial gather. *Id.* at 34.

Notably, each of these RODs contemplates conducting further gathers after achieving AML over a period of ten years, without making (or renewing) the required "overpopulation" and "necess[ity]" determinations, without engaging in any renewed consultation, and without committing to consider each of the sources of information listed in section 1333(b)(2), or, in the alternative, considering "all information currently available to" the Bureau.  16 U.S.C. § 1333(b)(2).  Moreover, although less clear, each of the plans appears to leave the Bureau unlimited discretion to conduct gathers intended to achieve AML at any time over the next

decade; each proposes a relatively early date for the "initial gather," but they recognize that further gathers (to be conducted at unspecified times, based on unspecified information and consultation) may be needed to achieve AML.

Accordingly, although the Court is persuaded that the Bureau is entitled to some leeway with respect to when it may conduct its initial gathers, and even subsequent gathers designed to achieve AML in the first place, the Court concludes that the plans exceed the Bureau's authority under the WHA to the extent they authorize new gathers—after achieving AML—without making new determinations under section 1333(b)(2), and to the extent they provide the Bureau with carte blanche to continue initial gathers for many years to come, notwithstanding the duty to act promptly and to ensure that gather decisions are informed by current information and consultation.  The Court will, therefore, vacate the RODs to the extent that they authorize the Bureau to conduct additional gathers after achieving AML.  *See Finnbin, LLC v. Consumer Prod. Safety Comm'n*, 45 F.4th 127, 136 (D.C. Cir. 2022) ("Successful challenges to one aspect of a rule yield partial vacatur unless there is 'substantial doubt' that the agency would have left the balance of the rule intact.").  The Court will otherwise remand the case to the Bureau to adopt reasonable limitations regarding when (and with what information in hand) it may conduct follow-on gathers before achieving AML.[5]

3.      *Application to the July 2021 Onaqui Roundup*

FOA also argues that the Bureau unlawfully removed horses from the Onaqui Mountain HMA in 2021.  In *FOA II*, the Court held that "FOA ha[d] not shown that it [wa]s likely to

---

[5] For the Muddy Creek HMA, the Bureau achieved AML in its first gather.  It removed 153 wild horses to bring the population down to 76 to 100 wild horses, which was within the AML range of 75 to 125.  Dkt. 112-2 at 3 (Warr Decl. ¶ 7).  In light of the Court's partial vacatur, therefore, the Muddy Creek Decision does not authorize any additional gathers.

prevail on" an earlier version of this claim "[b]ecause only about 30 months ha[d] passed since the Bureau issued its December 2018 ROD and because the Bureau ha[d] yet to achieve its 'initial' goal of reducing the herd size to the low end of AML, [so] the upcoming gather [wa]s reasonably viewed as a continuation of the Bureau's initial gather, which was supported by current excess and necessity determinations." 548 F. Supp. 3d at 59. That decision, however, considered only FOA's facial challenge to the Onaqui Mountain HMA ten-year ROD. Because FOA has amended its complaint to include an as-applied challenge to the gather, and because the Court now has before it an administrative record relating to the Bureau's decision, it must consider whether the gather was conducted in compliance with the WHA.

FOA argues that the 2021 gather violated the WHA because the Bureau "(1) . . . did not issue a specific determination in 2021 that there was an overpopulation of wild horses and removal was necessary; and (2) . . . did not consult with independent parties about the 2021 Onaqui Roundup before it removed wild horses." Dkt. 116 at 48–49. Neither contention is persuasive. As explained above, the WHA does not require a new excess and necessity determination for every gather; staged gathers are permissible. Consultation, in turn, may be required for an excess and necessity determination, but it is not required for each gather. *See supra* Part III(B)(1)(c). To be sure, FOA would have a point if the 2021 Onaqui Mountain HMA gather occurred after the Bureau had already achieved AML—that is, after it had already redressed the overpopulation that prompted its 2018 excess and necessity determination—or if Bureau delayed unreasonably before commencing or continuing the gather. But that is not what happened.

The AML range for the Onaqui Mountain HMA is 120–210 wild horses. Dkt. 124-3 at 169. In December 2018, BLM produced an EA that estimated the then-current wild horse

population was 510 and that anticipated that the population would grow to about 589 by the time

a gather could take place in 2019.  Dkt. 124-3 at 173.  On December 14, 2018, the Bureau used

those estimates to determine, pursuant to section 1333(b)(2), that "[e]xcess wild horses currently

exist within and adjacent to the HMA" and that "[r]emoval of excess wild horses is necessary to

achieve a TNEB" (thriving natural ecological balance).  *Id.* at 153.  The ROD, accordingly,

authorized the "remov[al] [of] approximately 465 wild horses inside and adjacent to the HMA in

an initial gather."  *Id.* at 152.

Nine months later, the Bureau initiated its first gather pursuant to the December 2018

ROD, resulting in the removal of 241 horses in September 2019.  Dkt. 52 at 2; Dkt. 64-10 at 2

(Gates Decl. ¶ 4) (S.A.R. 236).  The Bureau removed another nine horses on October 8, 2019.

Dkt. 114 at 50 (Answer ¶ 372).  In July 2020 and August 2020, it removed another two and

seven horses, respectively.  *Id.*  In short, nine months after the Bureau issued its Onaqui

Mountain HMA ROD, it had commenced the required gather, and as of August 2020, it had yet

to reach AML.  Dkt. 64-10 at 2 (Gates Decl. ¶4) ("At the completion of th[e] [2019–2020] gather

the HMA was and is still over two times above the specified AML.").

Five months later, the Bureau began planning for the subsequent stage of this gather,

which would start in July 2021.  *See e.g.*, Dkt. 68-1 (S.A.R. 239); Dkt. 68-2 at 2 (S.A.R. 240).

Significantly, the Bureau was still striving to achieve AML in the first instance; it was not

conducting a "maintenance" gather after having achieved AML.  *See* Dkt. 68-5 at 3 (HQ-261

Gather Request Matrix) (S.A.R. 243) (describing the proposed gather as part of a multi-phased

gather that would bring the population down to high end AML).  The Bureau planned to gather

approximately 400 wild horses, removing 296, and releasing 104 back after treating some of

those horses with fertility vaccines.  Dkt. 124-4 at 30.  Ultimately, it gathered 435 wild horses

and returned 123 of those horses to the range.  Dkt. 77 at 52 (TAC ¶¶ 377, 381); Dkt. 114 at 50–

51 (Answer ¶¶ 377, 381).  Overall, the record illustrates that the Bureau worked consistently and

with reasonable dispatch to remove the excess wild horses on the Onaqui Mountain HMA over a

period of 31 months.  Moreover, even after conducting the July 2021 gather, the HMA remained

above AML (or, on Plaintiff's telling, Dkt. 116 at 13, within—but certainly not below—AML).[6]

The Court, accordingly, concludes that the July 2021 Onaqui Mountain HMA gather constitutes

a permissible continuation of the initial gather lawfully authorized in the ROD.

 Plaintiff, nonetheless, argues that the gather was unlawful because conditions had

changed since December 2018 such "that there was not an overpopulation of wild horses and

removal was not necessary prior to the 2021 Onaqui Roundup."  Dkt. 116 at 51.  In support of

this contention, FOA offers the declarations of wildlife ecologists Craig Downer, Dkt. 116-1, and

Erik Molvar, Dkt. 116-2.  These documents were not considered by the Bureau when it

authorized the July 2021 gather and are thus outside the administrative record.  As a result,

Plaintiff's reliance on this evidence "runs counter to the principle that judicial review of an

administrative action is just that—a review of the administrative action the agency took based on

what was before it at the time it acted."  *Open Soc'y Inst. v. U.S. Citizenship & Immigr. Servs.*,

573 F. Supp. 3d 294, 307 (D.D.C. 2021) (citation omitted).  Plaintiff recognizes that courts

consider extra-record evidence in APA cases only in extraordinary circumstances, but it argues

that doing so is justified here because the declarations offer "background information [that] is

needed to determine whether BLM considered all relevant factors."  Dkt. 123 at 35.  The Court is

unpersuaded.  FOA could have offered this evidence before the agency acted—and, indeed,

---

[6] Although Plaintiff disagrees with some of the Bureau's numbers, it does not challenge the July
2021 gather on the ground that the Bureau gathered more horses than authorized in the ROD or
left the herd size at a level *below* AML.

Downer sent the Bureau a conclusory and uninformative email in early March 2021.  Dkt. 124-4

at 31.  Under these circumstances, and where the Bureau had thoroughly evaluated the Onaqui

Mountain HMA in December 2018, the Court cannot conclude that FOA has "demonstrate[d]

unusual circumstances [sufficient to] justify[] a departure from the general rule."  *City of Dania*

*Beach v. FAA*, 628 F.3d 581, 590 (D.C. Cir. 2010) (citation omitted).

    But even if the Court were to consider this extra-record evidence, it would not make a

difference.  The Downer declaration is unduly conclusory, merely asserting that there were

"thousands of sheep" but "not an excess number of wild horses," without offering any details or

observations that provide reasoning to support that conclusion.  Dkt. 116-1 at 7 (Downer Decl.

¶ 21).  The Molvar declaration, in turn, reflects his personal observations of the forage conditions

during visits to the Onaqui Mountain HMA, which led him to doubt Bureau's explanation that

there was insufficient forage to sustain the herd during a draught.  Dkt. 116-2 at 4.  But Molvar's

declaration is undercut by his own assertion that he "document[ed] extreme overgrazing by cattle

in areas of the Onaqui Mountain HMA," *id.* at 4 (Molvar Decl. ¶ 11), and found the wild horses

were constrained to certain areas based on the limited grazing conditions, *id.* at 9.  His

observations regarding how forage was distributed between livestock and wild horses, moreover,

address a separate issue of allocation, which is also within the Bureau's domain, but that is not at

issue in this case and does not bear on whether the findings contained in the 2018 ROD were

somehow outmoded by the time the July 2021 gather occurred.  *See* Dkt. 120 at 33.  As the

Bureau noted when these arguments were raised during the preliminary injunction briefing, after

the authorization but before acting, the Bureau's expert assessments disputed Mr. Downer's

characterization of the sheep and explained that it was also taking action with respect to livestock

but that did not void the need to remove wild horses. Dkt. 64-10 at 6–8 (Gates Decl.).

The Court, accordingly, concludes that the July 2021 Onaqui Mountain HMA gather constituted a reasonable continuation of the initial gather authorized in the December 2018 ROD.

## C.     National Environmental Policy Act

Next, FOA challenges each of the RODs under NEPA, arguing that the Bureau should have concluded that the proposed ten-year plans would have significant effects on the environment and, thus, should have prepared an Environmental Impact Statement.  Dkt. 116 at 43.  As discussed above, the Bureau prepared an EA for each ROD, which examined the potential consequences of the decisions and issued a Finding of No Significant Impact—or FONSI—as to each.  Dkt. 124 at 18; Dkt. 124-1 at 96; Dkt. 124-2 at 13; Dkt. 124-3 at 163.

As the Court explained in *FOA II*:

> When reviewing NEPA challenges, the Court's task "is not to 'flyspeck'" the Bureau's "environmental analysis for 'any deficiency no matter how minor.'"  *Sierra Club v. FERC*, 827 F.3d 36, 46 (D.C. Cir. 2016) (quoting *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 75 (D.C. Cir. 2011)).  Instead, the Court's job is "simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary and capricious."  *Id.* (quoting *Balt. Gas & Elec. Co.*, 462 U.S. at 97–98, 103 S.Ct. 2246).  This does not mean that "[j]udicial review of an agency's [FONSI] is . . . merely perfunctory;" rather, "the [C]ourt must [e]nsure that the agency took a hard look at the environmental consequences of its decision."  *Sierra Club v. Peterson*, 717 F.2d 1409, 1413 (D.C. Cir. 1983) (internal quotation marks omitted).  When evaluating whether an agency discharged its duty by issuing an EA and a FONSI, the D.C. Circuit considers whether the agency's NEPA analysis: (1) identif[ies] accurately the relevant environmental concerns, (2) take[s] a hard look at the problem in preparing its Environmental Assessment, (3) ma[kes] a convincing case for any finding of no significant impact, and (4) show[s] why, if there is an impact of true significance, there are sufficient changes or safeguards in the project to reduce the impact to a minimum, which would obviate the need for an Environmental Impact Statement entirely.  *Am. Rivers v. FERC*, 895 F.3d 32, 49 (D.C. Cir. 2018); *see also Peterson*, 717 F.2d at 1413.

*FOA II*, 548 F. Supp. 3d. at 63–64.

FOA challenges the Bureau's FONSIs on three grounds.  First, it argues that Bureau failed to take a "hard look" at the long-term effects of fertility control measures.  Dkt. 116 at 44.  Second, it argues the Bureau failed adequately to consider the genetic diversity and viability of the herds.  *Id.* at 45–46.  Third, it argues the Bureau failed to consider how free-roaming wild horses support the ecosystem.  *Id.* at 47.  None of these arguments is persuasive.

First, the Bureau did, in fact, take a "hard look" at the long-term effects of the fertility control measures, and it reasonably concluded that the ten-year plans would have no significant impact.  The EAs each provide a meaningful discussion of the proposed fertility control measures.  Dkt. 124 at 57–81; Dkt. 124-1 at 139–56; Dkt. 124-2 at 87–107; Dkt. 124-3 at 196–202, 209–220.  FOA claims that certain long-term implications of changes in the horses' social behavior associated with PZP are unknown and that potential permanent infertility consequences of GonaCon are unknown.  Dkt. 116 at 44.  But this is just the type of "flyspecking" that D.C. Circuit precedent does not permit, at least where, as here, the agency has considered the question.  The Eagle Complex EA, for example, discussed multiple studies showing that although there are effects on mare behavior as a result of the lack of pregnancy, the effects are not adverse and "did not demonstrate any long-term negative consequence."  Dkt. 124 at 63.  FOA's assertion that the Bureau admits the "[l]ong-term implications of these changes in social behavior are currently unknown," ignores the remainder of the sentence in which the Bureau concluded: "but no negative impacts on the overall animals or populations welfare or well-being have been noted in these studies."  *Id.* at 64; *cf. In Defense of Animals v. U.S. Dep't of the Interior*, 751 F.3d 1054, 1070–71 (9th Cir. 2014) (rejecting a similar NEPA challenge to PZP).

As for GonaCon, the Bureau also took the requisite "hard look" at "long-term infertility" observed by the Killian (2008) study, which found greater infertility rates for the next *three*

years, but also considered the Baker (2017) study, which "observed a return to fertility over *4 years*" unless given a booster dose.  *Id.* at 72.  The Bureau also described other studies—Elhay (2007), Donovan (2013), Schulman (2013)—finding that the anti-GnRH vaccines have reversible effects.  *Id.*  This analysis adequately supported the Bureau's FONSI determination with respect to this question, as did the similar analysis in the EAs for Muddy Creek, Pine Nut, and Onaqui.  *See* Dkt. 124-1 at 151–52, 146–47; Dkt. 124-2 at 91–93, 99–100; Dkt. 124-3 at 198–99, 211–12.

Second, the EAs also adequately addressed genetic diversity.  Discussing the 2018 Onaqui Mountain HMA ROD in *FOA II*, the Court explained:

> The EA also considered genetic diversity and the anticipated effects of population control on "long-term population growth."  Dkt. 46-2 at 308–09.  The most recent genetic study of the Onaqui HMA herd occurred in 2005 and revealed low heterozygosity in the herd.  *Id.* at 308.  Although this study was arguably outdated in 2018, the Court concludes that the genetics analysis was nevertheless sufficient for two reasons.  First, the BLM manages the Onaqui herd as part of a larger meta-population of wild horses across HMAs.  *Id.*  Therefore, even if the genetic diversity of one herd, like the Onaqui herd, is low, it can be bolstered with influx from other herds.  That raises the second point: the same 2005 study that found low heterozygosity in the Onaqui herd recommended that "2 or 3 mares from any other herd" be added to bolster the Onaqui population's genetic diversity.  *Id.*  The Bureau not only did this, it went well beyond, and introduced eighteen mares and six stallions to the Onaqui Mountain HMA between 2005 and 2018.  *Id.*  "Therefore . . . the expectation is that by now the Onaqui herd has a much higher level of heterozygosity, and still has high levels of allelic diversity."  *Id.*  Although FOA is surely correct that a more recent genetic assessment would have strengthened the 2018 EA's analysis, BLM's judgment as to the genetic health of the population implicates its expert judgment.  And given that the December 2018 EA was drafted with the goal of reducing the population to 121 animals in 2019, FOA offers no reason to believe that taking longer to do so, and instead reaching that goal in 2021, would have a greater effect on the herd's genetics.

*FOA II*, 548 F. Supp. 3d. at 64.  The Court continues to adhere to this conclusion, which it adopts here.  The same holds true, moreover, for the similar considerations of genetic diversity set forth in the other EAs.  The Pine Nut Mountains HMA ROD provides that "[w]hen analysis indicates low diversity[,] a few young horses from other HMAs or areas outside of the HMA would be

released along with animals identified for release back into the HMA." Dkt. 124-2 at 86. The

Eagle Complex and Muddy Creek RODs make the same point. Dkt. 124 at 34; Dkt. 124-1 at

132. With respect to the Pine Nut Mountains HMA, FOA argues that the Cothran study said

"any loss could be detrimental," but it once again cuts the relevant sentence short, failing to

include the study's observation that "[t]he proposed AML is high enough to keep future loss of

variation within an acceptable range." Dkt. 124-2 at 306. As for FOA's objection that the

Bureau failed to consider the impact of translocated horses, the Court notes that not only do the

RODs set up monitoring protocols for continued assessment of genetic diversity but, in addition,

the EAs discuss scientific studies supporting the introduction of additional mares to alleviate

inbreeding concerns. *See e.g.*, Dkt. 124 at 34, 65; Dkt. 124-1 at 131; Dkt. 124-2 at 93; Dkt. 124-

3 at 200.

       Third, the Court concludes that the Bureau adequately considered the environmental

effects of simply leaving the wild horses unbothered. It may be that wild horses have some

positive effects on their ecosystem, but the Bureau analyzed a no action alternative in each EA

and reasonably concluded that, on the whole, that alternative was not preferable. Among other

environmental consequences, the Bureau noted: "there would be a steady increase in wild horse

numbers for the foreseeable future, which would continue to exceed the carrying capacity of the

range[, so i]ndividual horses would be at greater risk of death by starvation and lack of water,"

Dkt. 124 at 82; "habitat conditions for all special status animal species would continue to

deteriorate as wild horse numbers above the established AMLs further reduce herbaceous

vegetative cover and trample riparian areas, springs and stream banks," *id.* at 85; "overgrazing of

the present plant communities could lead to an expansion of noxious weeds and invasive non-

native species due deteriorating vegetative condition which makes the range more susceptible to

weed invasion and to the spread of weed infestations," *id.* at 89; *see also* Dkt. 124-1 at 136; 124-2 at 127, 129; Dkt. 124-3 at 220–22.

Finally, although FOA argues that the 2021 Onaqui Roundup "violated BLM's regulations and was a significant unexplained departure from BLM's policy and guidance" because the Bureau "did not conduct a site-specific NEPA document for the 2021 Onaqui Roundup," it does not argue that NEPA itself—as opposed to longstanding Bureau policy—required a new site-specific analysis in 2021.  Dkt. 116 at 51; *see generally* Dkt. 116.  In any event, such an argument would have little force.  As the Court held in *FOA II*, the 2018 Onaqui Mountain EA supports "subsequent, implementing action," so long as those actions were "contemplated and analyzed by the earlier [NEPA] analysis."  548 F. Supp. 3d. at 62.  Here, the gather that occurred in July 2021 was merely undertaken to complete the initial gather and to reach the goal set forth—and considered—in the 2018 Onaqui Mountain HMA ROD, EA, and FONSI.  *See generally* Dkt. 124-3 at 156–351 (FONSI and EA); *see also* Dkt. 68-5 at 3 (HQ-261 Gather Matrix) (S.A.R. 243).  Because the agency action taken in 2021 was contemplated by and analyzed in the 2018 EA, no further NEPA analysis was required.  As the D.C. Circuit observed in *Mayo v. Reynolds*, 875 F.3d 11, 20–21 (D.C. Cir. 2017), once an agency takes a "hard look" at the environmental consequences of a proposed, major federal action, "it is not required to repeat its analysis simply because the agency makes subsequent discretionary choices in implementing the program."

The Court will, accordingly, grant summary judgment to Defendants on the NEPA claims.

### D.     BLM Regulations and Policies

Finally, FOA argues that the Bureau acted arbitrarily and capriciously because its actions departed from its past policies.  Dkt. 116 at 34–43.  FOA raised essentially the same arguments in *FOA II*, and the Court rejected them there.  It does so again here.

*First*, FOA argues that the RODs "departed from the [H]andbook and applicable manuals' instruction that BLM shall issue roundup decisions 31 to 76 days before the proposed start date of the roundup, absent an emergency."  Dkt. 116 at 35.  As the Court explained in *FOA II*, this argument does not apply to the 2021 Onaqui gather because of "the Bureau's March 2019 'Permanent Instruction Memorandum,' which 'supersedes' the prior guidance and now directs authorized officers to 'issue removal decisions effective upon issuance . . . for situations where the removal is required . . . to preserve or maintain a thriving natural ecological balance and multiple-use relationship.'"  *FOA II*, 548 F. Supp. 3d. at 66 (quoting Bureau of Land Management, 2019 Permanent Instruction Memorandum (Mar. 15, 2019), https://www.blm.gov/policy/pim-2019-004).

Nor was the Court persuaded by this line of argument, as applied to the RODs themselves.[7]  To start, over the course of this litigation, FOA has never identified how, if at all, it was prejudiced by the Bureau's failure to start the gathers within 76 days of issuance of the RODs.  The guidance that FOA invokes "explains that the purpose of the rule 'is to provide an opportunity for administrative review of the decision,' Dkt. 46 at 14, and there is no reason to believe that FOA was denied that opportunity."  548 F. Supp. 3d at 66.  Under the APA's "rule of prejudicial error," 5 U.S.C. § 706, reviewing courts must consider whether the agency's error

---

[7] Even by FOA's own reasoning, the Muddy Creek ROD poses no issue, since the initial gather was commenced within the 76 days window.  Dkt. 52 at 2.

affected the outcome.  *See Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112,

1121 (D.C. Cir. 2010).  "The burden to demonstrate prejudicial error is on the party challenging

agency action."  *Id.*  Although that burden is "not . . . a particularly onerous requirement,"

*Shinseki v. Sanders*, 556 U.S. 396, 410 (2009), here, FOA has failed to offer any reason to

believe that it suffered any prejudice at all because the gathers did not begin with 76 days of

issuance of the RODs.  Moreover, even beyond that difficulty, FOA fails to explain why any

such delay should result in the invalidation of the RODs themselves; perhaps an interested party

might have sought to compel the Bureau to begin the gathers sooner, but the dates on which the

initial gathers started relate to the *implementation* of the RODs and not to their validity *ab initio*.

Nor is there any merit to FOA's more ambitious claim that the 31–76 days window is

intended to provide an opportunity for an administrative appeal before each "individual gather,"

even when that gather is part of a staged gather plan that was subject to administrative review.

Dkt. 116 at 36.  That contention is at odds with the plain language of the provision and past

practice.  In requiring the 31–76 days delay before "the proposed gather *start[s]*," Dkt. 124 at

281, the Handbook contemplates that a gather can take place over time, and the Handbook "says

nothing about when the gather must end," *FOA II*, 548 F. Supp. 3d at 67.  The point of the delay

is to provide an opportunity for "administrative review" before that gather begins, Dkt. 124 at

281, and where the gather plan anticipated a phased gather, which requires the Bureau to return

to the HMA on two or more occasions, those opposed to the plan will have the opportunity to

voice their concerns before the phased process begins.  Moreover, as the Court observed in *FOA

II*, "the guidance does not foreclose phased gathers, which are 'nothing new for [the] BLM,'."

548 F. Supp. 3d at 67 (quoting *Friends of Animals v. Pendley*, 523 F.Supp.3d 39, 57–58 (D.D.C.

2021)).  Although the Court also observed that the Bureau may have "somewhat overstate[d] the

historical pedigree of this practice," the Court identified at least three past examples of long-term gather plans. *Id.* Finally, "and even more to the point, it is clear that the BLM has frequently failed to commence gathers within 76 days of a decision based on myriad 'nigh-insurmountable administrative obstacles,'" undercutting FOA's contention that the four RODs at issue here mark a break with long-standing practice. *Id.* (quoting *W. Rangeland Conservation*, 265 F. Supp. 3d at 1291).

*Second*, FOA argues that "BLM departed from its policy of providing the public thirty days to review and comment on a site-specific NEPA document analyzing a proposed roundup." Dkt. 116 at 37. In *FOA II*, the Court rejected this argument, explaining (as applied to the Onaqui Mountain HMA) that the policy was satisfied by the Bureau's site-specific EA in the 2018 ROD, and that any future challenge would need to be brought based on specific facts, showing that the particular gather was not encompassed within the ROD's NEPA analysis. 548 F. Supp. 3d at 65. The only as-applied challenge that is brought is to the 2021 Onaqui gather, and the Court has already rejected this challenge in that context. *See supra* Part III(C).

*Third*, FOA argues that the Bureau's position in this case constitutes an "unexplained departure from past litigation positions." Dkt. 116 at 40. In particular, it argues that the Bureau represented in *Friends of Animals v. Haugrud*, 236 F. Supp. 3d 131 (D.D.C. 2017), "that BLM's policies prohibit it from issuing a decision that authorizes a series of roundups spanning multiple years" and that "conducting a roundup in the future without the public's knowledge is 'contrary to the BLM's own guidelines and policy.'" Dkt. 116 at 40–41 (citation and emphasis omitted). Here, however, the only implementing gather that FOA has challenged was the July 2021 Onaqui Mountain HMA gather, and, as this Court has previously explained, FOA received more than 30 days advance notice of that gather. *FOA II*, 548 F. Supp. 3d at 65 (citing Dkt. 64-3 at 2).

*Fourth*, FOA argues that the Bureau acted contrary to its Handbook because it "create[d] long-term plans under the guise of an implementation/roundup decision," yet the RODs and EAs fail to comply with the "distinct and separate" procedures for adopting long-term plans. Dkt. 116 at 37–38. The Court is unpersuaded. As the Court explained in *FOA II*:

> Essentially, FOA argues that the handbook's categories of land use plans, HMAPs, and gather plans, as well as the distinct requirements for issuing each, make little sense if a decision that is neither a land use plan nor an HMAP can have long-term consequences of the kind contemplated by the 2018 decision. Although FOA is correct that the handbook sets forth these categories, it is also clear that the Bureau has considerable flexibility in choosing which types of plans to use and what to put in them. The handbook, for example, contemplates that the Bureau could use an array of approaches to manage an HMA. It might, for example, use a land use plan, an EA, an established AML, and a gather plan. Dkt. 46 at 314. Or the Bureau might use an AML, an HMAP, and a gather plan. *Id.* Or some other combination. Thus, although the categories may offer useful organizational tools, the handbook and manual leave the authorized officer with considerable discretion in framing her decision. FOA points to nothing in either document that expressly forbids the authorized officer from issuing a long-term gather decision.

*FOA II*, 548 F. Supp. 3d. at 67. The arguments that Plaintiff raised in *FOA II*, moreover, are, if anything, less convincing now that the Court has invalided the RODs in part, thereby precluding the Bureau from relying on the RODs to authorize future "maintenance" gathers, conducted after it has achieved AML and the herd has grown to the point that a new "overpopulation exists," to conduct gathers long in the future, where the Bureau has failed to proceed with reasonable dispatch, or where new information calls into question the premises on which the RODs were based.

*Fifth*, FOA objects that the RODs are inconsistent with the land use plans for specific sites. Dkt. 116 at 41. It argues, in particular, that the Resource Management Plan ("RMP") governing Muddy Creek commits the Bureau "actively [to] seek the views of the public" and to prepare a HMAP. *Id.* at 41–42. But nothing about the Muddy Creek ROD prevented (or prevents) the Bureau from continuing to seek public

participation or from creating a HMAP. If FOA wants to challenge the Bureau's failures to do so, it can (perhaps) bring a separate challenge. *But cf. Leigh v. Raby*, No. 22-cv-34, 2022 WL 267353, at *6 (D. Nev. Jan. 28, 2022) (holding that plaintiffs were unlikely to succeed on the merits of their claim that a HMAP was required prior to implementing a gather plan).

Nor is the Court persuaded by FOA's argument that the Carson City RMP requires a further environmental review prior to implementing each gather within the Pine Nut Mountains HMA. *Id.* at 42. FOA is correct that an environmental review was required, but, absent changed circumstances not raised in this case, that requirement was satisfied by the Pine Nut Mountains EA. *See* Dkt. 124-2 at 13. The same is true with respect to FOA arguments relating to the Eagle Complex, and they fail for these same reasons. Dkt. 116 at 42. Finally, FOA argues that the Pony Express RMP, which governs the Onaqui Mountain HMA, requires that all wild horse roundups be evaluated on a case-by-case basis and that all decisions presented in the RMP be evaluated annually. *Id.* The RMP, however, operates at a high level of generality, and FOA fails to identify any specific requirement that the Bureau has failed to meet. *See* Dkt. 124-3 at 367. Based on the Court's review, moreover, only one provision of the RMP even arguably relates to this case, and that provision merely requires that the Bureau manage the herd size at a specified level (measured in Animal Unit Months), an issue that FOA does not raise here.

The Court will, accordingly, grant summary judgment in favor of the Bureau with respect to FOA's APA claims asserting that the agency departed from past policy without explanation.

**CONCLUSION**

For the foregoing reasons, the Court will (1) **DENY** the Bureau's motion for partial dismissal, Dkt. 112; (2) likewise **DENY** the State of Utah's motion for partial dismissal, Dkt. 113; (3) **GRANT** in part and **DENY** in part the Bureau's motion for summary judgment, Dkt. 112; (4) likewise **GRANT** in part and **DENY** in part the State of Utah's motion for summary judgment, Dkt. 113; and (5) **GRANT** in part and **DENY** in part Plaintiff's cross-motion for summary judgment, Dkt. 116.  The Court will also **PARTIALLY VACATE** the Muddy Creek, Eagle Complex, Pine Nut, and Onaqui Mountain Decision Records to the extent that they authorize the Bureau to conduct additional gathers after achieving AML.  The Court will otherwise **REMAND** the case to the Bureau to adopt reasonable limitations regarding when (and with what information in hand) it may conduct follow-on gathers before achieving AML for each of the four Decision Records.

A separate order will issue.


/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge


Date:  March 30, 2024